**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

Leo Ford and Boston Life and Annuity,

                Plaintiffs,

vs.

KPMG LLP; Belmont Insurance Management;
Casey McDonald; Kris Beighton; Andrea
Douglas; Greenberg Traurig, P.A.; Greenberg
Traurig, LLP; Jerome Hesch; GFAN; ABG;
Bancroft Property & Casualty, Ltd., (aka
Bancroft Life & Casualty, Ltd., and Bancroft
Life & Casualty ICC, Ltd.); Bradley Barros; and
Philip Sigel,

                Defendants.

Case No.: 9:16-cv-80618


**JURY DEMANDED**


## COMPLAINT

    Plaintiffs sue Defendants and allege:

### NATURE OF CASE

    1.    This action is predicated upon violations of the federal Racketeer Influenced and Corrupt Organizations Act, the Florida Racketeer Influenced and Corrupt Organizations Act, conversion, breach of fiduciary duty, fraud, breach of contract, tortious interference with existing contracts, and tortious interference with prospective economic advantage.

    2.    Defendants lawyers and accountants represented Plaintiffs and then, without informing Plaintiffs, conspired with the other Defendants to establish businesses competing with Plaintiffs and then stole Plaintiffs' clients using wire and mail fraud.

### PARTIES

    3.    Plaintiff Boston Life and Annuity ("Boston Life") is an insurance company.

Plaintiff Leo Ford is a principal with Boston Life.

4.      KPMG LLP is an accounting firm that represented Ford and Boston Life and subsequently the non-lawyer, non-accountant Defendants.  KPMG established Belmont Insurance Management to manage Boston Life.  McDonald, Beighton, and Douglas work for KPMG and Belmont.

5.      Greenberg Traurig LLP and Greenberg Traurig, P.A., are law firms that represented Ford and Boston Life and subsequently the non-lawyer, non-accountant Defendants.  Jerome Hesch is a lawyer with Greenberg Traurig.

6.      Brad Barros was a sales agent of Boston Life and is a principal of GFAN, ABG, and Bancroft Property and Casualty.  While still working for Boston Life and Ford, Barros conspired with the other Defendants to set up a business competing with Ford and Boston Life and then solicit and steal Ford's and Boston Life's products and clients.

## JURISDICTION

7.      Jurisdiction is predicated upon original jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is conferred under 28 U.S.C. § 1331 by virtue of 18 U.S.C. §§ 1961-1968 & 901(a), and the Court has pendant jurisdiction over the common law claims.

## VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the alleged events giving rise to the original claim occurred and continue to occur in this District.  Defendants conduct business in this District and/or reside in this District.  Defendants' fraudulent activities occurred within this District.

## INTERSTATE AND FOREIGN COMMERCE

9.      Defendants used telephone, wire, and mail communications and solicitations to target Ford and Boston Life and their clients throughout the United States.  Defendants used mail

fraud and wire fraud to advance the scheme by sending fraudulent documents and other information in many states.

## FACTUAL BACKGROUND

10.     Defendants ("Conspirators") conspired in a multi-year and international criminal enterprise to steal the business of, ruin the reputations of, and loot the assets of Boston Life and Annuity ("BLA") and Leo Ford (collectively the "BLA Group").   The Conspirators include attorneys and accountants who represented the BLA Group and used the information from the BLA Group to assist the other Conspirators to compete against the BLA Group.  The Conspirators took active steps to conceal, fracture, segment and compartmentalize the informational database, which was needed to recognize that fraudulent activities have taken place prior to now.

## A. DIVERSION $2,700,000

11.     On April 21, 2012, Leo Ford read about a federal court case involving Barros, Sigel, Bailey and Bancroft. Bancroft hired as its insurance manager Intercontinental Management Nigel Bailey.  Bancroft was not paying InterContinental's fee, and Intercontinental sued Bancroft for the fee. In the lawsuit, as evidence of Bancroft's wrongdoing, Intercontinental submitted evidence of Bancroft's bad faith acts against the BLA Group.

12.     In the referenced federal case, it is stated that:

> Count I - P. Sigel is a principal of Bancroft and Trustee of the Bancroft Trust which owns Bancroft. In 2002, P. Sigel diverted to Bancroft's bank accounts $2.7 million in premium payments by 11 participants in ABG, a trade association, that were intended for an insurance program offered by Boston Life and Annuity called Refund Plus. P.20/21

> Count II - Barros is a principal of Bancroft.

> Count IX – ABG, a Florida corporation, is owned by, and an alter ego of, Barros. ABG maintained at least one bank account for the transaction of Bancroft business. ABG was the marketing agent for Boston Life and Annuity and was instrumental in the diversion to

Bancroft of the $2.7 million in premium payments intended for the Refund Plus program offered by Boston Life and Annuity. P.24

Count X – GFAN is another alter ego of Barros that was instrumental in (a) the diversion to Bancroft of the $2.7 million in premium payments for the Refund Plus program offered by Boston Life and Annuity. P.24

12.     As noted previously, in the motion to amend counterclaim and add new parties and in the proposed third-party complaint, the ICMC Defendants make allegations of fraud against Bancroft and its principals relating to (a) the diversion to Bancroft's accounts of more than $2.7 million in premium payments intended for a program of Boston Life and Annuity in 2002…" P.27

13.      "Attorney Hesch served as Bancroft's tax attorney at one time." P.14/15 (Hesch is the Greenberg Traurig lawyer who also represented the BLA Group).

## B. REDACTION GREENBERG TRAURIG BILL

14.     After further research Ford learned that Greenberg Traurig and KPMG had key positions in this diversion as well as a continued criminal enterprise to the detriment of the BLA Group.  Greenberg Traurig engaged in 2 predicate acts of mail fraud by sending to Ford 2 fraudulent invoices, redacting Greenberg's billing in an attempt to hide its participation in this enterprise. US mail service was used sending that redacted bill. Email was also used in the redacted bill.

15.     Having learned of the above case and evidence in April, 2012, Leo Ford then began investigating the conspiracy.

## HISTORY

16.      Leo Ford ("LF") was approached by attorney Philip Sigel in November 2000 to determine whether Boston Life and Annuity Company, LTD ("BLAV") of St Vincent would consider offering a deductible casualty insurance product. Leo Ford was the beneficial owner of the shares of BLAV and acted as a product development consultant for BLAV.

17.     After Sigel explained his thoughts regarding the generalities of the product, Ford told Sigel that a tax opinion letter would be needed in order for BLAV or Ford to proceed as the desired product had US tax consequences. Sigel stated he was a client of the law firm Greenberg Traurig ("GT") in Miami. Sigel then proceeded to introduce Leo Ford and BLAV to attorney Jerome M. Hesch of Greenberg Traurig in the GT offices in Miami.

### C. GT RENEGES ON AN ORAL AGREEMENT WITH ITS CLIENT

18.     GT agreed verbally to only represent LF and BLA in this offshore casualty product that LF designed and not provide similar services or advice to another party or competitor. GT originally issued tax opinions to BLAV and later to BLA.

19.      Many meetings were held at the GT offices with Leo Ford, BLAV, Phil Sigel and Jerome Hesch over the course of the next two years developing the tax opinion as it was involved many aspects of tax law and insurance regulations and incorporating Ford's insurance product design and contract language. From a marketing perspective, Bradley Barros ("BB") was involved as his organizations, GFAN, GAN and ABG were to market the products. Materials were mailed, faxed and e-mailed to Ford at his Boca Raton, Florida office.  LF introduced Barros to GT and KPMG.

20.     From Barros' Deposition, dated August 9, 2007:

```
15      A. The Boston Life Program, the Boston Life
16      Program was an opportunity for me, through GFAN, and
17      in this case Association Benefits Group, to have a
18      viable, compliant casualty insurance product to
19      provide through -- to provide.
20      When I learned about the program I
21      was very excited to be able to be the marketing
22      person or a marketing person for the program.  That
23      was my role, to market the Boston Life product, and
24      specifically in regard to this."
```

21.     BLA and Ford were clearly the clients of GT. All tax opinions were issued to BLA

and mailed by US mail, faxed and emailed to BLA and Ford (Ford's address and fax in Boca Raton, Florida). Payments were made by BLA/Ford to GT for legal work that encompassed many areas: the preparation of tax opinions, the review of marketing materials, the review of the insurance product itself, the review of the 50 US States insurance regulatory issues, the qualification of the casualty as insurance under US States' guidelines, and the marketing of the product by speaking at a seminar in the Bahamas; to quote GT billing wording:

   a. "casualty insurance tax opinion",
   b. "review draft of marketing materials",
   c. "research re proposed insurance product structure",
   d. "insurance regulatory issues",
   e. "risk of insurance for malpractice and disability to qualify as insurance"; and
   f. "attendance and speak at a 2001 Program in Nassau, Bahamas".

   g. "Greenberg Bus Int Opinion Apr-18-2001 Original" signed by Hesch/GT
   h. "Greenberg Bus Int Opinion Apr-24-2001 Original" signed by Hesch/GT
   i. "Greenberg DI Opinion Nov-28-2001 Original" signed by GT
   j. "Greenberg DI Opinion Jan-30-2001 Original Version 2" signed by Hesch/GT
   k. "Greenberg Malpractice Opinion Jan-30-2001 Original Version 2" signed by Hesch/GT
   l. "Greenberg Bus Int Opinion Feb-26-2002 Original" signed by GT
   m. "Greenberg DI Opinion Feb-26-2002 Original" signed by GT
   n. "Greenberg Malpractice Opinion Feb-26-2002 Original" signed by GT

22.    From the Affidavit (5) of Brad Barros, dated September 21, 2007:

"These conferences took place both in the Bahamas and in Cancun, Mexico. Also in attendance was Professor Jerry Hesch, the noted tax lawyer and the author of the Boston Life legal opinions. Boston Life procured the attendance of Jerry Hesch."

23.    From Barros' Deposition, dated August 9, 2007: "It was Boston Life that had the relationship with Greenberg, Traurig.  It was Boston Life that sent me Greenberg Traurig brochures.  It was Boston Life that provided the Greenberg Traurig legal opinion."

24.    The information flow went via US mail, fax, email and phone conversations between GT, Sigel, Barros, Ford and BLA. Please note GT's billing records.

    A.      Greenberg Bill Jan-2-2001 Fax.pdf

    B.      Greenberg Bill Sep-30-2001 Fax.pdf

    C.      Hesch outstanding fees 22.06.07.pdf    via "FIRST-CLASS MAIL" AS DENOTED ON GT'S COVER LETTER

    D.      Hesch outstanding fees detailed 22.06.07.pdf

24.    When "Greenberg Bill Jan-2-2001 Fax.pdf" is compared to "Hesch outstanding fees detailed 22.06.07.pdf", three entries regarding Brad Barros have been removed in a sloppy redaction. The total bill remains the same. Barros name was simply removed.  These invoices were mail fraud.

25.    When Greenberg was purportedly representing the BLA Group, Greenberg billed the BLA group for conversations with Barros.  When the BLA group questioned the bills, Greenberg took Barros' name off the bills and resent them to BLA with no reduction in the amount billed.

26.    Greenberg Bill Jan-2-2001 Fax.pdf, "invoice no. 802552" entries:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 04/23/01 | Jerome M. Hesch | Discuss revisions with Brad Barros | .3 | $120.00 |
| 05/10/01 | Jerome M. Hesch | Telephone conference with Brad Barros | .7 | $280.00 |
| 05/10/01 | Jerome M. Hesch | Prepare revised comments and send to Brad Barros | .3 | $120.00 |
| | | TOTAL TIME | 11.70 | |
| | | TOTAL FEES | | $4,504.50 |

Redacted bill follows (please note date of June 2007-why did it take 5 years to deliver this bill?):

27.    Hesch outstanding fees detailed 22.06.07.pdf, "invoice no.802552" redacted entries:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|-----------|-------------|-------|--------|
| 04/23/01 | Jerome M. Hesch | Discuss revisions | .3 | $120.00 |

| 05/10/01 | Jerome M. Hesch | Telephone conference | .7 | $280.00 |
|----------|-----------------|----------------------|-----|---------|
| 05/10/01 | Jerome M. Hesch | Prepare revised comments and send | .3 | $120.00 |
| | | TOTAL TIME | 11.70 | |
| | | TOTAL FEES | | $4,504.50 |

28.    Based on political issues and changing regulations in St Vincent, it was decided to establish BLA in another jurisdiction in 2001. BVI was selected, and Ford contracted KPMG to prepare the presentation for a captive insurer to the BVI insurance regulators. KPMG recommended that its wholly owned subsidiary, Belmont Insurance Management Ltd ("Belmont") be BLA's insurance manager. Andrea Douglas is a Director of Belmont and is a partner in KPMG.

29.    Ford spent considerable time in KPMG's office working with Martin Eveleigh, the Insurance manager at KPMG, putting together the presentation package for the insurance regulators. Ford had an agreement with KPMG and Belmont would not provide similar services to a competitor for the casualty insurance products that Ford designed.  KPMG and Belmont breached that agreement and their representations were fraudulent.  Faxes were sent back and forth between KPMG and Ford's Florida office as well as mail and emails. The Belmont email address listed on Belmont letterhead the "Engagement Letter", dated January 24, 2002, to BLA was kpmginsurance@surfbvi.com. Many hours were spent on the phone and fax between Ford's Florida office and KPMG's BVI office as this was a new casualty product for KPMG and Belmont. KPMG/Belmont required GT's opinion letter before they would allow the first insurance contract to be issued.

30.    BLA and BVI was incorporated in November 2001.  The insurance license was also granted in November 2001 as evidenced in the fax from Belmont to Ford at his Florida office.

31.    Belmont took over as Registered Agent and Registered Office for BLA in 2003.

32.     KPMG was the auditor for BLA from the date of incorporation, November 12, 2001, until its September 30, 2002, yearend. The audit was completed on October 9, 2003, as evidenced by KPMG's sign off on the signature page. KPMG/Belmont took over administration in 2003 and since they were also insurance managers, told BLA that they could not perform the audit function and BLA had BDO perform its audit functions thereafter. It should be noted that Belmont and KPMG had the same office address and that Belmont "employees" used "employeename@kmpgbvi.net" email addresses in their correspondence.

**D.     KPMG RENEGES ON ITS AGREEMENT WITH LF: A. FORMS A COMPETITOR COMPANY, BANCROFT, WITH BARROS AND SIGEL; B. ASSISTS IN BANCROFT'S LICENSING WITH THE BVI INSURANCE DEPARTMENT WHICH INCLUDES SUBMISSION OF PRODUCT DESIGNED BY BLA; AND C. PROVIDES ADMINISTRATION SERVICES FOR BANCROFT.  KPMG, BARROS, SIGEL, AND BANCROFT STEAL LF'S INTELLECTUAL PROPERTY BY PRODUCT DESIGN SUBMISSION TO THE BVI INSURANCE DEPARTMENT AND BY USING THAT PRODUCT DESIGN IN THEIR SALES**

33.     KPMG/Belmont assisted Barros and Sigel in the establishment of Bancroft Life and Casualty, Ltd. on May 1, 2003 as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

34.     KPMG/Belmont assisted Barros and Sigel in the establishment of Chesterfield Services Inc., on April 30, 2003 as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

35.     Association Benefits Group, INC., Chesterfield Services, INC. and Collaborative OBGYN Purchasing Alliance, d.b.a. The COOP are listed as shareholders of Bancroft on the Insurance Public Information documents. Bradley A. Barros, Philip Sigel and Kevin White are listed as directors. OBGYN has an address in Florida.

**E.  GT WRITES THE TAX OPINION LETTER FOR BANCROFT'S PRODUCTS, WHICH ARE DERIVATIVE COPIES OF BLA'S AND LF'S INTELLECTUAL PROPERTY**

36.     The time it takes to establish and have an insurer approved takes months. KPMG/Belmont, GT, Barros, Sigel and White began this effort in 2002. KPMG/Belmont would require a tax opinion letter from GT. Hesch/GT was Bancroft's tax attorney.

37.     From Bancroft's website, http://www.bancroftltd.net/phil-sigel, April 11, 2012: "Mr. Sigel cofounded Bancroft in 2002."

38.     From Barros' Deposition, dated August 9, 2007: "I have a beneficial interest in Bancroft."

39.     In 2002, KPMG/Belmont, GT, Barros, Sigel and Bancroft diverted to Bancroft's bank accounts $2.7 million in premium payments by 11 participants in ABG, a trade association, that were intended for an insurance program offered by Boston Life and Annuity.

14. BLA lost gross revenues $2.7 million, corporate market value and market position due to this continued conspiracy. Ford was robbed of $675,000 year one as his contract with BLA called for payment of 25% of casualty product premium. See Ford' s Agreement dated December 6, 2001. Total loss was $3,915,000 based on the product revenue stream if the clients had entered BLA's program as it was a five year pay in product.

40     Belmont was the insurance manager and administrator for BLA during this period. KPMG was performing its audit duties for BLA during this period. Belmont performed as insurance manager and administrator for Bancroft. Belmont had to sign all policies issued from BLA or Bancroft.

41.     The Conspirators continued in their ongoing criminal enterprise for years to ruin BLA, steal its clients, loot profits and tarnish the names of Ford and May (director of BLA and 10% shareholder).

42.     As a result of this continued criminal enterprise, BLA was unable to attract new

clients and was placed in voluntary receivership. KPMG's BVI and Cayman offices were appointed Joint Liquidators February 27, 2008 according to KPMG's "Report of the Joint Liquidators", dated March 20, 2008.  KPMG had a conflict in representing BLA and then acting as liquidator of BLA.  This joint appointment spanning two islands was a scheme that only served to cause time delays and exponentially increased costs in the liquidation of BLA and assist Bancroft.  There are many emails and letters from KPMG, McDonald and Beighton that prove their statement of availability to be a fallacy; "out of office", "travelling", "sick", "vacation", "at the airport", etc.  It took weeks and in some cases months to get responses. During this multiple year period, which began in 2002, KPMG continued and continues to this day in their conspiracy to loot the BLA Group.

### F.     KPMG UNILLATERALLY REVERSES ITS POSITION ON BLA'S CASUALTY PRODUCT AS INSURANCE MANAGER AND AUDITOR WHEN IT BECOMES THE LIQUIDATOR AND DECIDES TO ENRICH ITSELF BY LOOTING THE GENERAL RESERVES

43.    The liquidation was a simple matter, only a handful of separate account annuity clients remained and a summary judgement clarified that BLA owned its general reserves and that the casualty products were 1 year terms. KPMG agreed in its earlier audits that BLA owned its reserves. KPMG/Belmont, in the insurance product filing with the BVI Financial Services Department, stated that the casualty product required no reserving after the term of its risk, which was one year, and premium was earned as received. KPMG/Belmont as insurance manager agreed that no reserving was necessary and issued and signed the one year policies in question. This is more mail fraud by the Conspirators.

44.    KPMG billed $717,000 for its liquidation services, from December 20, 2007 to February 27, 2008. See P.36, KPMG's "Report of the Joint Liquidators". KPMG were only Provisional Liquidators at this time. Since KPMG refuses to provide any information to Ford, it is

believed the liquidation continues and as cash comes in, the liquidators take all the liquid money as fees.

45.     The liquidators failed in their duties to protect BLA and Florida and other US client policy assets. KPMG failed to pursue BLA assets worth millions:

| | |
|---|---:|
| Puritan | $2,500,000 |
| LCCF | $1,500,000 |
| Hoilman's/MHA Financial secret commission regarding BLA's MedCap investment | $65,000 |
| MedCap | $1,000,000 |

### G.  KPMG, AS LIQUIDATOR, INTENTIONALLY NEGLECTED ITS FIDICICARY DUTIES TO THE SHAREHOLDERS OF BLA, THE POLICYHOLDERS OF BLA, THE CONTRACT HOLDERS OF BLA AND BLA.

**PURITAN:**

46.     Policy holders F. Best, J. Shaw, M. Haddock and 10 other US clients including an IRA account, 3 non-US persons and BLA lost their funds due to KPMG's failure to follow-up on the Puritan theft/issue. At this time during the BLA liquidation, KPMG excluded Ford from all involvement and information regarding BLA.  BLA urged KPMG to pursue the Puritan principals to recover Puritan investors' funds that the Puritan principals stole.  But KPMG refused to pursue the matter as they made no money from the action, and the action would have required KPMG to hire professional firms to investigate and pursue.  Those funds would have reduced the general reserves and therefore less money for KPMG to bill BLA. Millions were lost as a result of KPMG's failure to act.  KPMG acted similarly regarding Medcap and LCCF investments.

**DOLPHIN COVE:**

47.     Casey Mcdonald, one of the KPMG liquidators, told Ford that one of the Cayman KPMG office's "clients", was interested in buying one of BLA's real estate assets, Dolphin Cove

in the United States Virgin Islands, but only at pennies on the dollar. See e-mails May/June 2008. Various emails and telephone conversations support KPMG's plan to assist one of their Cayman clients by defrauding one Florida BLA policyholder whose annuity policy was an owner of Dolphin Cove.  KPMG has declined to pay out to the Florida annuitant, the value that annuitant has in the Dolphin Cove property. KPMG first made an offer to the annuitant and then refused to recognize the annuitant's claim. The total value of the Florida annuitant's claim is close to $2 million.

### H.    KPMG SELF DEALING

48.    On advice of counsel, BLA was placed into voluntary liquidation.  BLA was not insolvent because BLA had plenty of funds to pay the bills, cash of $1-2 million.

49.    KPMG/Beighton/McDonald had a meeting in Miami regarding BLA and their connived position that a solvent company placed into voluntary liquidation was insolvent. If insolvent, the BVI regulators would have immediately placed it into involuntary receivership. The auditor's (BDO) and a third party accountant's statement show it was not insolvent.  KPMG abused its power to run rampant and overcharge BLA in fees and participated in self-dealing and fraudulent transactions regarding BLA and its annuity clients for corporate and personal betterment of the Conspirators.

### I.    GREENBERG WROTE TAX OPINION LETTERS TO ASSIST BANCROFT WITH ITS BUSINESS COMPETING AGAINST BLA

50.    After writing tax opinion letters for BLA to support BLA's insurance product, GT/Hesch provided Bancroft with the tax opinion that allowed Sigel, GFAN, ABG, Barros and Bancroft to rob BLA of clients and products and divert the $2.7 million via ABG bank accounts.

51.    When Staffworks (as SCI's predecessor) and Scolari were resident in Orange County, Scolari was introduced by his then-accountant to an Orange County tax attorney, Mr. Matt

Brown. Brown presented Scolari and Staffworks with the Bancroft Insurance Program…Brown presented Scolari with a tax opinion letter to Bancroft from the law firm of Greenberg Traurig that promoted the tax benefits of the Bancroft Program.   Scolari entered into the Bancroft Program…premium payments totaling at least $7.6 million.

52.     GT reviewed all of Bancroft's marketing materials from Bancroft's inception.

53.     From an Affidavit (5) of Brad Barros dated September 21, 2007: "Bancroft hired Greenberg Traurig from its inception to review all of its marketing materials for compliance."

**J.      GT REFUSES TO WRITE BLA'S TAX OPINION IN YEAR FIVE, ESSENTIALLY PLACING BLA OUT OF BUSINESS. GT SAYS IT WILL AND THEN REFUSES. GT CLAIMS BLA OWES IT MONEY AND REDACTS ITS BILL FROM 4 YEARS EARLIER.**

54.     GT/Hesch emailed, faxed numerous documents and told the BLA Group as well as third unrelated parties in 2004 and 2005 that GT would renew the tax opinions for BLA. GT/Hesch told Ford he would renew the opinions. More mail and wire fraud.

55.     The updates were never done in order to deny BLA/Ford of an updated tax opinion and to allow Bancroft and GT to take advantage of their marketing of unregistered insurance products and securities in the United States. GT/Hesch intentionally misled third party marketers of BLA products by making misleading statements regarding the opinion letters.  More acts of mail and wire fraud.

56.     GT/Hesch, in an email dated December 30, 2005, confirmed in an email to a third party's counsel and copied to BLA counsel, that GT would prepare updates for two of the three opinion letters.  More wire and mail fraud.

56.     GT/Hesch, in an email and fax to BLA/May, dated June 20, 2006, which is believed to be intentionally misdated (should be January 20, 2006, considering Hesch states, "I am in receipt of your December 19, 2005 email"), GT/Hesch states, "Due to a pressing workload, and other

considerations, our firm has decided not to undertake this proposed engagement to provide updated opinion letters."

57.     One of Bancroft's products, "Premium Lite", was touted as an insurance product but fails the insurance guidelines to qualify, therefore making it a security which falls under SEC jurisdiction. Bancroft's products were not registered as insurance products or securities in the United States.

58.     Bancroft and GT marketed and sold unregistered insurance products and securities in the United States from an unlicensed company, Bancroft.

59.     The Federal and State tax implications of the purchasers is another consideration in the Conspirators continuing RICO criminal enterprise. There are fatal flaws in the Bancroft Program tax scheme that disqualify it as an insurance product.  Its purported tax benefits of deductibility of premium, tax deferred growth, selection of investment, life insurance and loan ability without incurring a taxable event are a fraud as the product is not qualified as an insurance product. The individual components of the product look and act like insurance but when taken together in the whole, the product is not insurance but a security/investment. This is another example of compartmentalizing the information to disguise the fraud.

60.     GT marketed the Bancroft product in the United States by speaking at joint Bancroft/GT presentations at GT's offices.

61.     From Barros' Deposition, dated August 9, 2007:

```
2       Q      Did any representative of Greenberg speak
3       at any conferences that were sponsored by GFAN, ABG
4       or Bancroft?
5       A      When?
6       Q      At any time.
7       A      Say the question again.
8       Q      Did any representative of the Greenberg
9       law firm speak at any conference that was sponsored
```

10    by GFAN, ABG or Bancroft?
11    MS. SHEARN:  I will object to the form.
12    It's a compound question.
13    A     I still answer, right?
14    Q    Yes.
15    A     Yes.  Jerry Hesch."

62.    The announcement of a joint GT/Bancroft marketing and sales program follows:

From an email Brad Barros to Mechell Burgette, dated August 19, 2004:

Subject: From GFAN – Introducing Premium Lite: The Ultimate Insurance Solution

Webinar, Software and Conference Training Schedule

Conferences – there are two training conferences scheduled for Premium Lite: Washington, DC and Santa Monica, CA. The conferences will be from 8:00 am to noon, and will include lunch.

All conferences will be held in the local offices of Greenberg Traurig, LP.

Guest speakers to the advanced planning webinars and conferences will include the following individuals, depending on availability:

Jerome Hesch, JD – Jerry is a professor at the University of Miami law school, and is a partner at the national law firm of Greenberg Traurig, LP….

Jon Foster, JD – Jonathan Foster, a partner at the national law firm of Greenberg Traurig, LP., is the Chairman for the firm's Estate & Wealth Management Group…"

Enrollment Form. Complete this Enrollment Form and fax it to 302-678-9574.

If you have any questions, please call us at 302-678-4600.

Powerful new uses for Premium Lite with pensions, estate and business planning, and professional athletes.

For casualty insurance to be deductible, premiums must be considered reasonable. If not reasonable, back taxes, interest and penalties may be assessed by the IRS.

63.    The webinars were September 9, 16, 17 and 20, 2004 and the conferences in GT

offices were September 22 and 28, 2004.

64.   Regarding the GFAN/GT announcement's statement about deductibility, pensions and the IRS, from an "Offshore Alert" article, dated June 24, 2011:

> Troubled offshore insurer Bancroft Life & Casualty ICC Ltd., which appears to have operated a bogus tax avoidance scheme aimed at U.S. taxpayers, has filed five separate civil complaints against insureds in the United States over the last three months.
>
> In court filings responding to the complaints, the FFD group accused Bancroft Life & Casualty of providing a "bogus insurance product.
>
> A similar allegation against Bancroft Life & Casualty was made by another insured, controlled by Seattle, Washington resident Cesar Scolari, in a lawsuit in which he claimed that he sent more than $7 million to Bancroft under the guise of 'premium payments' and then received it back under the guise of 'loans', which he claimed to have stopped servicing due to concerns about alleged over-billing and fraud by Bancroft.

65.   The Department of Labor oversees pensions and it has a very specific set of laws and regulations separate from the insurance regulations that address deductibility, tax deferred growth and loans or distributions from pension plans. These may be found at the US Department of Labor's website: http://www.dol.gov/ebsa/.

66.   Barros does not hold a license to sell investments.

67.   From Barros' Deposition, dated August 9, 2007:

Q    you were not licensed to sell investments?
A    I don't remember when my license lapsed.

**K.    BARROS RENEGES ON HIS AGREEMENT WITH BLA/LF AFTER BARROS RECEIVED MONIES TO BE BLA'S EXCLUSIVE MARKETING AGENT.**

68.   Bancroft's products are knock-offs of BLA's products.  Barros/Bancroft/Sigel used proprietary information on a new product BLA was developing and launching. BLA granted loans to Barros in 2002 and forgave the loans in 2003 on the agreement Barros would be the exclusive marketing agent for BLA and not offer any other products or represent any other company unless

otherwise agreed.

69.     Bancroft's initial license listed "Disability and Special Risk" as the company's product lines.   Barros is listed as a Director of Bancroft on the license and his company, Association Benefits Group, Inc. listed as an owner (Exhibit 4, p167, line 14 through P168, line 10 and Exhibit 11c).   Greenberg wrote the same tax opinion letters as Greenberg wrote for BLA.

70.     Barros was an integral part of the BLA marketing effort. His indemnification of IAPB and Dijon as a result of his causing those entities to be established per the Sentry and Benefit Purpose Trusts were key to complying with the GT opinion letter and GT's advice regarding the legal and regulatory structure required for BLA.

71.     Sigel, Barros, Bancroft, KPMG/Belmont and GT conspired to use Ford's propriety intellectual property *regarding the insurance product design and his policy language, which was not in the public domain*, for their personal and corporate gain. The Conspirators diverted client funds due for BLA and stole Ford's intellectual property.

**L.     ANOTHER DIVERSION OF PREMIUM DUE FOR BLA BY BARROS**

72.     Barros, in the last quarter 2002, diverted a client for the new product design, called "Refund+Life", Ford developed with American General and BLA.

73.     Barros delayed the submission of a life insurance policy and apparently diverted funds and the client to Bancroft.

74.     From Barros' email dated August 22, 2002:

NEWSFLASH
Boston Life has just entered into a relationship with American General Life, one of the largest life carriers in the US and a wholly owned subsidiary of AIG, the largest insurance group in the world. American General Life will provide certain insurance products for Boston Life and American General Life will promote the resulting program. This program is specifically designed for US based associations representing many tens of thousands of high net

worth clientele.  It demonstrates the innovation and credibility of Boston Life and its products.

Boston Life continues to develop relationships with established and new companies who demonstrate innovation or impressive and consistent performance records.

The above is mail and wire fraud because the Conspirators were using the product for their own purposes, not for the BLA Group.

75.    From Barros' Deposition in the Brevard, County of Florida lawsuit, Blue Topaz LLC v Employers International Inc et al, dated August 9, 2007:

```
13    Q   You state "we have entered into a
14    semi exclusive relationship with American General
15    Life and are opening negotiations for a worldwide
16    exclusivity arrangement with AIG."  What did you
17    mean by that?
18    A   I meant that we were going -- that Leo
19    Ford and I had gone to American General Life, and we
20    were going to -- we had worked out an agreement that
21    American General would work with Boston Life and
22    Annuity in regard to using its life products with
23    Refund Plus in an insurance reserve pool, and that
24    we were trying to work out something beyond American
25    General, to work with all the AIG Life companies
1     Worldwide.
```

Barros' Dep. 229:13-25, 230:1.

**M.    KPMG/GT/BARROS/SIGEL CONSPIRACY PLANNING**

76.    Sigel agreed to a 50/50% business arrangement with Ford regarding Group Insurance Policies dated January 30, 2001. This was an effort to use Ford's knowledge to design insurance products and his money to fund the GT opinion letter and all expenses relating to KPMG/Belmont concerning the casualty insurance products. Sigel had no intention of performing and went on with GT/KPMG/Belmont/Barros to form a competing company, Belmont.

77.    Sigel reviewed and added comments to Ford's draft policy language as evidenced

by his handwriting on policy drafts. The notes on the draft policies denote that Belmont/KPMG designated the premium "as earned".

78.     The Conspirators diverted client funds due for BLA and stole BLA/Ford's intellectual property with GT/KPMG/Belmont knowledge and assistance.

79.      During this period of time, a smear and intentional disinformation campaign was launched against BLA/Ford/May.

80.     Barros approached BLA and "offered" to take all of BLA's clients to Bancroft.

81.     From the First Affidavit of Brad Barros, dated April 10, 2007in the British Virgin Islands case of Boston Life & Annuity Ltd v Dijon Holdings Limited et al: "In late 2006 I shared Boston Life's audit with former BVI Insurance Regulator, Nigel Bailey. The audit was performed by BDO in the BVI. Mr. Bailey could not find any such identification of a Reserve and was concerned as to the efficacy of Boston Life."

82.     Barros failed to disclose to the BVI Court that Barros/Bancroft had a direct business link as Nigel Bailey at that time was a Vice President of Intercontinental Captive Management Company, LTD, Greensburg, Pennsylvania, the management company hired by Bancroft on October 15, 2004 to manage Bancroft's day-to-day operations. It was in Barros/Bailey's interests to harm BLA/Ford/May.

83.     Barros continued: "I was told directly by Professor Hesch, the billing attorney for Boston Life at Greenberg Traurig, that the reason that Greenberg Traurig would not update the legal opinion was due to the fact that Boston Life would not pay their prior legal bills and that any attempt by Mr., May to blame Greenberg Traurig for not updating the opinion was "ridiculous because, as Rick (May) well knows, they (Boston Life) wouldn't pay their bills!" (Exhibit 33, p16, para 66)

84.   More fraud.  In fact, BLA paid its legal bills, including the bill in which Greenberg redacted Barros' name.

85.   GT/Hesch provided privileged BLA documents to Barros and others. "In fact, Professor Hesch has provided documentation to me outlining his role with Boston Life.

86.   BLA's lawyer, GT Hesch, in a letter dated September 13, 2006, communicated to Attorney William Hoilman, the lead attorney who had filed suits in Miami against BLA/Ford/May and was assisting Barros in the BVI litigation and smear campaign.

87.   Hoilman's Company, MHA Financial is the company identified in KPMG's "Report of the Joint Liquidators" as taking a secret commission from one of BLA's investments. KPMG as Liquidators have failed to follow up on this asset. Barros was in collusion with Hoilman to destroy BLA/Ford/May. From Barros' Deposition in the Brevard, County of Florida lawsuit, Blue Topaz LLC v Employers International Inc et al, dated August 9, 2007, dated August 9, 2007:

```
23    Q     (MR. WOLFE) Do you recall giving an
24    affidavit in the BVI case consisting of 19 pages
25    which was signed on or about March 5th 2007?
1     THE WITNESS:  No.  Nobody other than my
2     attorneys.
3     Q     (MR. WOLFE) Which attorney did you
4     consult with when you prepared this affidavit?
5     A     Bill Hoilman.
6     Q     Why did you prepare this affidavit?
7     A     Because Bill asked me to.
8     Q     At the time Bill was also representing the
9     defendants in the BVI case and the plaintiffs in the
10    Miami case, is that correct?
```

Barros' Dep. 175:23-25, 177:1-10.

88.   KPMG/Belmont violated client privilege and their fiduciary duty by discussing the BLA proceedings with Barros: "Prior to Boston life filing a Claim before this Court on March 7, 2006, I spoke with Simon Owen, who at the time was the Insurance Manager of Boston Life at

Belmont Insurance Management in Tortola, BVI about Boston Life."

## CAUSATION

89.     While representing the BLA Group, KPMG/GT/Barros/Bancroft used the BLA Group's intellectual property and set up a competing insurance product and business.

90.     KPMG/GT/Barros/Bancroft diverted $2.7M of premiums that were supposed to go to BLA.

91.     GT refused to write the 5th year opinion letter at the time GT had prepared Barros'/Bancroft's business and products and conducting seminars with Barros/Bancroft.

92.     BLA could not take 5th year premiums from 54 clients because no tax opinion letter stating that the premiums were deductible for tax purposes.  So BLA could not collect 5th year premium.  Barros/Bancroft encouraged 54 BLA clients to sue BLA.

93.     BLA went to the Eastern Caribbean Supreme Court to ask for a summary judgment holding that BLA did not have to give previous premiums back to clients if they did not pay the 5th year premium.

94.     Before court decision Barros/Bancroft wanted BLA to transfer clients to Bancroft. Hoilman represented 54 clients who sued BLA in Florida.  Hoilman went to BVI Eastern Caribbean Supreme Court and got ex parte freeze order re BLA assets.

95.     Froze assets of BLA.  Crippled BLA.  Barros/Bancroft went to internet and press and bad press killed BLA business.  BLA counterclaimed in Florida.  All settled except Ford who was never served and never counterclaimed and never settled.  At this time KPMG was liquidator and would not sue Barros.

96.     BLA won the summary judgment in the Eastern Caribbean Court.  The freeze order was lifted.  KPMG was the liquidators.  KPMG could have sued Barros, Bancroft, and GT for

ruining BLA business.  But KPMG just liquidated and raped BLA with fees and costs.

97.     GT/KPMG/Barros/Bancroft set up a competing company.  GT would not issue opinion letters.  Barros/Bancroft ruined BLA's reputation.  KPMG raped the company in liquidation.

98.     While all this was going on, Barros/Bancroft told BLA that Bancroft would take BLA's 52 clients, proving Bancroft was in the same business.

## DAMAGES

| Event | Loss to Ford (interest not applied) | People/Organizations Involved |
|---|---|---|
| Diversion $2.7 million GT, ABG insurance premium (11 risks) intended for BLA (plan was$2.7M each year for 5 years and they diverted year 1 years 2-5 not paid for a total of $13.5M lost premium) | $3,375,000 (Ford was to receive 25% of premium per Ford's contract) + $540,000 (2% per year premium fee) = *$3,915,000 interest of 4% would add $1,566,000 minimum* | Sigel, Barros, KPMG, Bancroft, GFAN, ICMC, Baily (Conspirators Group A) |
| Ford's Loss of Initial Investment in BLA; Capitalization, legal, accounting and other fees (2001) | *$750,000 interest at 4% adds $450,000* | |
| Cash and Equity Loss (General reserves $11.5M; standard valuation of insurance company is 10 times general reserves | *$115,600,000 interest adds $41,616,000* | |
| Ford had a contract with BLA if liquidated or cease business | *$6,500,000 interest at 4% adds $2,340,000* | |
| Ford loss re Dolphin Cove real estate on ST. Thomas | *$375,000 + $405,000 = $780,000 ($405,000 is interest at 12% contractual)* | |
| Annuity | *$2,000,000 + $2,160,000 = $4,160,000 ($2,160,000 is interest at 12%)* | KPMG and Group B |
| Loss of Earnings 2006 – 2016 based on Ford previous year's | *$11,000,000 (no interest or reinvestment* | |

| Event | Loss to Ford (interest not applied) *of earned monies included)* | People/Organizations Involved |
|---|---|---|
| tax returns (2006-2016) | *of earned monies included)* | |
| **HARD LOSSES** | *$136,205,000* | |
| **INTEREST** | *$ 43,632,000* | |
| **TOTAL** | *$179,837,000* | |

\* Ford also claims treble damages under RICO.

99.     KPMG incorporated Bancroft and performed their insurance manager and admin functions. KPMG had an exclusive with BLA at that time not to perform similar duties with competing companies as BLA's product line was developed by Ford and was his IP.

100.     Greenberg Traurig issued opinion letters, reviewed Bancroft's marketing materials and structures, participated in marketing Bancroft products via webinars and presentations in GT offices and this is in depositions given by Barros in Florida as well as marketing materials. Other lawsuits by Bancroft clients against Bancroft will verify this.

101.     KPMG should never have accepted the position as liquidators due to their prior duties as incorporators, administrators, managers and auditors of BLA. KPMG did so in order to cover and conceal their misdeeds, which continue to this day. They "fee'd" all the liquid cash out of BLA and refused to distribute insurance policy assets and monies to Ford and his co policy holder, Mary Ford, a Florida resident. The application for that annuity was taken and executed in Florida.

102.     KPMG further failed to follow up on the counterclaim filed by BLA before its liquidation. The two other individuals received sizeable settlements from the 54 in Miami. KPMG failed in its fiduciary duty to protect BLA assets. Ford was never served and was informed he could not submit a counterclaim.

103.     KPMG refuses to pay any of Ford's claims although various contracts existed since the inception of BLA and his 5-year contract was renewed 5 to 6 months prior to BLA's voluntary

liquidation. Ford's expenses on the behalf of the BLA were not reimbursed. KPMG, although Ford was the major single creditor at liquidation refused to allow him on the Creditors' Committee, recognized that the 54 as creditors despite the Summary Judgment in favor of BLA. KPMG did not provide Ford with any knowledge of the liquidation after they positioned themselves to loot all of BLA funds and assets.

104.    Ford had $2M invested in Dolphin Cove real estate project on St. Thomas.  When the BLA business was liquidated, the Dolphin Cove partners removed Ford from Managing Member and would not deal with him.  KPMG contacted Dolphin Cove partners and entered negotiations to buy the Dolphin Cove real estate at pennies on the dollar. Dolphin Cove decided not to pay Ford his contractual monies due as they wanted Ford to be unable to fight them legally and also removed him as a Managing Member and from the DC website where he had been prominently placed as a Founder and Managing Member.

105.    KPMG refuses to pay and claims loans and distributions against the insurance policy that were not collateralized by the policy. Mary Ford and Leo Ford were residents of Florida at the time the insurance policy application was signed (in Florida) and assets transferred to BLA. Mary Ford remains a Florida resident to this day. Mary Ford had to sell the house she lived in since the mid 1980's due to lack of money and move with her young grandson to a far inferior location/house. By BVI law, policy assets are to be held in separate accounts not subject to claims of creditors, etc.  KPMG is not recognizing that law. Florida law is very strict protecting the assets of policyholders by the way.

106.    Ford has been unable to do any business and has had zero income since this debacle. Real estate joint ventures fell apart, people refused to do business with him after reading the negative press in the insurance and all other business endeavors.

## DEFENDANTS/CULPABLE PERSONS

107.    The Defendants/Conspirators identified above comprise an association-in-fact enterprise (hereinafter referred to as the "RICO Enterprise").   Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

## RICO ENTERPRISE

108.    Defendants/Conspirators are associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct towards the BLA Group.

109.    The Defendants/Conspirators used mail and wire fraud directed to both the BLA Group and their clients and the public to facilitate the RICO Enterprise.

## THE NAMES OF THE INDIVIDUALS, PARTNERSHIPS, CORPORATIONS, ASSOCIATIONS, OR OTHER LEGAL ENTITIES THAT CONSTITUTE THE RICO ENTERPRISE

110.    The names of the individuals, partnerships, corporations, and other legal entities that constitute the RICO Enterprise are set forth above.

111.    The above named Defendants/Conspirators have formed an association-in-fact enterprise comprised of the above Defendants and multiple other individuals and businesses that all play an integral role in orchestrating a fraudulent and deceptive scheme upon the BLA Group, its clients, and the public. They have utilized their background and knowledge and BLA's products and work product to structure various businesses and individuals in such a manner so as to serve critical, interrelated, and component roles necessary in facilitating Defendants' scheme and racketeering activity.

112.    The above persons and entities when combined as an association-in-fact enterprise provide vital and necessary component services that together facilitate racketeering activity and a fraudulent scheme that any one business or individual could not accomplish standing on its own. Each individual and business of the association-in-fact enterprise is necessary to accomplish the

overall objectives of the enterprise.

### THE STRUCTURE, PURPOSE, FUNCTION, AND COURSE OF
### CONDUCT OF THE TIMESHARE FRAUD RICO ENTERPRISE

113.    The various functions of each Defendant are outlined above in greater detail.

114.    The Defendants, their agents, and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact. The various Defendants function together as a continuing unit. From on or about 2005 to present, Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including multiple acts of mail fraud, wire fraud, online fraud, and/or financial fraud. Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. Defendants' acts of mail fraud, wire fraud, online fraud, and financial fraud are occurring on an ongoing and daily basis targeting BLA's clients.

115.    Defendants' participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing/continuing basis since 2005.

116.    Defendants utilize wire fraud, mail fraud, online fraud, and/or financial fraud to accomplish or further the enterprise's fraudulent scheme, and Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce.  The nature of Defendants' predicate acts, business model, and organizational structure involve a distinct threat of long-term racketeering activity.  Defendants have the same or similar purposes, results, participants, victims, methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy, and meticulous organizational structure.  The acts committed

by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal, and predatory practices occurring on a daily basis.  Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise.  Defendants' scheme is ongoing and daily in nature, and predicate acts are committed daily and routinely.  Those predicate acts are continuing and will continue into the future.

117.    The organization functions with Defendants' orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. The meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

118.    Defendants' enterprise has an existence that is independent of and/or separate from the pattern of racketeering activity in which it engages.  Defendants have some raison d'etre beyond mere criminality.  The association-in-fact enterprise consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

119.    The enterprise is an association-in-fact enterprise comprised of Defendants, and other persons and entities listed above.

**THE DEFENDANTS ARE INDIVIDUALS OR ENTITIES SEPARATE FROM THE TIMESHARE FRAUD RICO ENTERPRISE**

120.    All Defendants are associated with the alleged association in-fact enterprise and each comprises and integral part of the entire scheme as outlined in greater detail above. Defendants have orchestrated and meticulously structured the various Defendant companies and individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

121.    Defendants are not the enterprise itself.

122.    Each Defendants' role in the association-in-fact enterprise is outlined above. Defendants and other, but unidentified, individuals working for Defendants are currently and/or have perpetrated racketeering activity and are members of the association-in-fact enterprise. This perpetration of racketeering activity is ongoing as described above.

123.    All individual Defendants play an integral role in actively furthering the objective of the enterprise.  All individual Defendants are members of the association-in-fact enterprise. None of the individual Defendants were passive instruments or victims.   The individual Defendants are instruments for racketeering activity and the companies provide necessary and vital components of Defendants' scheme and racketeering activity.

124.    The pattern of racketeering activity and the enterprise are separate.

125.    The RICO enterprise and the RICO activity have not merged into one entity.  The individual Defendants utilize the various persons and entities to engage in racketeering activity. The organization functions with Defendants orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme.  This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

126.    Defendants' fraud and deception described above are primarily necessary to accomplish the enterprise scheme and requires conduct beyond the purview of legitimate business practices associated with just selling and marketing a timeshare contract.

### THE RELATIONSHIP BETWEEN THE ACTIVITIES OF THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY

127.    The racketeering activity differs from the usual and daily activities of the enterprise.

128.    Defendants' businesses in this case, when combined as an association-in-fact

enterprise, provide vital and necessary component services that together facilitate the racketeering activity and fraudulent scheme that any one business or individual could not accomplish standing on its own. The racketeering activity and/or mail fraud and wire fraud arise as the result of fraud.

### THE BENEFITS THAT THE ENTERPRISE RECEIVES FROM THE PATTERN OF RACKETEERING ACTIVITY

129.     The Defendants/Conspirators benefitted financially from the above racketeering activity by receiving premiums, attorneys' fees, management fees, accounting fees, and liquidation fees as set forth above.

### THE ENTERPRISE ACTIVITIES AFFECT INTERSTATE AND FOREIGN COMMERCE

130.     Defendants' telephone, mail, and online solicitations to the BLA Group and BLA's clients reach throughout the United States, the Caribbean, and Europe. The association-in-fact enterprise is comprised of individuals and business from different states and countries.

131.     Defendants' racketeering activity has far reaching effects and impacts interstate commerce.

### PERSONS AND ENTITIES ARE NOT BOTH THE LIABLE "PERSON" AND THE "ENTERPRISE" UNDER 18 U.S.C. § 1962(A)

132.     The Complaint alleges an association-in-fact enterprise, and the association-in-fact is not per se Defendants.

133.     The Defendants/Culpable Persons are set forth above.  Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

134.     The association-in-fact enterprise is comprised of the Defendants and the paralegals and secretaries who work for the above attorneys and other Defendants.  Those individuals all serve roles in accomplishing the conduct and racketeering activity described above, all associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct.

**DEFENDANTS ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY**

135.    Defendants, in furtherance of the association-in-fact enterprise, have committed, and continue to commit, the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

**PREDICATE ACTS**

136.    Defendants' association-in-fact enterprise has committed the predicate acts of mail and wire fraud on a continuing and ongoing basis as outlined above.  Defendants' mail and wire fraud involves a scheme or plan to intentionally defraud the BLA Group and their clients using the mail and wires to further their scheme.  Defendants' fraudulent misrepresentations and other documents were sent via wire and U.S. Mail to the BLA Group and their clients.  The BLA Group and their clients were deceived by those fraudulent communications.

137.    These predicate acts are ongoing, occur on a daily basis, and will carry on into the future as Defendants continue to advertise their fraudulent services to clients and the public. Defendants' fraudulent misrepresentations outlined above are conveyed through the U.S. Mail, online, and via telephonic communications.  Defendants make these fraudulent statements online, via U.S. Mail, and during telephonic communications.

138.    Defendants' mail and wire fraud are in direct violation of 18 U.S.C. § 1343.

**THE PREDICATE ACTS FORM A "PATTERN OF RACKETEERING ACTIVITY"**

139.    The predicate acts discussed above, the last of which occurred within 10 years after the commission of a prior act of racketeering activity, are an ongoing, open-ended scheme.  These predicate acts have occurred over the course of at least 10 years and continue to the present on a daily basis.

140.    Defendants' association-in-fact enterprise has exhibited a "pattern of racketeering activity" by its commission of numerous related acts of mail and wire fraud, all of which have

common purposes, results, participants, victims, methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events.  Each predicate act, individual, business, and component of their fraudulent and deceptive scheme is necessary to accomplish the overall objective of the enterprise.

141.     The foregoing predicate acts and racketeering activity are necessary to accomplish vital components and the overall objective of the association-in-fact enterprise.  Defendants resort to committing various predicate acts to effectuate their fraudulent scheme, including fraudulent misrepresentations in person, online, and over the telephone wires.

142.     Defendants conspire to commit the predicate acts of mail and wire fraud in furtherance of their fraudulent scheme.  Mail fraud plays an integral component in accomplishing Defendants' fraudulent scheme.

### THE PREDICATE ACTS RELATE TO EACH OTHER AS
### PART OF A COMMON PLAN

143.     The racketeering activity and/or mail and wire fraud arise as the result of Defendants' deceptive and fraudulent tactics to ruin BLA's reputation and steal BLA's products and clients.  The purpose of the scheme is to enable Defendants to ruin BLA's reputation and steal BLA's products and clients.  This entire process is illegal, fraudulent and deceptive.  As discussed above, each predicate act and component of the fraudulent and deceptive process is necessary to accomplish the overall objective of the enterprise and common plan of the enterprise's members.

144.     The predicate acts of mail and wire fraud are necessary and essential to accomplish the overall objective of Defendants' association-in-fact enterprise.  To consummate the scheme, Defendants then repeatedly commit mail and wire fraud.

### 18 U.S.C. § 1962(D) CONSPIRACY

145.     The BLA Group has been injured by Defendants' conspiracy to violate 18 U.S.C.

§ 1962(c), and Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of subsection (c).  Defendants act in concert and conspire to profit financially by defrauding BLA of its products, clients, and reputation.  Defendants act in concert to utilize fraudulent, deceptive, and illegal tactics.  Defendants earn pure, substantial profits off the scheme.  A civil conspiracy between the various Defendants is a vital and integral aspect in accomplishing the Defendants' unlawful purposes.  The complexity of Defendants' organizational structure and methodology clearly shows that each Defendant acts with a common purpose supported by a concerted action to defraud.  Each Defendant intends to defraud, that intent is common to each Defendant, and each Defendant understands that the others intend to defraud.

### DEFENDANTS' ACTIONS CAUSE INJURY TO BUSINESS AND PROPERTY

146.    As described above, Defendants' deceptive and illegal sales tactics are designed to ruin BLA's reputation and steal BLA's products and clients.

147.    Fraud and stealing business secrets are a violation of public policy, are illegal and affect interstate commerce.

148.    Defendants' fraudulent activities are the sole and proximate case of the BLA Group's damages.

### DIRECT CAUSAL RELATIONSHIP BETWEEN THE
### INJURY AND THE RICO VIOLATIONS

149.    The BLA Group's injuries are actually and proximately caused by Defendants' violations of Section 1962.

### THE DAMAGES SUSTAINED FOR WHICH EACH DEFENDANT IS LIABLE

150.    Defendants bear joint and several liabilities under conspiracy theories alleged in this Complaint. The actions of each Defendant and the damages attributable to just that component of the enterprise or fraudulent scheme are set forth above.

## CAUSES OF ACTION

## COUNT I

## CIVIL RICO – 28 U.S.C. § 1962(c)

151.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

152.    Defendants, their agents and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact enterprise.   The various Defendants/companies function together as a continuing unit.

153.    From on or about 2005 to present, Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including multiple acts of mail fraud, wire fraud, and/or financial fraud.

154.    Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity.  Defendants' acts of mail fraud, wire fraud, and other fraud are occurring on an ongoing and daily basis targeting BLA's clients and reputation.

155.    Defendants participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing and continuing basis.  Defendants have been profiting from their activities since at least 2005.

156.    Defendants utilize wire fraud, mail fraud, and/or other fraud to accomplish, facilitate or further the enterprise's fraudulent scheme, and Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce. The nature of

Defendants' predicate acts, business model, and organizational structure involves a distinct threat of long-term racketeering activity.

157.    Defendants have the same or similar purposes, results, participants, victims, and methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy and meticulous organization. The acts committed by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal and predatory practices occurring on a daily basis.  Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise.

158.    The organization's hierarchy is detailed above in this Complaint.  The purpose of the scheme is to fraudulently ruin BLA's reputation and steal BLA's products and clients, through mail and wire fraud.

159.    The enterprise functions by meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme.  The meticulous structure is further necessary to accomplish the enterprise's ultimate objectives.

160.    Defendants' enterprise has an existence that is independent to and/or separate from the pattern of racketeering activity in which it engages.  Defendants have some raison d'etre beyond mere criminality.  The association-in-fact enterprise in this case consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

161.    Defendants submit fraudulent documents to by U.S. Mail, FedEx, or UPS, and the BLA Group have relied to their detriment upon Defendants' representations contained in the documents.

162.    Defendants' actions have resulted in damages to the State and its citizens.

163.    Defendants' actions are intentional.

164.    Plaintiffs are entitled to collect treble damages, attorney's fees and any other relief applicable under 18 U.S.C. § 1962(c).

## COUNT II

## CIVIL RICO

## 28 U.S.C. § 1962(d)

165.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

166.    Plaintiffs have been injured by Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of subsection (c).

167.    A civil conspiracy between the various Defendants is a vital and integral aspect to accomplishing the Defendants' unlawful purposes.

168.    The complexity of the organizational structure and the method of transaction clearly reflect that each Defendant has a common purpose supported by a concerted action to defraud. Each Defendant had the intent to defraud, that intent was common to each Defendant, and each Defendant had the understanding that the others had the intent to defraud.

169.    The Plaintiffs are entitled to treble damages, attorney's fees and any other relief applicable under 18 U.S.C. § 1962(d).

## COUNT III

## CONVERSION

170.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

171.    Plaintiffs own or have the right to the client information, fees, and product information Defendants stole.

172.    Defendants intentionally interfered with Plaintiffs' property.

173.    Defendants deprived Plaintiffs of possession and use of the property.

174.    Defendants' conversion caused Plaintiffs damages.

## COUNT IV

## BRACH OF FIDUCIARY DUTY

175.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

176.    Defendants owed Plaintiffs a fiduciary duty to not compete against Plaintiffs, to not engage in mail fraud and wire fraud regarding Plaintiffs, to inform Plaintiffs of all actions taken regarding Barros and his entities, to not steal Plaintiffs' clients, and to not steal Plaintiffs' products.

177.    Defendants intentionally breached their fiduciary duties.

178.    Defendants' breach of fiduciary duties caused Plaintiffs damages.

## COUNT V

## FRAUD

179.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

180.    Defendants made false statements concerning material facts.

181.    Defendants knew the false statements were false.

182.    Defendants intended the false statements would induce Plaintiffs and Plaintiffs' clients to act on the statements.

183.    Plaintiffs and Plaintiffs' clients relied on the false statements to the injury of Plaintiffs who suffered damages as a result of the fraud.

## COUNT VI

### BREACH OF CONTRACT

184.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

185.    Plaintiffs and Defendants had contracts as set forth above.

186.    Defendants breached their contracts with Plaintiffs.

187.    As a result of Defendants' breach of contract, Plaintiffs have suffered damages.

## COUNT VII

### TORTIOUS INTERFERENCE WITH CONTRACTS

188.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

189.    Plaintiffs had contracts with their clients.

190.    Defendants had knowledge of those contracts.

191.    Defendants intentionally procured breaches of the contracts.

192.    There was no justification or privilege regarding the interference with the contracts.

193.    Plaintiffs have been damaged by Defendants' interference.

## COUNT VIII

### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS

194.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

195.    Plaintiffs had business relationships with their clients.

196.    Defendants had knowledge of Plaintiffs' business relationships with their clients.

197.    Defendants intentionally and unjustifiably interfered with Plaintiffs' business

relationships with their clients.

198.    Plaintiffs have been damaged by as a result of the breach of the business relationships.

## COUNT IX

### FLORIDA CIVIL RICO – SECTION 772.103, FLORIDA STATUTES

199.    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

200.    Defendants' actions constitute a violation of Section 772.103, Florida Statutes, Florida's Civil RICO Statute.

### AS TO ALL COUNTS:  TOLLING OF STATUTES OF LIMITATIONS

201.    Plaintiffs adopt, reiterate, incorporate by reference, and re-allege each and every allegation contained in this Complaint as if each were set forth separately herein.

202.    Any applicable statutes of limitation have either been delayed in their triggering event(s) or have been suspended in their operation by virtue of the equitable tolling principles, the "discovery rule," and/or related rules and doctrines.

203.    As previously alleged, Defendants fraudulently and deliberately concealed their fraudulent and scandalous wire and mail fraud by purportedly working for and representing Plaintiffs while at the same time and without disclosing to Plaintiffs and hiding from Plaintiffs that Defendants were stealing Plaintiffs' products, setting up competing businesses, and stealing Plaintiffs' clients.  Defendants' actions were calculated to deceive Plaintiffs and prevent discovery of wrongdoing, and which did in fact deceive the Plaintiffs and prevent discovery of wrongdoing.

204.    Plaintiffs could not reasonably have discovered the fraudulent nature of Defendants' transactions until Plaintiffs learned of the Bancroft court case described above on

April 21, 2012, and then begin investigating the claims and evidence in that case.

205.    Many of acts and omissions complained of herein are ongoing and continuing in nature and persist to the present day.

206.    As a consequence of the foregoing, the Court should determine that no portion of any cause of action herein is barred by any applicable statute of limitations or by the equitable doctrine of laches.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request as follows:

a.      Actual and compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial.

b.      Civil penalties to the fullest extent allowed by law.

c.      Costs, losses and fees related to the substantial resources needed to investigate and prosecute Defendants' willful and malicious actions.

d.      Disgorgement of Defendants' unjust enrichment paid by timeshare owners.

e.      Punitive and exemplary damages against Defendants, jointly and severally, in an amount to be determined at trial.

f.      An award of treble damages and reasonable attorneys' fees, costs and expenses.

g.      An award of pre- and post- judgment interest on any award of damages to the fullest extent allowed by law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues raised herein.

RESPECTFULLY SUNMITTED, this the 19th day of April, 2016.

_/s/ Paul Platte_____
PAUL PLATTE, ESQUIRE
FLORIDA BAR NO. 298298

PAUL PLATTE PA
1465 S. Ft. Harrison Ave., Suite 202
Clearwater, FL 33756
Telephone: 727.474.1011
Email: paul@paulplatte.com