**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Leo Ford,

Plaintiff,

vs.

KPMG LLP; KPMG BVI Limited; KPMG Cayman; James Drury; Russell Crumpler; Belmont Insurance Management; Casey McDonald; Kris Beighton; Andrea Douglas; Greenberg Traurig, P.A.; Greenberg Traurig, LLP; Jerome Hesch; GFAN; ABG; Bancroft Property & Casualty, Ltd., (aka Bancroft Life & Casualty, Ltd., and Bancroft Life & Casualty ICC, Ltd.); Bradley Barros; and Philip Sigel,

Defendants.

Case No.: 9:16-cv-80618

**JURY DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff sues Defendants and alleges:

## NATURE OF CASE

1. This action is predicated upon violations of the federal Racketeer Influenced and Corrupt Organizations Act, the Florida Racketeer Influenced and Corrupt Organizations Act, conversion, breach of fiduciary duty, fraud, breach of contract, tortious interference with existing contracts, and tortious interference with prospective economic advantage.

2. Defendants attorneys (Greenberg Traurig) and accountants (the KPMG Defendants) represented Boston Life & Annuity ("BLA"), an insurance company, and Ford, a principal of BLA (BLA and Ford collectively will be referred to the "BLA Group"). Without informing their clients Ford and BLA, the accountants and lawyers used information from Ford to set up and assist the Barros Defendants to compete against Ford and BLA.

3. The pattern of criminal activity continues to this day. In furtherance of the RICO conspiracy, the Conspirators continue the mail fraud and wire fraud as recently as July 8, 2016, when the KPMG Defendants sent out fraudulent mail and wires asserting a claim that Ford's property in his annuity policy belongs to the BLA liquidation estate, even though there is an order specifically prohibiting the KPMG Defendants from asserting any claim regarding BLA's assets; BVI law specifically states Ford's annuity policy, not BLA, owned the annuity policy assets; and KPMG has admitted in writing that an annuity policy such as Ford's, not the annuity company, owns the annuity policy assets. The Defendants conspired in a multi-year and international criminal enterprise to steal the business of, ruin the reputation of, and loot the assets of Ford.

4. Ford first learned that he was damaged by the conspiracy on April 21, 2012, when he read a Memorandum in Civil Action No. 10, United States District Court, Western District of Pennsylvania, signed by William Standish, US District Judge, dated April 5, 2012 (hereafter "Memorandum in Civil Action No. 10") and subsequently started to investigate the conspiracy.

5. Ford is not suing Greenberg for merely doing legal work for Barros. Greenberg actually stole Ford's products and used them to actively promote Barros' business. Ford is not suing KPMG for mere accounting work. The KPMG Defendants actually managed and operated Ford's and BLA's business.

6. Ford is not suing to recover BLA's assets or damages. Ford is suing to recover his own damages.

**PARTIES**

7. KPMG LLP, KPMG Cayman, and KPMG BVI Limited are accounting firms and management firms that represented Ford and Boston Life and the Barros Defendants. KPMG

established Belmont Insurance Management to manage Boston Life. McDonald and Beighton worked for KPMG BVI, Crumpler and Drury work for KPMG Cayman, and Douglas worked for Belmont. The Defendants identified in this paragraph will be collectively referred to as the "KPMG Defendants".

8. Greenberg Traurig LLP and Greenberg Traurig, P.A., (collectively "Greenberg Traurig" or "Greenberg" or "GT") are a law firm that represented Ford and Boston Life and the Barros Defendants. Jerome Hesch is a lawyer with Greenberg Traurig.

9. Brad Barros was a sales agent of Boston Life. Barros and Philip Sigel were and are principals of GFAN, ABG, and Bancroft Property and Casualty (collectively the "Barros Defendants"). While still working for Boston Life and Ford, Barros and Sigel conspired with the other Defendants to set up a business competing with Ford and Boston Life, then solicit and steal Ford's products and clients, and then ruin Ford's reputation and business.

## JURISDICTION

10. Jurisdiction is predicated upon original jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is conferred under 28 U.S.C. § 1331 by virtue of 18 U.S.C. § 1961-1968 & 901(a), and the Court has supplemental jurisdiction over the common law claims.

## VENUE

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the alleged events giving rise to the original claim occurred and continue to occur in this District. Defendants conduct business in this District and/or reside in this District. Defendants' fraudulent activities occurred within this District.

## INTERSTATE AND FOREIGN COMMERCE

12. Defendants used telephone, wire, and mail communications and solicitations to

target Ford and his clients throughout the United States. Wires were used from Miami, the Cayman Islands, the British Virgin Islands, and Delaware. Defendants used mail fraud and wire fraud to advance the scheme by sending fraudulent documents and other information in many states. Defendants' fraudulent activities have been ongoing including through July 8, 2016.

**FACTUAL BACKGROUND**

**A. DIVERSION OF $2,700,000**

13. On April 21, 2012, Leo Ford first read about a federal court case involving Barros, Sigel, Bailey and Bancroft. Bancroft hired as its insurance manager Intercontinental Management and Nigel Bailey. Bancroft was not paying InterContinental's fee, and Intercontinental sued Bancroft for the fee. In the lawsuit, as evidence of Bancroft's wrongdoing, Intercontinental submitted evidence of Bancroft's bad faith acts against Ford.

14. In the referenced federal case, it is stated that:

> Count I - P. Sigel is a principal of Bancroft and Trustee of the Bancroft Trust which owns Bancroft. In 2002, P. Sigel diverted to Bancroft's bank accounts $2.7 million in premium payments by 11 participants in ABG, a trade association, that were intended for an insurance program offered by Boston Life and Annuity called Refund Plus. P.20/21
>
> Count II - Barros is a principal of Bancroft.
>
> Count IX – ABG, a Florida corporation, is owned by, and an alter ego of, Barros. ABG maintained at least one bank account for the transaction of Bancroft business. ABG was the marketing agent for Boston Life and Annuity and was instrumental in the diversion to Bancroft of the $2.7 million in premium payments intended for the Refund Plus program offered by Boston Life and Annuity. P.24
>
> Count X – GFAN is another alter ego of Barros that was instrumental in (a) the diversion to Bancroft of the $2.7 million in premium payments for the Refund Plus program offered by Boston Life and Annuity. P.24

15. In their motion to amend counterclaim and add new parties and in the proposed

third-party complaint, the ICMC Defendants made allegations of fraud against Bancroft and its principals relating to the diversion to Bancroft's accounts of more than $2.7 million in premium payments intended for a program of Boston Life and Annuity in 2002…" P.27

16. In that case it is alleged "Attorney Hesch served as Bancroft's tax attorney at one time." P.14/15 Hesch is the Greenberg Traurig lawyer who also represented the BLA Group. April 21, 2012, is the first time Ford learned that Hesch and Greenberg represented Barros and Bancroft.

17. While Ford may have known before April 21, 2012, that the Barros Defendants were competing against the BLA Group, Ford did not first have reason to know of the conspiracy between the Barros Defendants, the KPMG Defendants, and Greenberg Traurig, and Ford did not know of the damages caused to Ford in the $2.7 Million diversion until April 21, 2012.

**B. REDACTION IN GREENBERG TRAURIG BILL**

18. After reading the above and further research, Ford learned that Greenberg Traurig and KPMG had key positions in that $2.7 Million diversion as well as a continued criminal enterprise to the detriment of Ford. Greenberg Traurig engaged in two predicate acts of mail fraud by sending to Ford two fraudulent invoices, redacting Greenberg's billing in an attempt to hide its participation in this enterprise. US mail service was used sending that redacted bill. Email was also used in the redacted bill.

19. Having learned of the above case and evidence in April, 2012, Leo Ford then began investigating the conspiracy.

**HISTORY**

20. Leo Ford ("LF") was approached by attorney Philip Sigel in November 2000 to determine whether Boston Life and Annuity Company, LTD ("BLAV") of St Vincent would

consider offering a deductible casualty insurance product. Leo Ford was the beneficial owner of the shares of BLAV and acted as a product development consultant for BLAV.

21. After Sigel explained his thoughts regarding the generalities of the product, Ford told Sigel that a tax opinion letter would be needed in order for BLAV or Ford to proceed as the desired product had US tax consequences. Sigel stated he was a client of the law firm Greenberg Traurig in Miami. Sigel then proceeded to introduce Leo Ford and BLAV to attorney Jerome M. Hesch of Greenberg Traurig in their offices in Miami.

**C. GT RENEGES ON AN ORAL AGREEMENT WITH ITS CLIENT**

22. Greenberg Traurig agreed verbally to only represent Leo Ford and BLA in this offshore casualty product, which Leo Ford designed, and not provide similar services or advice to another party or competitor. Greenberg Traurig originally issued tax opinions to Ford, BLAV and later to BLA.

23. Many meetings were held at the GT offices in South Florida with Leo Ford, BLAV, Phil Sigel and Jerome Hesch over the course of the next two years developing the tax opinion as it involved many aspects of tax law and insurance regulations and incorporating Ford's insurance product design and contract language. From a marketing perspective, Bradley Barros ("BB") was involved as his organizations, GFAN, GAN and ABG were to market the products.

Materials were mailed, faxed and e-mailed to Ford at his Boca Raton, Florida office. Leo Ford introduced Barros to GT and KPMG.

24. From Barros' Deposition, dated August 9, 2007:

A. The Boston Life Program, the Boston Life
Program was an opportunity for me, through GFAN, and

in this case Association Benefits Group, to have a viable, compliant casualty insurance product to provide through -- to provide.

When I learned about the program I was very excited to be able to be the marketing person or a marketing person for the program. That was my role, to market the Boston Life product, and specifically in regard to this."

25. BLA and Ford were clearly the clients of Greenberg Traurig. All tax opinions were issued to BLA and mailed by US mail, faxed and emailed to BLA and Ford (Ford's address and fax in Boca Raton, Florida). Payments were made by BLA/Ford to Greenberg Traurig for legal work that encompassed many areas: the preparation of tax opinions, the review of marketing materials, the review of the insurance product itself, the review of the 50 US States insurance regulatory issues, the qualification of the casualty as insurance under US States' guidelines, and the marketing of the product by speaking at a seminar in the Bahamas; to quote Greenberg Traurig billing wording:

a. "casualty insurance tax opinion",
b. "review draft of marketing materials",
c. "research re proposed insurance product structure",
d. "insurance regulatory issues",
e. "risk of insurance for malpractice and disability to qualify as insurance"; and
f. "attendance and speak at a 2001 Program in Nassau, Bahamas".

g. "Greenberg Bus Int Opinion Apr-18-2001 Original" signed by Hesch/GT
h. "Greenberg Bus Int Opinion Apr-24-2001 Original" signed by Hesch/GT
i. "Greenberg DI Opinion Nov-28-2001 Original" signed by GT
j. "Greenberg DI Opinion Jan-30-2001 Original Version 2" signed by Hesch/GT
k. "Greenberg Malpractice Opinion Jan-30-2001 Original Version 2" signed by Hesch/GT
l. "Greenberg Bus Int Opinion Feb-26-2002 Original" signed by GT

m. "Greenberg DI Opinion Feb-26-2002 Original" signed by GT
n. "Greenberg Malpractice Opinion Feb-26-2002 Original" signed by GT

26. From the Affidavit (5) of Brad Barros, dated September 21, 2007:

"These conferences took place both in the Bahamas and in Cancun, Mexico. Also in attendance was Professor Jerry Hesch, the noted tax lawyer and the author of the Boston Life legal opinions. Boston Life procured the attendance of Jerry Hesch."

27. From Barros' Deposition, dated August 9, 2007: "It was Boston Life that had the relationship with Greenberg, Traurig. It was Boston Life that sent me Greenberg Traurig brochures. It was Boston Life that provided the Greenberg Traurig legal opinion."

28. The information flow went via US mail, fax, email and phone conversations between GT, Sigel, Barros, Ford and BLA. Please note GT's billing records.

A. Greenberg Bill Jan-2-2001 Fax.pdf

B. Greenberg Bill Sep-30-2001 Fax.pdf

C. Hesch outstanding fees 22.06.07.pdf via "FIRST-CLASS MAIL" AS DENOTED ON GT'S COVER LETTER

D. Hesch outstanding fees detailed 22.06.07.pdf

29. When "Greenberg Bill Jan-2-2001 Fax.pdf" is compared to "Hesch outstanding fees detailed 22.06.07.pdf", three entries regarding Brad Barros have been removed in a sloppy redaction. The total bill remains the same. Barros name was simply removed. These invoices were mail fraud.

30. When Greenberg was purportedly representing Ford and BLA, Greenberg billed the BLA group for conversations with Barros. When the Ford questioned the bills, Greenberg took Barros' name off the bills and resent them to BLA with no reduction in the amount billed.

31. Greenberg Bill Jan-2-2001 Fax.pdf, "invoice no. 802552" entries:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 04/23/01 | Jerome M. Hesch | Discuss revisions with Brad Barros | .3 | $120.00 |
| 05/10/01 | Jerome M. Hesch | Telephone conference with Brad Barros | .7 | $280.00 |
| 05/10/01 | Jerome M. Hesch | Prepare revised comments and send to Brad Barros | .3 | $120.00 |
| | | TOTAL TIME | 11.70 | |
| | | TOTAL FEES | | $4,504.50 |

Redacted bill follows (please note date of June 2007-why did it take 5 years to deliver this bill?):

32. Hesch outstanding fees detailed 22.06.07.pdf, "invoice no.802552" redacted entries:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|---|
| 04/23/01 | Jerome M. Hesch | Discuss revisions | .3 | $120.00 |
| 05/10/01 | Jerome M. Hesch | Telephone conference | .7 | $280.00 |
| 05/10/01 | Jerome M. Hesch | Prepare revised comments and send | .3 | $120.00 |
| | | TOTAL TIME | 11.70 | |
| | | TOTAL FEES | | $4,504.50 |

33. First Greenberg Traurig mailed invoices to Ford showing work with Barros. Then Greenberg Traurig mailed invoices to Ford deleting references to Greenberg Traurig work with Barros, which were false – mail fraud -- and which Ford relied on to his detriment by continuing to work with Barros and Greenberg. Then Ford found out on April 21, 2012, that Greenberg had in fact worked with Barros in setting up the competing company.

**D. GREENBERG WRITES THE TAX OPINION LETTER FOR BANCROFT'S PRODUCTS, WHICH ARE DERIVATIVE COPIES OF BLA'S AND FORD'S INTELLECTUAL PROPERTY**

34. The time it takes to establish and have an insurer approved takes months. KPMG/Belmont, GT, Barros, Sigel and White began this effort in 2002. KPMG/Belmont would require a tax opinion letter from GT. Hesch/GT was Bancroft's tax attorney.

35. From Bancroft's website, http://www.bancroftltd.net/phil-sigel, April 11, 2012:

"Mr. Sigel cofounded Bancroft in 2002."

36. From Barros' Deposition, dated August 9, 2007: "I have a beneficial interest in Bancroft."

37. Greenberg wrote tax opinion letters for Ford and BLA, which Greenberg represented to be for Ford's and BLA's clients, but which were false, as Greenberg was using Ford's intellectual property and also writing the same letters for Barros' clients.

**E. KPMG RENEGES ON ITS AGREEMENT WITH FORD: A. FORMS A COMPETITOR COMPANY, BANCROFT, WITH BARROS AND SIGEL; B. ASSISTS IN BANCROFT'S LICENSING WITH THE BVI INSURANCE DEPARTMENT WHICH INCLUDES SUBMISSION OF PRODUCT DESIGNED BY BLA; AND C. PROVIDES ADMINISTRATION SERVICES FOR BANCROFT. KPMG, BARROS, SIGEL, AND BANCROFT STEAL FORD'S INTELLECTUAL PROPERTY BY PRODUCT DESIGN SUBMISSION TO THE BVI INSURANCE DEPARTMENT AND BY USING THAT PRODUCT DESIGN IN THEIR SALES**

38. Ford had numerous meetings, phone calls, faxes, and emails with KPMG LLP at its South Florida office. KPMG LLP's Dallas office performed actuarial work for BLA. KPMG LLP sent invoices for $25,000 to Ford's South Florida office. Ford and BLA paid KPMG LLP $25,000 for JPMG LLP's actuarial work. The invoices were false because KPMG used the work to assist the Barros Defendants, not just the Ford and BLA.

39. Based on political issues and changing regulations in St Vincent, and advice from Greenberg and KPMG, it was decided to establish BLA in another jurisdiction in 2001. The British Virgin Islands ("BVI") was selected. KPMG LLP advised Ford and BLA to use KPMG BVI Limited, Belmont, and Douglas in the BVI. Meetings were held in KPMG LLP's office regarding the KPMG's establishment of and management of BLA. Ford contracted KPMG BVI to prepare the presentation for a captive insurer to the BVI insurance regulators. KPMG LLP recommended that its wholly owned subsidiary, KPMG BVI then Belmont Insurance Management Ltd ("Belmont") act as BLA's insurance manager. Andrea Douglas is a Director of

Belmont and is a partner in KPMG. Ford spent considerable time in KPMG's office working with Martin Eveleigh, the Insurance manager at KPMG, putting together the presentation package for the insurance regulators. Ford had an agreement with KPMG and Belmont would not provide similar services to a competitor for the casualty insurance products that Ford designed. KPMG and Belmont breached that agreement and their representations were fraudulent. Faxes were sent back and forth between KPMG and Ford's Florida office as well as mail and emails. The Belmont email address listed on Belmont letterhead the "Engagement Letter", dated January 24, 2002, to BLA was kpmginsurance@surfbvi.com. Many hours were spent on the phone and fax between Ford's Florida office and KPMG's BVI office as this was a new casualty product for KPMG and Belmont. KPMG/Belmont required Greenberg Traurig's opinion letter before they would allow the first insurance contract to be issued.

40. BLA BVI was incorporated in November 2001. The insurance license was also granted in November, 2001, as evidenced in the fax from Belmont to Ford at his Florida office.

41. Belmont took over as Registered Agent and Registered Office for BLA in 2003.

42. KPMG was the auditor for BLA from the date of incorporation, November 12, 2001, until its September 30, 2002, year end. The audit was completed on October 9, 2003, as evidenced by KPMG's sign off on the signature page. On the recommendation of KPMG LLP in South Florida to Ford, KPMG BVI and Belmont took over administration of BLA from Ford in 2003. KPMG BVI and Belmont operated BLA. KPMG BVI told Ford that since KPMG BVI and Belmont were also insurance managers, they could not perform the audit function and BLA had BDO perform its audit functions thereafter. It should be noted that Belmont and KPMG had the same office address and that Belmont "employees" used "employeename@kmpgbvi.net" email addresses in their correspondence.

43. KPMG/Belmont assisted Barros and Sigel in the establishment of Bancroft Life and Casualty, Ltd. on May 1, 2003 as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

44. KPMG/Belmont assisted Barros and Sigel in the establishment of Chesterfield Services Inc., on April 30, 2003 as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

45. Association Benefits Group, INC., Chesterfield Services, INC. and Collaborative OBGYN Purchasing Alliance, d.b.a. The COOP are listed as shareholders of Bancroft on the Insurance Public Information documents. Bradley A. Barros, Philip Sigel and Kevin White are listed as directors. OBGYN has an address in Florida.

46. Thus, while the KPMG Defendants represented in documents mailed and emailed to Ford that the KPMG Defendants were working on Ford's and BLA's business, the KPMG Defendants were using Ford's products and ideas to establish and work on the Barros Defendants' business. Ford first learned of this on April 21, 2012.

47. In 2002, KPMG/Belmont, Greenberg, Barros, Sigel and Bancroft diverted to Bancroft's bank accounts $2.7 million in premium payments by 11 participants in ABG, a trade association, that were intended for an insurance program offered by Boston Life and Annuity. Ford first learned of that $2.7 Million diversion on April 21, 2012.

48. BLA lost gross revenues $2.7 million, corporate market value and market position due to this continued conspiracy. Ford was robbed of $675,000 year one as his contract with BLA called for payment of 25% of casualty product premium. See Ford' s Agreement dated December 6, 2001. Total loss was $3,915,000 based on the product revenue stream if the clients had entered BLA's program as it was a five year pay in product.

49. KPMG BVI and Belmont performed much more than accounting services during that period. KPMG BVI and Belmont were the insurance managers and administrators for Ford and BLA during this period. KPMG BVI and Belmont and Douglas were running BLA. Belmont performed as insurance manager and administrator for Bancroft. Belmont had to sign all policies issued from BLA or Bancroft. So while KPMG BVI and Belmont were filing documents with the BVI government and mailing and emailing documents to Ford representing to Ford that it was accounting work for Ford and BLA, KPMG BVI and Belmont were also using Ford's products and ideas to do the work for the Barros Defendants. Barros hired and directed Greenberg and the KPMG Defendants regarding their work that assisted Barros and competed with and injured Ford.

50. The KPMG Defendants' audits mailed to Ford and BLA were false, because the information was represented as audits of BLA, when in fact the KPMG Defendants were also using the information for audits of the Barros Defendants.

51. The Conspirators continue up to and including July 8, 2016, in their ongoing criminal enterprise for years to ruin Ford and BLA, steal their clients, loot profits and tarnish the name of Ford.

52. As a result of this continued criminal enterprise, Ford and BLA were unable to attract new clients and BLA was placed in voluntary receivership.

53. KPMG LLP routinely advises its clients to use KPMG BVI for the clients' tax matters. KPMG LLP advised Ford and BLA to use KPMG BVI and Belmont.

54. KPMG Cayman, McDonald, Beighton (and subsequently Crumpler and Drury) were appointed Joint Liquidators February 27, 2008 according to KPMG's "Report of the Joint Liquidators", dated March 20, 2008. KPMG LLP, KPMG BVI, KPMG Cayman, McDonald,

Beighton, Crumpler, and Drury had a conflict in representing BLA and then acting as liquidators of BLA. This joint appointment spanning two islands was a scheme that only served to cause time delays and exponentially increased costs in the liquidation of BLA and assist Bancroft. There are many emails and letters from KPMG, McDonald and Beighton that prove their statement of availability to be a fallacy; “out of office”, “travelling”, “sick”, “vacation”, “at the airport”, etc. It took weeks and in some cases months to get responses. During this multiple year period, which began in 2002, KPMG continued and continues to this day in their conspiracy to loot the BLA Group.

55. During the time that KPMG LLP, KPMG BVI, Belmont, and Douglas managed BLA, and during the liquidation by KPMG Cayman, Beighton, McDonald, Drury, and Crumpler, Ford was excluded from information and decisions about BLA. Despite Ford’s due diligence to learn what was going on with BLA and what the Defendants were doing about BLA and Ford’s products, Ford did not learn about the conspiracy or his injury in fact until he read a Memorandum in Civil Action No. 10 on April 21, 2012.

56. Orders KPMG obtained from the BLA liquidation are unenforcable as the liquidation estate appointment, liquidation estate operation, and liquidation estate orders were obtained by fraud, including but not limited to the KPMG Defendants’ withholding of information from the BVI liquidation such as KPMG’s own admissions that annuity policy assets such as Ford’s are assets from the annuity company BLA and not part of the liquidation estate.

57. In furtherance of the RICO conspiracy, the Conspirators continue the mail fraud and wire fraud as recently as July 8, 2016, when the KPMG Defendants sent out fraudulent mail and wires to Ford and his lawyer asserting a claim that Ford’s property in his annuity policy belongs to the BLA liquidation estate, even though there is an order specifically prohibiting the

KPMG Defendants from asserting any claim regarding BLA's assets; BVI law specifically states Ford's annuity policy, not BLA, owned the annuity policy assets; and KPMG has admitted in writing that an annuity policy such as Ford's, not BLA, owns the annuity policy assets.

58. The KPMG Defendants' failure to keep Ford's and other annuitants' assets in accounts separate from BLA and stealing those assets is a crime. Section 812.014, Florida Statutes; British Virgin Islands Criminal Code Part XIV.

## F. KPMG UNILLATERALLY REVERSES ITS POSITION ON BLA'S CASUALTY PRODUCT AS INSURANCE MANAGER AND AUDITOR WHEN IT BECOMES THE LIQUIDATOR AND DECIDES TO ENRICH ITSELF BY LOOTING THE GENERAL RESERVES

59. The liquidation was a simple matter, only a handful of separate account annuity clients remained and a summary judgement clarified that BLA owned its general reserves and that the casualty products were 1 year terms. The KPMG Defendants agreed in its earlier audits that BLA owned its reserves. The KPMG Defendants, in the insurance product filing with the BVI Financial Services Department, stated the casualty product required no reserving after the term of its risk, which was one year, and premium was earned as received. The KPMG Defendants as insurance manager agreed that no reserving was necessary and issued and signed the one year policies in question. That is more mail fraud by the Conspirators.

60. KPMG billed $717,000 for its liquidation services for 2 months, from December 20, 2007 to February 27, 2008. See P.36, KPMG's "Report of the Joint Liquidators". KPMG were only Provisional Liquidators at this time.

61. As evidenced by wire fraud and mail fraud email letters dated July 8, 2016, KPMG seeks to continue the liquidation even tough an order from the BVI prohibits the liquidators from pursuing claims about BLA's assets, and as cash comes in the liquidators take as fees all the liquid money including Ford's annuity policy assets (which KPMG admits, and BVI

law confirms, and KPMG documents show) belong to Ford, not BLA, the BLA liquidation estate, or the Defendants.

62. The liquidators failed in their duties to protect BLA and Florida and other US client policy assets. KPMG failed to pursue third parties for BLA assets worth millions:

| | |
|---|---|
| Puritan | $2,500,000 |
| LCCF | $1,500,000 |
| Hoilman's/MHA Financial secret commission regarding BLA's MedCap investment | $65,000 |
| MedCap | $1,000,000 |

**G. KPMG, AS LIQUIDATOR, INTENTIONALLY NEGLECTED ITS FIDICICARY DUTIES TO THE SHAREHOLDERS OF BLA, THE POLICYHOLDERS OF BLA, THE CONTRACT HOLDERS OF BLA AND BLA.**

**PURITAN:**

63. Policy holders F. Best, J. Shaw, M. Haddock and 10 other US clients including an IRA account, 3 non-US persons and BLA lost their funds due to the KPMG Defendants' failure to follow-up on the Puritan theft/issue. At this time during the BLA liquidation, the KPMG Defendant's excluded Ford from all involvement and information regarding BLA. BLA urged the KPMG Defendants to pursue the Puritan principals to recover Puritan investors' funds that the Puritan principals stole. But the KPMG Defendants refused to pursue the matter as they made no money from the action, and the action would have required the KPMG Defendants to hire professional firms to investigate and pursue. Those funds would have reduced the general reserves and therefore less money for the KPMG Defendants to bill BLA. Millions were lost as a result of the KPMG Defendants' failure to act. KPMG acted similarly regarding Medcap and LCCF investments. As recently as July 8, 2016, the KPMG Defendants refuse to recover BLA assets and instead seek money only from Ford.

**DOLPHIN COVE:**

64. Casey McDonald, one of the KPMG liquidators, told Ford that one of the Cayman KPMG office's "clients", was interested in buying one of BLA's real estate assets, Dolphin Cove in the United States Virgin Islands, but only at pennies on the dollar. See e-mails May/June 2008. Various emails and telephone conversations support KPMG's plan to assist one of their Cayman clients by defrauding Ford, a Florida BLA policyholder, who is an owner of Dolphin Cove through his annuity policy. The KPMG Defendants refuse to pay out the Dolphin Cove proceeds to Ford even though the KPMG Defendants' documents show Ford owns the property; BVI law states Ford through his annuity owns the property; a Certification from the BVI prohibits the KPMG Defendants from asserting any claim regarding the BLA assets; and the KPMG Defendants admit in a letter that annuity policies such as Ford's own their property, not the annuity company like BLA. As recently as July 8, 2016, the KPMG Defendant continued the wire fraud and mail fraud when KPMG claimed the Dolphin Cove property and refuse to acknowledge Ford's and his annuity policy's legitimate claim to the property and Carina stock by way of 2 wire fraud and mail fraud email letters to Ford and the undersigned counsel claiming the Dolphin Cove property, even though Ford and his annuity paid for the Dolphin Cove property.

**H. KPMG SELF DEALING**

65. On advice of counsel, BLA was placed into voluntary liquidation. BLA was not insolvent because BLA had plenty of funds to pay the bills, cash of $1-2 million.

66. The KPMG Defendants had a meeting at KPMG's office regarding BLA and their connived position that a solvent company placed into voluntary liquidation was insolvent. If insolvent, the BVI regulators would have immediately placed it into involuntary receivership.

The auditor's (BDO) and a third party accountant's statement show it was not insolvent. The liquidators withheld information from the liquidation court and committed fraud. KPMG, McDonald, and Beighton (and now Crumpler and Drury) abused and continue to abuse their power to run rampant and overcharge BLA in fees and participated in self-dealing and fraudulent transactions regarding BLA and its annuity clients for corporate and personal betterment of the Conspirators.

**I. GREENBERG WROTE TAX OPINION LETTERS TO ASSIST BANCROFT WITH ITS BUSINESS COMPETING AGAINST BLA**

67. After writing tax opinion letters for BLA to support BLA's insurance product, GT/Hesch provided Bancroft with the tax opinion that allowed Sigel, GFAN, ABG, Barros and Bancroft to rob BLA of clients and products and divert the $2.7 million via ABG bank accounts. Greenberg fraudulently misrepresented the tax opinion letters were for Ford and BLA, when in fact the tax opinion letters were also for the Barros Defendants. Greenberg's actions were also in violation of the Florida Rules of Professional Conduct, which prohibit a lawyer who formerly represented a client, such as Ford and BLA, from representing another person in matters adverse to the former client, and which prohibit a lawyer from using or revealing information relating to the representation of s former client to the disadvantage of the former client. Rule 4-1.9.

68. When Staffworks (as SCI's predecessor) and Scolari were residents in Orange County, Scolari was introduced by his then-accountant to an Orange County tax attorney, Mr. Matt Brown. Brown presented Scolari and Staffworks with the Bancroft Insurance Program. Brown presented Scolari with a tax opinion letter to Bancroft from Greenberg Traurig that promoted the tax benefits of the Bancroft Program. Scolari entered into the Bancroft Program, premium payments totaling at least $7.6 million.

69. GT reviewed all of Bancroft's marketing materials from Bancroft's inception.

70. From an Affidavit (5) of Brad Barros dated September 21, 2007: "Bancroft hired Greenberg Traurig from its inception to review all of its marketing materials for compliance."

**J. GT REFUSES TO WRITE BLA'S TAX OPINION IN YEAR FIVE, ESSENTIALLY PLACING BLA OUT OF BUSINESS. GT SAYS IT WILL AND THEN REFUSES. GT CLAIMS BLA OWES IT MONEY AND REDACTS ITS BILL FROM 4 YEARS EARLIER.**

71. Greenberg told Ford the insurance product was tax compliant in 4 years of tax opinion letters to Ford and Ford's clients. That was mail fraud. The product was not tax compliant without the 5th year tax opinion letter.

72. GT/Hesch emailed, faxed numerous documents and told Ford and BLA as well as third unrelated parties in 2004 and 2005 that GT would renew the tax opinions for BLA. GT/Hesch told Ford he would renew the opinions.

73. The updates were never done in order to deny BLA/Ford an updated tax opinion and to allow Bancroft and GT to take advantage of their marketing of unregistered insurance products and securities in the United States. GT/Hesch intentionally misled third party marketers of BLA products by making misleading statements regarding the opinion letters.

74. GT/Hesch, in an email dated December 30, 2005, confirmed in an email to a third party's counsel and copied to BLA counsel, that GT would prepare updates for two of the three opinion letters.

75. GT/Hesch, in an email and fax to BLA/May, dated June 20, 2006, which is believed to be intentionally misdated (should be January 20, 2006, considering Hesch stated, "I am in receipt of your December 19, 2005 email"), GT/Hesch stated, "Due to a pressing workload, and other considerations, our firm has decided not to undertake this proposed engagement to provide updated opinion letters." Greenberg also sent letters and emails to Ford and others stating that Greenberg did not issue the tax opinions because Ford and BLA did not

pay their legal bills, which was false. Greenberg's statements above were wire fraud and mail fraud. Greenberg did not provide Ford and BLA with the tax opinion letters because Greenberg was working for Ford's and BLA's competitors the Barros Defendants.

76. One of Bancroft's products, "Premium Lite", was touted as an insurance product but fails the insurance guidelines to qualify, therefore making it a security, which falls under SEC jurisdiction. Bancroft's products were not registered as insurance products or securities in the United States.

77. Bancroft and GT marketed and sold unregistered insurance products and securities in the United States from an unlicensed company, Bancroft.

78. The Federal and State tax implications of the purchasers is another consideration in the Conspirators continuing RICO criminal enterprise**.** There are fatal flaws in the Bancroft Program tax scheme that disqualify it as an insurance product. That is a crime. Its purported tax benefits of deductibility of premium, tax deferred growth, selection of investment, life insurance and loan ability without incurring a taxable event are a fraud as the product is not qualified as an insurance product. The individual components of the product look and act like insurance but when taken together in the whole, the product is not insurance but a security/investment. This is another example of compartmentalizing the information to disguise the fraud.

79. GT marketed the Bancroft product in the United States by speaking at joint Bancroft/GT presentations at GT's offices.

80. From Barros' Deposition, dated August 9, 2007:

Q Did any representative of Greenberg speak
at any conferences that were sponsored by GFAN, ABG
or Bancroft?
A When?
Q At any time.
A Say the question again.

Q Did any representative of the Greenberg law firm speak at any conference that was sponsored by GFAN, ABG or Bancroft?
MS. SHEARN: I will object to the form. It's a compound question.
A I still answer, right?
Q Yes.
A Yes. Jerry Hesch."

81. The announcement of a joint GT/Bancroft marketing and sales program follows:

From an email Brad Barros to Mechell Burgette, dated August 19, 2004:

> Subject: From GFAN – Introducing Premium Lite: The Ultimate Insurance Solution
>
> Webinar, Software and Conference Training Schedule
>
> Conferences – there are two training conferences scheduled for Premium Lite: Washington, DC and Santa Monica, CA. The conferences will be from 8:00 am to noon, and will include lunch.
>
> All conferences will be held in the local offices of Greenberg Traurig, LP.
>
> Guest speakers to the advanced planning webinars and conferences will include the following individuals, depending on availability:
>
> Jerome Hesch, JD – Jerry is a professor at the University of Miami law school, and is a partner at the national law firm of Greenberg Traurig, LP….
>
> Jon Foster, JD – Jonathan Foster, a partner at the national law firm of Greenberg Traurig, LP., is the Chairman for the firm's Estate & Wealth Management Group…"
>
> Enrollment Form. Complete this Enrollment Form and fax it to 302-678-9574.
>
> If you have any questions, please call us at 302-678-4600.
>
> Powerful new uses for Premium Lite with pensions, estate and business planning, and professional athletes.
>
> For casualty insurance to be deductible, premiums must be considered reasonable. If not reasonable, back taxes, interest and penalties may be assessed by the IRS.

82. The webinars were September 9, 16, 17 and 20, 2004 and the conferences in GT offices were September 22 and 28, 2004.

83. Greenberg and KPMG stole Ford's ideas and products to do work with Ford's competitor in order to increase fees while having to do minimum original legal and accounting work respectively.

84. Greenberg stole Ford's insurance product, used it to make insurance products for Barros and charge Barros for the products, then make more fees writing tax compliance letters for Barros' clients, and the make more money making webinars and attending seminars with Barros promoting the insurance products Barros and Greenberg stole from Ford.

85. Regarding the GFAN/GT announcement's statement about deductibility, pensions and the IRS, from an "Offshore Alert" article, dated June 24, 2011:

> Troubled offshore insurer Bancroft Life & Casualty ICC Ltd., which appears to have operated a bogus tax avoidance scheme aimed at U.S. taxpayers, has filed five separate civil complaints against insureds in the United States over the last three months.
>
> In court filings responding to the complaints, the FFD group accused Bancroft Life & Casualty of providing a "bogus insurance product.
>
> A similar allegation against Bancroft Life & Casualty was made by another insured, controlled by Seattle, Washington resident Cesar Scolari, in a lawsuit in which he claimed that he sent more than $7 million to Bancroft under the guise of 'premium payments' and then received it back under the guise of 'loans', which he claimed to have stopped servicing due to concerns about alleged over-billing and fraud by Bancroft.

86. The Department of Labor oversees pensions and it has a very specific set of laws and regulations separate from the insurance regulations that address deductibility, tax deferred growth and loans or distributions from pension plans. These may be found at the US Department of Labor's website: http://www.dol.gov/ebsa/.

87. Barros does not hold a license to sell investments. Barros' selling of investments as part of the RICO conspiracy is a crime. Sections 517.12 and 517.302, Florida Statutes.

88. From Barros' Deposition, dated August 9, 2007:

Q you were not licensed to sell investments?
A I don't remember when my license lapsed.

89. At the time Greenberg and the Barros Defendants were fraudulently telling Ford and BLA that Greenberg and the Barros Defendants were working for Ford and BLA, Greenberg was working for the Barros Defendants and the Barros Defendants were working for themselves.

**K. BARROS RENEGES ON HIS AGREEMENT WITH BLA/LF AFTER BARROS RECEIVED MONIES TO BE BLA'S EXCLUSIVE MARKETING AGENT.**

90. Bancroft's products are knock-offs of BLA's products. The Barros Defendants used wire fraud and mail fraud from Barros to Ford to fraudulently represent to Ford and BLA that the Barros Defendants were working for Ford and BLA. In fact, the Barros Defendants were using Ford's insurance products and proprietary information on a new product Ford was developing and launching. BLA granted loans to Barros in 2002 and forgave the loans in 2003 on Barros' wire fraud and mail fraud that Barros was the exclusive marketing agent for BLA and would not offer any other products or represent any other company unless otherwise agreed. At the time, the Barros Defendants were establishing Bancroft, developing their own product using Ford's ideas, and competing against Ford and BLA.

91. Bancroft's initial license listed "Disability and Special Risk" as the company's product lines. Barros is listed as a Director of Bancroft on the license and his company, Association Benefits Group, Inc. listed as an owner (Exhibit 4, p167, line 14 through P168, line 10 and Exhibit 11c). Greenberg wrote the same tax opinion letters that Greenberg wrote for BLA.

92. Barros was an integral part of the BLA marketing effort. His indemnification of

IAPB and Dijon as a result of his causing those entities to be established per the Sentry and Benefit Purpose Trusts were key to complying with the GT opinion letter and GT's advice regarding the legal and regulatory structure required for BLA.

93. Sigel, Barros, Bancroft, KPMG/Belmont and GT conspired to use Ford's propriety intellectual property *regarding the insurance product design and his policy language, which was not in the public domain*, for their personal and corporate gain. The Conspirators diverted client funds due for BLA and stole Ford's intellectual property.

**L. ANOTHER DIVERSION OF PREMIUM DUE FOR BLA BY BARROS**

94. Barros, in the last quarter 2002, diverted a client for the new product design, called "Refund+Life", which Ford developed with American General and BLA.

95. Barros delayed the submission of a life insurance policy and apparently diverted funds and the client to Bancroft.

96. From Barros' email dated August 22, 2002:

> NEWSFLASH
> Boston Life has just entered into a relationship with American General Life, one of the largest life carriers in the US and a wholly owned subsidiary of AIG, the largest insurance group in the world. American General Life will provide certain insurance products for Boston Life and American General Life will promote the resulting program. This program is specifically designed for US based associations representing many tens of thousands of high net worth clientele. It demonstrates the innovation and credibility of Boston Life and its products.
>
> Boston Life continues to develop relationships with established and new companies who demonstrate innovation or impressive and consistent performance records.

The above is mail and wire fraud because the Conspirators were using the product for their own purposes, not for the BLA Group.

97. From Barros' Deposition in the Brevard, County of Florida lawsuit, *Blue Topaz*

*LLC v. Employers International Inc. et al.*, dated August 9, 2007:

> Q You state "we have entered into a semi exclusive relationship with American General Life and are opening negotiations for a worldwide exclusivity arrangement with AIG." What did you mean by that?
>
> A I meant that we were going -- that Leo Ford and I had gone to American General Life, and we were going to -- we had worked out an agreement that American General would work with Boston Life and Annuity in regard to using its life products with Refund Plus in an insurance reserve pool, and that we were trying to work out something beyond American General, to work with all the AIG Life companies Worldwide.

Barros' Dep. 229:13-25, 230:1.

### M. KPMG/GT/BARROS/SIGEL CONSPIRACY PLANNING

98. Sigel agreed to a 50/50% business arrangement with Ford regarding Group Insurance Policies dated January 30, 2001. That document was wire and mail fraud because at the time the Barros Defendants were using Ford's products to design insurance products and his money to fund the GT opinion letter and all expenses relating to KPMG/Belmont concerning the casualty insurance products.

99. Sigel reviewed and added comments to Ford's draft policy language as evidenced by his handwriting on policy drafts. The notes on the draft policies denote that Belmont/KPMG designated the premium "as earned" by Ford. That document mailed and wired to Ford was mail and wire fraud because the Barros Defendants diverted the funds.

100. The Conspirators diverted client funds due for BLA and stole BLA/Ford's intellectual property with GT/KPMG/Belmont knowledge and assistance.

101. During this period of time, a smear and intentional disinformation campaign was launched against BLA/Ford.

102. Barros approached BLA, not Ford, another person, and "offered" to take all of BLA's clients to Bancroft. Although Barros approached BLA, not Ford, another person, and "offered" to take all of BLA's clients to Bancroft and Ford may have known that Barros and Sigel were in the insurance business, Ford did not learn until April 21, 2012, when he read a Memorandum in Civil Action No. 10 about Barros' and the other Defendants conspiracy to work together and steal Ford's ideas and insurance products; the mail fraud and wire fraud sent by the Defendants; the crimes committed by Defendants; and the injury in fact to Ford resulting from the diversion of the $2,700,000 identified in Barros' deposition and Defendants' other actions, which resulted in ruining Ford's business and reputation and causing Ford to lose property such as the assets in Ford's annuity.

103. From the First Affidavit of Brad Barros, dated April 10, 2007 in the British Virgin Islands case of Boston Life & Annuity Ltd v Dijon Holdings Limited et al: "In late 2006 I shared Boston Life's audit with former BVI Insurance Regulator, Nigel Bailey. The audit was performed by BDO in the BVI. Mr. Bailey could not find any such identification of a Reserve and was concerned as to the efficacy of Boston Life."

104. Barros failed to disclose to the BVI Court that Barros/Bancroft had a direct business link as Nigel Bailey at that time was a Vice President of Intercontinental Captive Management Company, LTD, Greensburg, Pennsylvania, the management company hired by Bancroft on October 15, 2004 to manage Bancroft's day-to-day operations. It was in Barros/Bailey's interests to harm BLA/Ford.

105. Barros continued: "I was told directly by Professor Hesch, the billing attorney for Boston Life at Greenberg Traurig, that the reason that Greenberg Traurig would not update the legal opinion was due to the fact that Boston Life would not pay their prior legal bills and that

any attempt by Mr. May to blame Greenberg Traurig for not updating the opinion was "ridiculous because, as Rick (May) well knows, they (Boston Life) wouldn't pay their bills!" (Exhibit 33, p16, para 66)

106. More fraud. In fact, BLA paid its legal bills, including the bill in which Greenberg redacted Barros' name.

107. GT/Hesch provided privileged BLA documents to Barros and others. "In fact, Professor Hesch has provided documentation to me outlining his role with Boston Life.

108. BLA's lawyer, GT Hesch, in a letter dated September 13, 2006, communicated to Attorney William Hoilman, the lead attorney who had filed suits in Miami against BLA/Ford/May and was assisting Barros in the BVI litigation and smear campaign.

109. Hoilman's Company, MHA Financial is the company identified in KPMG's "Report of the Joint Liquidators" as taking a secret commission from one of BLA's investments. KPMG as Liquidators have failed to follow up on this asset. Barros was in collusion with Hoilman to destroy BLA/Ford. From Barros' Deposition in the Brevard, County of Florida lawsuit, *Blue Topaz LLC v. Employers International Inc. et al.*, dated August 9, 2007, dated August 9, 2007:

> Q (MR. WOLFE) Do you recall giving an
> affidavit in the BVI case consisting of 19 pages
> which was signed on or about March 5th 2007?
> THE WITNESS: No. Nobody other than my
> attorneys.
> Q (MR. WOLFE) Which attorney did you
> consult with when you prepared this affidavit?
> A Bill Hoilman.
> Q Why did you prepare this affidavit?
> A Because Bill asked me to.
> Q At the time Bill was also representing the
> defendants in the BVI case and the plaintiffs in the
> Miami case, is that correct?

Barros' Dep. 175:23-25, 177:1-10.

110. KPMG/Belmont violated client privilege and their fiduciary duty by discussing the BLA proceedings with Barros: "Prior to Boston life filing a Claim before this Court on March 7, 2006, I spoke with Simon Owen, who at the time was the Insurance Manager of Boston Life at Belmont Insurance Management in Tortola, BVI about Boston Life."

**CAUSATION**

111. While representing the BLA Group, KPMG/GT/Barros/Sigel/Bancroft used the Ford's ideas, intellectual property, and insurance products and set up a competing insurance product and business.

112. KPMG/GT/Barros/Bancroft diverted $2.7M of premiums that were supposed to go to Ford and BLA.

113. GT refused to write the 5th year opinion letter – fraudulently stating because ford and BLA did not pay their legal bills -- at the time GT had prepared Barros'/Bancroft's business and products and conducting seminars with Barros/Bancroft.

114. BLA could not take 5th year premiums from 54 clients because no tax opinion letter stating that the premiums were deductible for tax purposes. So BLA could not collect 5th year premium. The Barros Defendants sent wire fraud and mail fraud to 54 BLA clients stating BLA owed the clients' money and encouraging the clients to sue BLA.

115. BLA went to the Eastern Caribbean Supreme Court to ask for a summary judgment holding that BLA did not have to give previous premiums back to clients if they did not pay the 5th year premium.

116. Before court decision Barros/Bancroft wanted BLA to transfer clients to Bancroft. Hoilman represented 54 clients who sued BLA in Florida. Hoilman went to BVI Eastern

Caribbean Supreme Court and got ex parte freeze order re BLA assets.

117. All Defendants assisted in freezing the assets of Ford and BLA. (In this complaint, Ford is not suing for assets of BLA). That freeze order was obtained by the Defendants' fraud and crippled BLA and Ford's ability to do business. The Barros Defendants then went to the internet and press claiming Ford and BLA stole money and did not pay attorneys. The bad press killed Ford's and BLA's business. At that time, the KPMG Defendants were the BLA liquidators and conspired with the Barros Defendants and would not sue the Barros Defendants and just liquidated and raped BLA with fees and costs.

118. BLA won the summary judgment in the Eastern Caribbean Court. The freeze order was lifted. The was reversed, but the reversal had nothing to with the RICO conspiracy in this case. GT/KPMG/Barros/Bancroft set up a competing company. GT would not issue opinion letters. KPMG raped the company in liquidation. The above actions of the Defendants ruined Ford's and BLA's reputation and rendered it impossible for Ford to work in the insurance business as he had done for 25 years.

119. While all this was going on, after the KPMG Defendants took control of BLA and excluded Ford from knowledge about the business, Barros/Bancroft offered -- not to Ford -- that Bancroft would take BLA's 52 clients, proving Bancroft was in the same business. Ford found out about Barros' offer after April 21, 2012. Ford attempted to discover matters about BLA, but the Defendants refused to provide Ford with information about BLA while the KPMG Defendants managed BLA before, during, and after the liquidation.

120. The Defendants stole Ford's ideas and products and ruined his reputation and ability to work in the insurance business.

121. The Defendants conspired to steal Ford's assets, and did in fact steal the assets

from Ford's annuity policy, which contractually and legally was not part of BLA or the BLA liquidation, as recently as July 8, 2016 and continuing up to this day attempting to prevent Ford from receiving assets in his annuity policy such as proceeds from the sale of the Dolphin cove property on St. Thomas, stock in a company associated with that property, and membership in a limited liability company that owned that property, which Ford's annuity policy purchased.

122. On information and belief, to be determined during discovery, the KPMG Defendants took money and assets from Ford's annuity, which by contract, law, and KPMG admissions should have been kept in separate accounts, and the KPMG Defendants put Ford's annuity assets in BLA general reserves and the KPMG took the annuity assets as fees.

**DAMAGES**

| Event | Loss to Ford (interest not applied) | People/Organizations Involved |
|---|---|---|
| Diversion $2.7 million GT, ABG insurance premium (11 risks) intended for BLA (plan was$2.7M each year for 5 years and they diverted year 1 years 2-5 not paid for a total of $13.5M lost premium) | $3,375,000 (Ford was to receive 25% of premium per Ford's contract) + $540,000 (2% per year premium fee) = ***$3,915,000 interest of 4% would add $1,566,000 minimum*** | Sigel, Barros, KPMG, Bancroft, GFAN, ICMC, Baily (Conspirators Group A) |
| Ford's Loss of Initial Investment in BLA; Capitalization, legal, accounting and other fees (2001) | ***$750,000 interest at 4% adds $450,000*** | |
| Cash and Equity Loss (General reserves $11.5M; standard valuation of insurance company is 10 times general reserves | ***$115,600,000 interest adds $41,616,000*** | |
| Ford had a contract with BLA if liquidated or cease business | ***$6,500,000 interest at 4% adds $2,340,000*** | |
| Ford loss re Dolphin Cove real estate on ST. Thomas | ***$375,000 + $405,000 = $780,000 ($405,000 is interest at 12% contractual)*** | |

| Event | Loss to Ford (interest not applied) | People/Organizations Involved |
|---|---|---|
| Annuity | ***$2,000,000 + $2,160,000 = $4,160,000 ($2,160,000 is interest at 12%)*** | KPMG and Group B |
| Loss of Earnings including loss of reputation and loss of ability to do business 2006 – 2016 based on Ford previous year's tax returns (2006-2016) | ***$11,000,000 (no interest or reinvestment of earned monies included)*** | |
| **HARD LOSSES** | ***$136,205,000*** | |
| **INTEREST** | ***$ 43,632,000*** | |
| **TOTAL** | ***$179,837,000*** | |

* Ford also claims treble damages under RICO.

123. KPMG incorporated Bancroft and performed their insurance manager and admin functions. KPMG had an exclusive with BLA at that time not to perform similar duties with competing companies as BLA's product line was developed by Ford and was his IP.

124. Greenberg Traurig issued opinion letters, reviewed Bancroft's marketing materials and structures, participated in marketing Bancroft products via webinars and presentations in GT offices as set forth in depositions given by Barros in Florida as well as marketing materials. Other lawsuits by Bancroft clients against Bancroft will verify this.

125. KPMG, McDonald, Beighton, Crumpler, and Drury should never have accepted the position as liquidators due to their prior duties as incorporators, administrators, managers and auditors of BLA. KPMG, McDonald, Beighton, Crumpler, and Drury did so in order to cover and conceal their misdeeds, which continue to this day as evidenced by 2 acts of mail fraud and wire fraud on July 8, 2016. They "fee'd" all the liquid cash out of BLA Ford's annuity policy and refused to distribute insurance policy assets and monies to Ford and his co policy holder, Mary Ford, a Florida resident. The application for that annuity was taken and executed in Florida.

126. KPMG, McDonald, Beighton, Crumpler, and Drury further failed to follow up on the counterclaim filed by BLA before its liquidation. Two other individuals received sizeable settlements from 54 BLA clients in Miami. Ford was never served and was informed he could not submit a counterclaim.

127. As set forth above, KPMG failed in its fiduciary duty to protect BLA's and Ford's assets.

128. KPMG, McDonald, Beighton, Crumpler, and Drury refuse to pay any of Ford's claims although various contracts existed since the inception of BLA and his 5-year contract was renewed 5 to 6 months prior to BLA's voluntary liquidation. Ford's expenses on the behalf of the BLA were not reimbursed. Although Ford was the major single creditor at liquidation, KPMG, McDonald, Beighton, Crumpler, and Drury refused to allow him on the Creditors' Committee, recognized that the 54 as creditors despite the Summary Judgment in favor of BLA. KPMG, McDonald, Beighton, Crumpler, and Drury did not provide Ford with any knowledge of the liquidation after they positioned themselves to loot all of BLA funds and assets.

129. Ford had $2M invested in Dolphin Cove real estate project on St. Thomas. When the BLA business was liquidated, the Dolphin Cove partners removed Ford from Managing Member and would not deal with him. KPMG contacted Dolphin Cove partners and entered negotiations to buy the Dolphin Cove real estate at pennies on the dollar. Dolphin Cove decided not to pay Ford his contractual monies due as they wanted Ford to be unable to fight them legally and also removed him as a Managing Member and from the DC website where he had been prominently placed as a Founder and Managing Member. As recently as July 8, 2016, KPMG, McDonald, Beighton, Crumpler, and Drury continue to fraudulently assert claims over the Dolphin Cove property and fraudulently deprive Ford of his investment in the Dolphin Cove

property, even though the BVI Certification prohibits the KPMG Defendants from asserting any claims regarding BLA's assets.

130. KPMG, McDonald, Beighton, Crumpler, and Drury refuse to pay and claims loans and distributions against the Ford's annuity policy that were not collateralized by the policy. Mary Ford and Leo Ford were residents of Florida at the time the annuity policy application was signed (in Florida) and assets transferred to a separate account at BLA. Mary Ford remains a Florida resident to this day. Mary Ford had to sell the house she lived in since the mid 1980's due to lack of money and move with her young grandson to a far inferior location/house. By BVI law, policy assets are to be held in separate accounts not subject to claims of creditors, etc. KPMG, McDonald, Beighton, Crumpler, and Drury are fraudulently not recognizing that law. Florida law is very strict protecting the assets of policyholders.

131. Ford has been unable to do any insurance business since this conspiracy. Real estate joint ventures fell apart, and people refused to do business with him after reading the negative press in the insurance and all other business endeavors.

**DEFENDANTS/CULPABLE PERSONS**

132. The Defendants/Conspirators identified above comprise an association-in-fact enterprise (hereinafter referred to as the "RICO Enterprise"). Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

**RICO ENTERPRISE**

133. Defendants/Conspirators are associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct towards the BLA Group.

134. The Defendants/Conspirators used mail and wire fraud, as recently as July 8, 2016, directed to both the BLA Group and their clients and the public to facilitate the RICO Enterprise.

**THE NAMES OF THE INDIVIDUALS, PARTNERSHIPS, CORPORATIONS, ASSOCIATIONS, OR OTHER LEGAL ENTITIES THAT CONSTITUTE THE RICO ENTERPRISE**

135. The names of the individuals, partnerships, corporations, and other legal entities that constitute the RICO Enterprise are set forth above.

136. The above named Defendants/Conspirators have formed an association-in-fact enterprise comprised of the above Defendants and multiple other individuals and businesses that all play an integral role in orchestrating a fraudulent and deceptive scheme upon the Ford and BLA, their clients, and the public. Defendants have utilized their background and knowledge and Ford's products and work product to structure various businesses and individuals in such a manner so as to serve critical, interrelated, and component roles necessary in facilitating Defendants' scheme and racketeering activity.

137. The above persons and entities when combined as an association-in-fact enterprise provide vital and necessary component services that together facilitate racketeering activity and a fraudulent scheme that any one business or individual could not accomplish standing on its own. Each individual and business of the association-in-fact enterprise is necessary to accomplish the overall objectives of the enterprise.

**THE STRUCTURE, PURPOSE, FUNCTION, AND COURSE OF CONDUCT OF THE TIMESHARE FRAUD RICO ENTERPRISE**

138. The various functions of each Defendant are outlined above in greater detail.

139. The Defendants, their agents, and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact. The various Defendants function together as a continuing unit. From on or about 2005 to as recently as July 8, 2016, Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged

in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including multiple acts of mail fraud, wire fraud, online fraud, and/or financial fraud. Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. Defendants' acts of mail fraud, wire fraud, online fraud, and financial fraud are occurring on an ongoing and daily basis targeting BLA's clients, Ford's assets, Ford's annuity policy, and Ford's intellectual property.

140. Defendants' participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing/continuing basis since 2005.

141. Defendants utilize wire fraud, mail fraud, online fraud, and/or financial fraud to accomplish or further the enterprise's fraudulent scheme, and Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce. The nature of Defendants' more than 2 and multiple predicate acts, including 2 acts of wire fraud and mail fraud on July 8, 2016, business model, and organizational structure involve a distinct threat of long-term racketeering activity. Defendants have the same or similar purposes, results, participants, victims, methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy, and meticulous organizational structure. The acts committed by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal, and predatory practices occurring on a daily basis. The KPMG Defendants refuse to protect the assets of other annuitants in segregated accounts, such as Fred Best, all the time raping the insurance company of assets and fees. Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise. Defendants' scheme is ongoing and daily in nature, and predicate acts are committed

daily and routinely. Those predicate acts are continuing and will continue into the future.

142. The organization functions with Defendants' orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. The meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

143. Defendants' enterprise has an existence that is independent of and/or separate from the pattern of racketeering activity in which it engages. Defendants have some raison d'etre beyond mere criminality. The association-in-fact enterprise consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

144. The enterprise is an association-in-fact enterprise comprised of Defendants, and other persons and entities listed above.

**THE DEFENDANTS ARE INDIVIDUALS OR ENTITIES SEPARATE FROM THE TIMESHARE FRAUD RICO ENTERPRISE**

145. All Defendants are associated with the alleged association in-fact enterprise and each comprises and integral part of the entire scheme as outlined in greater detail above. Defendants have orchestrated and meticulously structured the various Defendant companies and individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

146. Defendants are not the enterprise itself.

147. Each Defendants' role in the association-in-fact enterprise is outlined above. Defendants and other, but unidentified, individuals working for Defendants are currently and/or have perpetrated racketeering activity and are members of the association-in-fact enterprise. This

perpetration of racketeering activity is ongoing as described above.

148. All individual Defendants play an integral role in actively furthering the objective of the enterprise. All individual Defendants are members of the association-in-fact enterprise. None of the individual Defendants were passive instruments or victims. The individual Defendants are instruments for racketeering activity and the companies provide necessary and vital components of Defendants' scheme and racketeering activity.

149. The pattern of racketeering activity and the enterprise are separate.

150. The RICO enterprise and the RICO activity have not merged into one entity. The individual Defendants utilize the various persons and entities to engage in racketeering activity. The organization functions with Defendants orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

151. Defendants' fraud and deception described above are primarily necessary to accomplish the enterprise scheme and requires conduct beyond the purview of legitimate business practices associated with just selling and marketing a timeshare contract.

**THE RELATIONSHIP BETWEEN THE ACTIVITIES OF THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY**

152. The racketeering activity differs from the usual and daily activities of the enterprise.

153. Defendants' businesses in this case, when combined as an association-in-fact enterprise, provide vital and necessary component services that together facilitate the racketeering activity and fraudulent scheme that any one business or individual could not accomplish standing on its own. The racketeering activity and/or mail fraud and wire fraud arise

as the result of fraud.

**THE BENEFITS THAT THE ENTERPRISE RECEIVES FROM THE PATTERN OF RACKETEERING ACTIVITY**

154. The Defendants/Conspirators benefitted financially from the above racketeering activity by receiving premiums, attorneys' fees, management fees, accounting fees, and liquidation fees as set forth above.

**THE ENTERPRISE ACTIVITIES AFFECT INTERSTATE AND FOREIGN COMMERCE**

155. Defendants' telephone, mail, and online solicitations to the BLA Group and BLA's clients reach throughout the United States, the Caribbean, and Europe. The association-in-fact enterprise is comprised of individuals and business from different states and countries.

156. Defendants' racketeering activity has far reaching effects and impacts interstate commerce.

**PERSONS AND ENTITIES ARE NOT BOTH THE LIABLE "PERSON" AND THE "ENTERPRISE" UNDER 18 U.S.C. § 1962(A)**

157. The Complaint alleges an association-in-fact enterprise, and the association-in-fact is not per se Defendants.

158. The Defendants/Culpable Persons are set forth above. Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

159. The association-in-fact enterprise is comprised of the Defendants and the paralegals and secretaries who work for the above attorneys and other Defendants. Those individuals all serve roles in accomplishing the conduct and racketeering activity described above, all associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct.

**DEFENDANTS ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY**

160. Defendants, in furtherance of the association-in-fact enterprise, have committed, and continue to commit, as recently as July 8, 2016, more than 2 and multiple predicate acts of wire fraud and mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

161. Although annuity contracts, the law, and KPMG's own admissions prove that assets in annuity policies are segregated from the annuity company, the KPMG Defendants continue to this day to take the position in public that annuity policy assets are property of the annuity company and refuse to protect annuity policy assets while raping the insurance company with fees, as in the case of annuitant Fred Best.

**PREDICATE ACTS**

162. Defendants' association-in-fact enterprise has committed the above and other predicate acts of mail and wire fraud on a continuing and ongoing basis as outlined above. Defendants' mail and wire fraud involves a scheme or plan to intentionally defraud the BLA Group and their clients using the mail and wires to further their scheme. Defendants' fraudulent misrepresentations and other documents were sent via wire and U.S. Mail to the BLA Group and their clients. The BLA Group and their clients were deceived by those fraudulent communications.

163. The predicate acts include: Barros' mail fraud and wire fraud to Ford that the Barros Defendants were acting as exclusive agents for Ford and BLA; Greenberg's wire fraud and mail fraud to Ford that Greenberg was performing work for Ford when in fact Greenberg was also using Ford's products to perform work for Barros; Greenberg's wire fraud and mail fraud to Ford that Greenberg was performing work for Ford when in fact Greenberg was also using Ford's products to perform work for Barros; Greenberg's wire fraud and mail fraud dated

June, 2007, to Ford containing the fraudulent billing identified above; the KPMG Defendants' wire fraud and mail fraud to Ford stating work done for Ford when in fact KPMG was also doing work for Barros; Greenberg's emails and letters to Ford stating Ford's insurance product complied with federal law; the KPMG Defendants' wire fraud and mail fraud to Ford dated July 22, 2010, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; the KPMG Defendants' wire fraud and mail fraud to Ford dated April 27, 2006, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; the KPMG Defendants' 2 predicate acts of wire fraud and mail fraud to Ford and the undersigned dated July 8, 2016, falsely asserting that assets that belong to Ford and Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG, when in fact the annuity documents, the law, and KPMG's own admissions prove the assets belong to Ford or Ford's annuity policy.

164. These predicate acts are ongoing, as recently as July 8, 2016, occur on a daily basis, and will carry on into the future as Defendants continue to advertise their fraudulent services to clients and the public. Defendants' fraudulent misrepresentations outlined above are conveyed through the U.S. Mail, online, and via telephonic communications. Defendants make these fraudulent statements online, via U.S. Mail, and during telephonic communications.

165. Defendants' predicate acts above were intentionally false and fraudulent.

166. The above predicate acts of wire fraud and mail fraud were false.

167. Ford relied on the above predicate acts of wire fraud and mail fraud to his detriment.

168. Defendants' mail and wire fraud are in direct violation of 18 U.S.C. § 1343.

**THE PREDICATE ACTS FORM A "PATTERN OF RACKETEERING ACTIVITY"**

169. The predicate acts discussed above, the last of which occurred within 10 years after the commission of a prior act of racketeering activity, are an ongoing, open-ended scheme.

These predicate acts have occurred over the course of at least 10 years and continue to the present on a daily basis.

170. Although annuity contracts, the law, and KPMG's own admissions prove that assets in annuity policies are segregated from the annuity company, the KPMG Defendants continue to this day to take the position in in wire fraud and mail fraud that annuity policy assets are property of the annuity company and refuse to protect annuity policy assets while raping the insurance company with fees, as in the case of wire fraud and mail fraud to annuitant Fred Best dated March 30, 2009, refusing to protect Mr. Best's annuity assets.

171. Greenberg admitted in the Toronto-Dominion Bank case that, like here, Greenberg withheld key financial documents. Greenberg held marketing seminars for Ford; and Greenberg held webinars and seminars for Barros. The Barros Defendants committed similar fraud regarding insurance documents regarding Cesar Scolari. Similar conduct by the Barros Defendants arose in *Bancroft Life & Casualty ICC, LTD., v. Intercontinental Management*, et. al, Case. No. 10-704 (USDC WD PA 2011). Neil Mitchell sued KPMG about a similar conspiracy to push a company Torex Retail into liquidation and then not protect the assets.

172. Defendants' association-in-fact enterprise has exhibited a "pattern of racketeering activity" by its commission of numerous related acts of mail and wire fraud, all of which have common purposes, results, participants, victims, methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events. Each predicate act, individual, business, and component of their fraudulent and deceptive scheme is necessary to accomplish the overall objective of the enterprise.

173. The foregoing predicate acts and racketeering activity are necessary to accomplish vital components and the overall objective of the association-in-fact enterprise. Defendants

resort to committing various predicate acts to effectuate their fraudulent scheme, including fraudulent misrepresentations in person, online, and over the telephone wires.

174. Defendants conspire to commit the predicate acts of mail and wire fraud in furtherance of their fraudulent scheme. Mail fraud plays an integral component in accomplishing Defendants' fraudulent scheme.

**THE PREDICATE ACTS RELATE TO EACH OTHER AS PART OF A COMMON PLAN**

175. The racketeering activity and/or mail and wire fraud arise as the result of Defendants' deceptive and fraudulent tactics to ruin Ford's reputation and steal Ford's products and clients and gain more commissions and fees. The purpose of the scheme is to enable Defendants to ruin Ford's reputation and steal Ford's products and clients. This entire process is illegal, fraudulent and deceptive. As discussed above, each predicate act and component of the fraudulent and deceptive process is necessary to accomplish the overall objective of the enterprise and common plan of the enterprise's members.

176. The predicate acts of mail and wire fraud are necessary and essential to accomplish the overall objective of Defendants' association-in-fact enterprise. To consummate the scheme, Defendants then repeatedly commit mail and wire fraud.

**18 U.S.C. § 1962(D) CONSPIRACY**

177. Ford has been injured by Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of subsection (c). Defendants act in concert and conspire to profit financially by defrauding Ford of his assets, products, clients, and reputation. Defendants act in concert to utilize fraudulent, deceptive, and illegal tactics. Defendants earn pure, substantial profits off the scheme. A civil conspiracy between the various Defendants is a vital and integral

aspect in accomplishing the Defendants' unlawful purposes. The complexity of Defendants' organizational structure and methodology clearly shows that each Defendant acts with a common purpose supported by a concerted action to defraud. Each Defendant intends to defraud, that intent is common to each Defendant, and each Defendant understands that the others intend to defraud.

**DEFENDANTS' ACTIONS CAUSE INJURY TO BUSINESS AND PROPERTY**

178. As described above, Defendants' deceptive and illegal sales tactics are designed to ruin Ford's reputation and steal Ford's products, clients, and assets.

179. Fraud and stealing business secrets are a violation of public policy, are illegal and affect interstate commerce.

180. Defendants' fraudulent activities are the sole and proximate case of Ford's damages.

**DIRECT CAUSAL RELATIONSHIP BETWEEN THE INJURY AND THE RICO VIOLATIONS**

181. Ford's injuries are actually and proximately caused by Defendants' violations of Section 1962.

**THE DAMAGES SUSTAINED FOR WHICH EACH DEFENDANT IS LIABLE**

182. Defendants bear joint and several liabilities under conspiracy theories alleged in this Complaint. The actions of each Defendant and the damages attributable to just that component of the enterprise or fraudulent scheme are set forth above.

**CAUSES OF ACTION**

**COUNT I**

**CIVIL RICO – 28 U.S.C. § 1962(c)**

183. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and

every allegation contained in this Complaint as if each were set forth separately herein.

184. Defendants, their agents and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact enterprise. The various Defendants/companies function together as a continuing unit.

185. From on or about 2005 to present, Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including multiple acts of mail fraud, wire fraud, and/or financial fraud.

186. Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. Defendants' acts of mail fraud, wire fraud, and other fraud are occurring on an ongoing and daily basis targeting BLA's clients and reputation.

187. Defendants participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing and continuing basis. Defendants have been profiting from their activities since at least 2005.

188. Defendants utilize wire fraud, mail fraud, and/or other fraud to accomplish, facilitate or further the enterprise's fraudulent scheme, and Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce. The nature of Defendants' predicate acts, business model, and organizational structure involves a distinct threat of long-term racketeering activity.

189. Defendants have the same or similar purposes, results, participants, victims, and

methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy and meticulous organization. The acts committed by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal and predatory practices occurring on a daily basis. Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise.

190. The organization's hierarchy is detailed above in this Complaint. The purpose of the scheme is to fraudulently ruin Ford's reputation and steal Ford's products, assets, and clients, through mail and wire fraud.

191. The enterprise functions by meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. The meticulous structure is further necessary to accomplish the enterprise's ultimate objectives.

192. Defendants' enterprise has an existence that is independent to and/or separate from the pattern of racketeering activity in which it engages. Defendants have some raison d'etre beyond mere criminality. The association-in-fact enterprise in this case consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

193. Defendants submit fraudulent documents to by U.S. Mail, FedEx, or UPS, and Ford has relied to his detriment upon Defendants' representations contained in the documents.

194. Defendants' actions have resulted in damages to Plaintiff.

195. Defendants' actions are intentional.

196. Plaintiff is entitled to collect treble damages, attorney's fees and any other relief applicable under 18 U.S.C. § 1962(c).

**COUNT II**

**CIVIL RICO**

**28 U.S.C. § 1962(d)**

197. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

198. Plaintiff has been injured by Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of subsection (c).

199. A civil conspiracy between the various Defendants is a vital and integral aspect to accomplishing the Defendants' unlawful purposes.

200. The complexity of the organizational structure and the method of transaction clearly reflect that each Defendant has a common purpose supported by a concerted action to defraud. Each Defendant had the intent to defraud, that intent was common to each Defendant, and each Defendant had the understanding that the others had the intent to defraud.

201. Plaintiff is entitled to treble damages, attorney's fees and any other relief applicable under 18 U.S.C. § 1962(d).

**COUNT III**

**CONVERSION**

202. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

203. Plaintiff owns or has the right to the Dolphin Cove property, membership in Four Points Management, Carina stock, Merlot stock, Raptor stock, money invested in Carina and Dolphin Cove, client information, fees, and insurance products, and product information that Defendants stole.

204. Defendants intentionally interfered with Plaintiff's property.

205. Defendants deprived Plaintiff of possession and use of the property.

206. Defendants' conversion caused Plaintiff damages.

**COUNT IV**

**BRACH OF FIDUCIARY DUTY**

207. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

208. Defendants owed Plaintiff a fiduciary duty to not compete against Plaintiff, to not perform legal and accounting work adverse to Plaintiff's interests, to not engage in mail fraud and wire fraud regarding Plaintiff, to inform Plaintiff of all actions taken regarding Barros and his entities, to not steal Plaintiff's clients, to not steal Plaintiff's assets, and to not steal Plaintiff's products and convert the products to their own uses.

209. Defendants had superior knowledge than Plaintiff about Defendants' actions, Plaintiff relied Defendants' superior knowledge to his detriment, Defendants made fraudulent statements to Plaintiff that Plaintiff relied on to his detriment.

210. Defendants intentionally breached their fiduciary duties.

211. Defendants' breach of fiduciary duties caused Plaintiff damages.

**COUNT V**

**FRAUD**

212. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

213. Defendants made false statements concerning material facts.

214. Defendants knew the false statements were false.

215. Defendants intended the false statements would induce Plaintiff and Plaintiff's

clients to act on the statements.

216. Plaintiff and Plaintiff's clients relied on the false statements to the injury of Plaintiff who suffered damages as a result of the fraud.

**COUNT VI**

**BREACH OF CONTRACT**

217. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

218. Plaintiff and Defendants had contracts as set forth above.

219. Defendants breached their contracts with Plaintiff.

220. As a result of Defendants' breach of contract, Plaintiff has suffered damages.

**COUNT VII**

**TORTIOUS INTERFERENCE WITH CONTRACTS**

221. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

222. Plaintiff had contracts with his clients.

223. Defendants had knowledge of those contracts.

224. Defendants intentionally procured breaches of the contracts by making false statements about Ford and encouraging the clients who sued Ford and BLA to sue Ford and BLA and breach their contracts with Ford and BLA.

225. The KPMG Defendants are aware of Ford's contracts regarding the St. Thomas property, and the KPMG Defendants are intentionally interfering with those contracts by claiming an interest in the St. Thomas property.

226. There was no justification or privilege regarding the interference with the

contracts.

227. Plaintiff has been damaged by Defendants' interference.

**COUNT VIII**

**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS**

228. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

229. Plaintiff has an advantageous business relationship regarding the Dolphin Cove property on St. Thomas, United States Virgin Islands. The KPMG Defendants have knowledge of Ford's advantageous business relationship. The KPMG Defendants claim an interest in that property even though the law, the annuity company documents, and KPMG's admissions to other prove the KPMG Defendants have no claim to that property. The KPMG Defendants intentionally and unjustifiably interfered and continue to interfere with Plaintiff's advantageous business relationship regarding the St. Thomas property.

230. Plaintiff had business relationships with his clients. Defendants intentionally interfered with those advantageous business relationships by making false statements about Ford and encouraging the clients to sue Ford and BLA and end their business relationships with Ford. The clients are those that sued Ford and BLA. Defendants had knowledge of Plaintiff's business relationships with his clients.

231. Defendants intentionally and unjustifiably interfered with Plaintiff's business relationships with his clients.

232. Plaintiff has been damaged by as a result of the breach of the business relationships.

**COUNT IX**

**FLORIDA CIVIL RICO – SECTION 772.103, FLORIDA STATUTES**

233. Plaintiff adopts, reiterates, incorporates by reference and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

234. By Defendants' actions set forth above, Defendants, with criminal intent, received proceeds in the form of commissions to the Barros Defendants, attorneys' fees to Greenberg, and fees to the KPMG Defendants, derived from a pattern of criminal activity, or from the collection of an unlawful debt from Ford's annuity policy, and Defendants used such proceeds in the establishment and operation of the RICO enterprise described herein. Defendants through a pattern of criminal activity and through the collection of an unlawful debt acquired and maintain an interest in and control of this RICO enterprise. Defendants associated with an enterprise to conduct or participate in such enterprise through a pattern of criminal activity and the collection of an unlawful debt. Defendants conspired to violate Section 772.103(1), (2), and (3), Florida Statutes.

235. Defendants' actions constitute violations of Sections 772.103(1), (2), (3), and (4), Florida Statutes, Florida's Civil RICO Statute.

**COUNT X**

**FRAUDULENT TRANSER – CHAPTER 726, FLORIDA STATUTES**

236. KPMG, McDonald, Beighton, Crumpler, and Drury threatened on July 8, 2016, to sell Carina stock, which Ford and his annuity paid for, which should not be part of any liquidation, and which KPMG, McDonald, Beighton, Crumpler, and Drury have no interest in and no right to sell. The actual intent of KPMG, McDonald, Beighton, Crumpler, and Drury is to hinder, delay, and defraud Ford and his annuity policy of their claim against Defendants.

**AS TO ALL COUNTS: TOLLING OF STATUTES OF LIMITATIONS**

237. Plaintiff adopts, reiterates, incorporates by reference, and re-alleges each and every allegation contained in this Complaint as if each were set forth separately herein.

238. Any applicable statutes of limitation have either been delayed in their triggering event(s) or have been suspended in their operation by virtue of the equitable tolling principles, the "discovery rule," and/or related rules and doctrines.

239. As previously alleged, Defendants fraudulently and deliberately concealed their fraudulent and scandalous wire and mail fraud by purportedly working for and representing Plaintiff while at the same time and without disclosing to Plaintiff and hiding from Plaintiff that Defendants were stealing Plaintiff's products and annuity assets, setting up competing businesses, and stealing Plaintiff's clients, and by concealing from Plaintiff the actions of the liquidators. The KPMG Defendants purposely excluded Plaintiff from knowing information about BLA and the BLA liquidation. Defendants' actions were calculated to deceive Plaintiff and prevent discovery of wrongdoing, and which did in fact deceive the Plaintiff and prevent discovery of wrongdoing.

240. Plaintiff attempted to ascertain Defendants' actions regarding BLA and the liquidation. Plaintiff could not reasonably have discovered the fraudulent nature of Defendants' transactions until Plaintiff learned of the Bancroft court case described above on April 21, 2012, and then begin investigating the claims and evidence in that case.

Many of acts and omissions complained of herein are ongoing and continuing in nature and persist through July 8, 2016, and continue today.

241. As a consequence of the foregoing, the Court should determine that no portion of any cause of action herein is barred by any applicable statute of limitations or by the equitable

doctrine of laches.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests as follows:

a. Actual and compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial.

b. Civil penalties to the fullest extent allowed by law.

c. Costs, losses and fees related to the substantial resources needed to investigate and prosecute Defendants' willful and malicious actions.

d. Disgorgement of Defendants' unjust enrichment.

e. Punitive and exemplary damages against Defendants, jointly and severally, in an amount to be determined at trial.

f. An award of treble damages and reasonable attorneys' fees, costs and expenses.

g. An award of pre- and post- judgment interest on any award of damages to the fullest extent allowed by law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues raised herein.

RESPECTFULLY SUBMITTED, this the 9th day of August, 2016.

/s/ Paul Platte
PAUL PLATTE, ESQUIRE
FLORIDA BAR NO. 298298
PAUL PLATTE PA
611 S. Ft. Harrison Ave., Suite 252
Clearwater, FL 33756
Telephone: 727.474.1011
Email: paul@paulplatte.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of August, 2016, a true and correct copy of the foregoing has been filed with the Court and served on the parties below via CM/ECF.

- Edward A. Marod, Esq.: emarod@gunster.com
- David A. Freedman, Esq.: dfreedman@coffeyburlington.com
- Jeffrey Bast, Esq.: jbast@bastamron.com
- Jeremy J. Hart, Esq.: jhart@bastamron.com
- Jeremy S. Korch, Esq.: jkorch@bastamron.com

/s/ Paul Platte
PAUL PLATTE, ESQUIRE