**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Leo Ford,

Plaintiff,

vs.

KPMG LLP; KPMG BVI Limited; James Drury; Russell Crumpler; Belmont Insurance Management; Casey McDonald; Kris Beighton; Andrea Douglas; Greenberg Traurig, P.A.; Greenberg Traurig, LLP; Jerome Hesch; GFAN; ABG; Bancroft Property & Casualty, Ltd., (aka Bancroft Life & Casualty, Ltd., and Bancroft Life & Casualty ICC, Ltd.); Bradley Barros; and Philip Sigel,

Defendants.

Case No.: 9:16-cv-80618

**JURY DEMANDED**

## SECOND AMENDED COMPLAINT

Plaintiff sues Defendants KPMG LLP, KPMG BVI, James Drury, Russell Crumpler, Belmont Insurance Management, Casey McDonald, Kris Beighton, and Andrea Douglas and alleges.

Ford has not served KPMG Cayman and does not sue that entity in this Second Amended Complaint.

## NATURE OF CASE

1. This action is predicated upon violations of the federal Racketeer Influenced and Corrupt Organizations Act.

2. Defendants accountants and business managers KPMG LLP, KPMG BVI Limited, James Drury, Russell Crumpler, Belmont Insurance Management, Casey McDonald, Kris Beighton, and Andrea Douglas (when referred to collectively, those Defendants will be

referred to as the "KPMG Defendants") represented Boston Life & Annuity ("BLA"), an insurance company, and Ford, a principal of BLA. The KPMG Defendants manage and are liquidators of BLA.

3. The KPMG Defendants have stolen Ford's assets. In furtherance of the RICO conspiracy, the KPMG Defendants continue the mail fraud and wire fraud when as part of the conspiracy the KPMG Defendants continue to assert a claim that Ford's property in his annuity policy belongs to BLA and the BLA liquidation estate, even though there was an order specifically prohibiting the KPMG Defendants from asserting any claim regarding Ford's assets; Ford's annuity policy states his annuity policy, not BLA, owns the annuity policy assets; British Virgin Islands (BVI) law specifically states Ford's annuity policy, not BLA, owns the annuity policy assets; and the KPMG Defendants admitted in writing that an annuity policy such as Ford's, not the annuity company, owns the annuity policy assets. The KPMG Defendants engaged in numerous act of mail fraud and wire fraud with the intent to steal the business of, ruin the reputation of, and take the assets of Ford. The pattern of criminal activity continues to this day.

4. Ford first learned he was damaged by the conspiracy after April 21, 2012, when he read a Memorandum in Civil Action No. 10, United States District Court, Western District of Pennsylvania, signed by William Standish, US District Judge, dated April 5, 2012 (hereafter "Memorandum in Civil Action No. 10") and subsequently started to investigate the conspiracy.

5. Ford is not suing the KPMG Defendants for mere accounting work. The KPMG Defendants actually manage and operate Ford's business.

6. Ford is not suing to recover BLA's assets or damages. Ford is suing to recover his own damages.

## PARTIES[1]

7. Leo Ford is an individual, US citizen, and resident of Panama.

8. KPMG LLP and KPMG BVI Limited are accounting and management firms that represented Ford, BLA, and the Barros Group (identified in paragraph 10 below). KPMG BVI and Douglas established Belmont Insurance Management to manage BLA and Ford's accounts. McDonald and Beighton are accountants and managers who worked with KPMG BVI. Crumpler and Drury are accountants and managers. Douglas worked with KPMG BVI and then Belmont.

9. Greenberg Traurig LLP and Greenberg Traurig, P.A., (collectively "Greenberg Traurig") are a law firm that represented Ford, BLA, and the Barros Group. Jerome Hesch is a lawyer working with Greenberg Traurig on behalf of BLA and Ford.

10. Brad Barros was a sales agent who worked with BLA and Ford. Barros and Philip Sigel were and are principals of GFAN, ABG, and Bancroft Property and Casualty (collectively the "Barros Group").

## JURISDICTION

11. Jurisdiction is predicated upon original jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is conferred under 28 U.S.C. § 1331 by virtue of 18 U.S.C. § 1961-1968 & 901(a). Personal jurisdiction is alleged in more detail below.

## VENUE

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the alleged events giving rise to the original claim occurred and continue to occur in this District. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) conduct business in this District. The KPMG Defendants' fraudulent

[1] Ford has dismissed his claims against Greenberg Traurig and the Barros Group.

activities occurred within this District. Venue will be alleged in more detail below.

**INTERSTATE AND FOREIGN COMMERCE**

13. Defendants used telephone, wire, and mail communications and solicitations to target Ford and his clients throughout the United States. Wires were used from Miami, the Cayman Islands and the BVI. The KPMG Defendants used mail fraud and wire fraud to advance the scheme by sending fraudulent documents and other information in many states. The KPMG Defendants' fraudulent activities have been ongoing including through today.

**FACTS**

**DIVERSION OF $2,700,000**

14. On April 21, 2012, Leo Ford first read about a federal court case involving the Barros Group. In that case, it was alleged the Barros Group diverted $2.7 million in premium payments that were intended for an insurance program offered by Ford and BLA. In that case, it is alleged Attorney Hesch served as the Barros Group's tax attorney at one time. Hesch is the Greenberg Traurig lawyer who also represented Ford and BLA. April 21, 2012, is the first time Ford learned that Hesch and Greenberg Traurig represented the Barros Group regarding insurance products that competed with Ford.

15. While Ford may have known before April 21, 2012, that the Barros Group was competing against Ford and BLA, Ford did not know and did not have a reason to know of the conspiracy between the Barros Group, the KPMG Defendants, and Greenberg Traurig until after April 21, 2012. Ford did not know and did not have reason to know of the damages caused to Ford in the $2.7 million diversion until after April 21, 2012.

16. Having learned of the above case in April, 2012, Leo Ford then began investigating the conspiracy. After reading the above and further research, Ford learned that

Greenberg Traurig and the KPMG Defendants had key positions in that $2.7 million diversion as well as a continued criminal enterprise to the detriment of Ford.

**GREENBURG TRAURIG AND THE BARROS GROUP**

17. Ford was approached by attorney Philip Sigel in November, 2000, to determine whether Boston Life and Annuity Company, LTD ("BLAV") of St Vincent would consider offering a deductible casualty insurance product. Ford was the beneficial owner of the shares of BLAV and acted as a product development consultant for BLAV.

**KPMG LLP**

18. Ford and BLA retained KPMG LLP to advise and work for Ford and BLA regarding establishing BLA in the BVI, perform accounting and management work, assist in developing insurance products, and representing Ford and BLA. KPMG LLP agreed to not provide similar services to a competitor for the specific casualty insurance products that Ford designed. KPMG LLP, as Ford's accountants, advisors, and managers, had a duty to disclose to Ford all the actions complained of here.

19. Ford had numerous meetings, phone calls, faxes, and emails with KPMG LLP at its South Florida office. KPMG LLP performed actuarial work for and gave business advice to Ford and BLA. KPMG LLP sent invoices for $25,000 to Ford's South Florida office. Ford and BLA paid KPMG LLP $25,000 for KPMG LLP's work. The invoices were false because KPMG LLP used the work to assist the Barros Group, not just Ford and BLA.

20. Meetings were held in KPMG LLP's South Florida office regarding the establishment of and management of BLA. Based on political issues and changing regulations in St Vincent, and advice from KPMG LLP, it was decided to establish BLA in the BVI. KPMG LLP recommended that its "wholly owned subsidiary", KPMG BVI then Belmont, act

as Ford's and BLA's insurance manager. KPMG LLP advised Ford to use KPMG BVI, Belmont, and Douglas in the BVI. Douglas worked with KPMG BVI, is a Director of Belmont, and represents she is a partner in "KPMG". Ford contracted with KPMG BVI to prepare the presentation for a captive insurer to the BVI insurance regulators and manage BLA.

21. BLA was set up with advice from the KPMG Defendants, including KPMG LLP. KPMG LLP advised Ford to utilize KPMG BVI, which advice set up the whole association in fact RICO enterprise that is the subject of this case. The KPMG Defendants, including KPMG LLP, had a common purpose, intent, and understanding to defraud Ford.

22. KPMG LLP arranged meetings in Miami between Ford and KPMG BVI. Defendant McDonald in his motion to dismiss admitted he attended such meetings in Miami.

23. KPMG.com, which states, in pertinent part: "Services are provided solely by member firms in their respective geographic areas" and "KPMG LLP, a Delaware limited liability partnership and the U.S. member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity".

24. Beighton, McDonald, Crumpler, Drury, Douglas, Belmont, and KPMG BVI did business in the exclusive jurisdiction of KPMG LLP.

25. KPMG LLP only operates in the United States, and the other KPMG entities are separate and only operate in the BVI or the Cayman Islands. If so, then all the actions taken by by the other KPMG Defendants in the United States in furtherance of the RICO conspiracy a fortiori must have been taken by KPMG LLP. Those actions include: transferring Ford's assets to the Miami company Carina; payments Carina from a Florida bank and a Florida trust; insuring Leo Ford (then a Florida resident), Mary Ford and their grandson Kenneth (always

Florida residents); sending letters to US annuitants admitting annuity policy assets are separate from the annuity company; asserting claims against property in the United States Virgin Islands; sending two pieces of mail and wire fraud to Florida fraudulently stating Ford owes BLA $750,000 and Ford is not entitled to the proceeds of the St. Thomas property.

26. Unbeknownst to Ford, KPMG BVI, Belmont and Douglas assisted Barros Group in the establishment of Bancroft Life and Casualty, Ltd., on May 1, 2003, as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

27. KPMG LLP agreed to not provide similar services to a competitor for the specific casualty insurance products that Ford designed. Then KPMG sent an invoice to Ford in Florida purportedly for KPMG work for Ford in the United States, which was a fraud because the work was for Ford's competitor Barros.

28. KPMG LLP routinely advises its clients to use KPMG BVI for the clients' tax matters. KPMG LLP advised Ford to use KPMG BVI, Belmont and Douglas.

**KPMG BVI, BELMONT AND DOUGLAS**

29. Ford and BLA retained KPMG BVI, Belmont, and Douglas to advise and work for Ford and BLA regarding establishing BLA in the BVI, perform accounting and management work, assist in developing insurance products, and representing Ford and BLA. KPMG BVI, Belmont, and Douglas agreed to not provide similar services to a competitor for the specific casualty insurance products that Ford designed. KPMG BVI, Belmont, and Douglas, as Ford's accountants, advisors, and managers, had a duty to disclose to Ford all the actions complained of here.

30. BLA was incorporated in the BVI in November 2001. The insurance license was

also granted in November, 2001, as evidenced in the fax from Belmont to Ford at his Florida office.

31. At the time BLA was set up with advice from the KPMG Defendants, Douglas worked with "KPMG". Then Belmont was formed as a "wholly owned subsidiary" of KPMG (as represented by KPMG LLP), and Douglas worked with Belmont and KPMG.

32. Ford spent considerable time in KPMG BVI's office forming BLA, advising Ford, putting together the presentation package for the insurance regulators. Ford had an agreement with KPMG BVI, Belmont, and Douglas that they would not provide similar services to a competitor for the casualty insurance products that Ford designed. KPMG BVI, Belmont, and Douglas breached that agreement and their representations were fraudulent. Faxes were sent back and forth between KPMG BVI, Belmont and Douglas and Ford's Boca Raton, Florida office as well as mail and emails. The Belmont email address listed on Belmont letterhead the "Engagement Letter", dated January 24, 2002, to BLA was kpmginsurance@surfbvi.com. Many hours were spent on the phone and fax between Ford's Florida office and KPMG BVI, Belmont and Douglas, as this was a new casualty product for KPMG BVI, Belmont and Douglas' contract to be issued.

33. Prior to the BLA liquidation, KPMG BVI, Belmont and Douglas (a partner in "KPMG") managed and controlled BLA.

34. KPMG BVI was the auditor for BLA from the date of incorporation, November 12, 2001, until its September 30, 2002, year end. The audit was completed on October 9, 2003, as evidenced by KPMG BVI's sign off on the signature page. On the recommendation of KPMG LLP in South Florida to Ford, KPMG BVI, Belmont and Douglas took over administration of BLA from Ford in 2003. Belmont took over as Registered Agent and

Registered Office for BLA in 2003. KPMG BVI, Belmont and Douglas operated BLA. Belmont and KPMG BVI had the same office address and same employees, and Belmont "employees" used "employeename@kmpgbvi.net" email addresses in their correspondence.

35. KPMG BVI, Belmont and Douglas performed much more than accounting services during that period. KPMG BVI, Belmont, and Douglas were the insurance managers and administrators for Ford and BLA during this period. KPMG BVI/Belmont/Douglas managed and were running BLA. KPMG BVI, Belmont, and Douglas also performed as insurance manager and administrator for the Barros Group. Belmont had to sign all policies issued from BLA and the Barros Group. So while KPMG BVI, Belmont and Douglas were filing documents with the BVI government and mailing and emailing documents to Ford representing to Ford that it was work for Ford and BLA, KPMG BVI, Belmont, and Douglas were also using Ford's products and ideas to do work for the Barros Group and set up a company competing with Ford.

36. KPMG BVI's, Belmont's and Douglas' audits mailed to Ford and BLA were false, because the information was represented as audits of BLA, when in fact KPMG BVI/Belmont/Douglas were also using the information for audits of the Barros Group.

37. Ford developed and Ford and BLA sold insurance products including annuity policies. Ford bought and invested money in a BLA annuity policy.

38. Ford and his annuity policy invested money in, among other things, property on St. Thomas, United States Virgin Islands, called Dolphin Cove.

39. As a matter of contract and BVI law, Ford's assets in the annuity policy and Ford's investment by Ford's annuity policy in Dolphin Cove was held or should have been held by KPMG BVI, Douglas, and Belmont (and later by McDonald, Beighton, Drury, and

Crumpler) in an account separate from BLA's general reserves (and later separate from the BLA liquidation estate). Mr. Ford's annuity and the Dolphin Cove property were separate from the property of BLA and the BLA liquidation.

40. Dolphin Cove has been sold. The KPMG Defendants refuse to give Ford the proceeds from the sale and refuse to give Ford any of the assets in Ford's annuity policy. The KPMG Defendants claim a company called Carina owned Dolphin Cove and the now the proceeds of the sale of Dolphin Cove.

41. If Ford's share of the St. Thomas property was transferred from his annuity policy to a South Florida company called Carina, which is funded from Florida, then KPMG BVI, Belmont and Douglas illegally transferred that property in violation of the annuity policy language requiring that annuity policy assets be segregated from annuity company assets, in violation of BVI law which mandates the same segregation, and in violation of admissions by the KMPG Defendants in letters that annuity policy to assets are segregated and not part of annuity company assets KPMG BVI's, Belmont's, Douglas' actions are part of the Defendants' conspiracy to steal Ford's property, assets, and clients, and ruin his reputation.

42. Ford is not complaining KPMG LLP,KPMG BVI, Belmont and Douglas could not do similar accounting work for other clients. What Ford alleges is Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) managed BLA's and Ford's business, stole Ford's insurance products and ideas to set up an insurance company directly competing with the KPMG Defendnats' client Ford, then put BLA in liquidation and then stole from Ford and charged excessive management and liquidation fees.

43. Defendant Douglas advertises she is a partner of "KPMG" -- not KPMG BVI or KPMG Cayman -- just "KPMG". She may be a partner in KPMG LLP; that will have to

developed in discovery.

44. Douglas, along with Belmont and KPMG BVI -- recommended by KPMG LLP -- actually managed and operated BLA into liquidation.

**BARROS GROUP**

45. From a marketing perspective, the Barros Group was involved as it was to market the products of Ford and BLA.

46. Unbeknownst to Ford, KPMG BVI, Belmont and Douglas assisted the Barros Group in the establishment of Chesterfield Services Inc., on April 30, 2003, as evidenced by Bancroft's Memorandum of Association and Articles of Incorporation. The Registered Office and Registered Agent was Belmont.

47. Thus, while KPMG LLP, KPMG BVI, Belmont and Douglas represented in documents mailed and emailed to Ford that these KPMG Defendants were working on Ford's and BLA's business, these KPMG Defendants were using Ford's products and ideas to establish and work on the Barros Group's business. Ford first learned of this after April 21, 2012.

48. In 2002, KPMG BVI, Belmont and Douglas diverted $2.7 million in premium payments by that were intended for an insurance program offered by Ford and BLA. Ford first learned of that $2.7 million diversion on April 21, 2012.

49. BLA and Ford lost gross revenues $2.7 million, corporate market value and market position due to this continued conspiracy. By reason of KPMG LLP's, KPMG BVI's, Belmont's, Douglas' actions, Ford lost income and his reputation in the insurance business.

50. KPMG BVI, Belmont, and Douglas reneged on their agreement to not work on product competing with Ford breached their duty to inform Ford of their actions complained of

herein, formed a competitor the Barros Group, stole Ford's product designs, assisted the Barros Group with licensing with the BVI insurance department which included submission of product designed by Ford, provided administration services to the Barros Group just like they did for Ford, and helped the Barros Group administer and sell Ford's products.

**MCDONALD, BEIGHTON, CRUMPLER, DRURY**

51. KPMG BVI, Belmont and Douglas had a meeting at KPMG's office regarding BLA and those KPMG Defendants advised Ford that BLA, then a solvent company, was insolvent and should be placed into voluntary liquidation. If insolvent, the BVI regulators would have immediately placed it into involuntary receivership. The auditor's (BDO) and a third party accountant's statement show BLA was not insolvent. KPMG BVI, Belmont, and Douglas, (and later when they were appointed liquidators McDonald, Beighton, Drury, and Crumpler) withheld information from Ford and the liquidation court and committed fraud. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury abused and continue to abuse their power to run rampant and overcharge BLA in fees and participated in self-dealing and fraudulent transactions regarding Ford and BLA and their annuity clients for corporate and personal betterment of all the KPMG Defendants.

52. As a result of this continued criminal enterprise, Ford is unable to attract new clients and BLA was placed in voluntary receivership.

53. BLA was placed into voluntary liquidation. BLA was not insolvent because BLA had plenty of funds to pay the bills, cash of $1-2 million.

54. McDonald, Beighton (and subsequently Crumpler and Drury) were appointed Joint Liquidators February 27, 2008, according to KPMG's "Report of the Joint Liquidators", dated March 20, 2008. KPMG BVI, McDonald, Beighton, Crumpler, and Drury had a conflict

in representing Ford and BLA and then acting as liquidators of BLA. This joint appointment spanning two islands was a scheme that only served to cause time delays and exponentially increased costs in the liquidation of BLA and assist the Barros Group, which personally caused damage to Ford in lost fees, clients, business and reputation in the insurance business. It took weeks and in some cases months to get responses. During this multiple year period, KPMG BVI continued and continues to this day in their conspiracy to loot BLA and Ford's assets.

55. During the time that KPMG BVI, Belmont, and Douglas managed BLA, and during the liquidation by Beighton, McDonald, Drury, and Crumpler, Ford was excluded from information and decisions about BLA and Ford's assets. Despite Ford's due diligence to learn what was going on with BLA and what Beighton, McDonald, Drury, and Crumpler were doing about BLA and Ford's assets and products, Ford did not learn about the conspiracy or his injury in fact until he read a Memorandum in Civil Action No. 10 on April 21, 2012.

56. On March 1, 2017, KPMG (BVI)'s lawyer admitted KPMG (BVI) has no claim to the proceeds of the sale of the USVI property: "KPMG . . . makes no claim to the funds".

57. An annuity policy, such as Mr. Ford's, Mary Ford' s, and their grandson Kenneth's annuity policy, is a liability, not an asset of an annuity company, such as BLA.

58. The terms of the annuity policy mandates that annuity policy assets must be kept in accounts segregated from the annuity company.

59. The KPMG Defendants admitted in emails and letters that annuity policy assets must be kept in accounts segregated from the annuity company.

60. BVI law states that such assets must be held in accounts segregated from the annuity/insurance company.

61. As part of this conspiracy, Douglas, Belmont, McDonald, Beighton, Drury,

Crumpler, and KPMG BVI fraudulently assert in emails and letters that Ford owes money to BLA or the BLA liquidation estate.

62. In summary, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) claim Ford does not own the St. Thomas property, and Ford owes BLA or the BLA liquidation estate, in spite of all the documents and admissions to the contrary.

63. The annuity policy states annuity policy assets must be held in a segregated account, separate from the general assets of BLA.

64. As set forth in a letter to US BLA annuitant Fred Best's lawyer, McDonald has admitted in writing such an annuity policy is separate from BLA and therefore not a part of a liquidation estate.

65. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury are attempting to steal stock in a corporation, Carina, that they claim owns laying on St. Thomas, USVI, and are attempting to steal land on St. Thomas, USVI.

66. The pattern of criminal activity continues to this day. In furtherance of the RICO conspiracy, the KPMG Defendants continue the mail fraud and wire fraud when as part of the conspiracy the KPMG Defendants continue to assert a claim that Ford's property in his annuity policy belongs to the BLA liquidation estate, even though there was an order specifically prohibiting the KPMG Defendants from asserting any claim regarding BLA's assets; Ford's annuity policy states annuity policy, not BLA, owns the annuity policy assets; BVI law specifically states Ford's annuity policy, not BLA, owns the annuity policy assets; and the KPMG Defendants have admitted in writing that an annuity policy such as Ford's, not the annuity company, owns the annuity policy assets. The Defendants conspired in a multi-year and international criminal enterprise to steal the business of, ruin the reputation of, and steal

the assets of Ford.

67. The KPMG Defendants are committing the mail and wire fraud regarding other BLA annuity policy holders in the US.

68. Orders McDonald, Beighton, Drury and Crumpler obtained from the BLA liquidation are unenforcable as the liquidation estate appointment, liquidation estate operation, and liquidation estate orders were obtained by fraud, including but not limited to Beighton, McDonald, Drury, and Crumpler's withholding of information from the BVI liquidation, such as KPMG BVI's, Belmont's, Douglas', McDonald's, Beighton's, Drury's, and Crumpler's own admissions that Ford's annuity policy assets are not part of the annuity company BLA and not part of the liquidation estate.

69. In furtherance of the RICO conspiracy, Beighton, McDonald, Drury, and Crumpler continue the mail fraud and wire fraud. Beighton, McDonald, Drury, and Crumpler sent out fraudulent mail and wires to Ford and his lawyer asserting a claim that Ford's property in his annuity policy belongs to the BLA liquidation estate, even though there was an order specifically prohibiting McDonald, Beighton, Drury and Crumpler from asserting any claim regarding BLA's assets; Ford's annuity policy stats Ford's annuity policy, not BLA, owns the annuity policy assets; BVI law specifically states Ford's annuity policy, not BLA, owned the annuity policy assets; and KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler have admitted in writing that an annuity policy such as Ford's, not BLA, owns the annuity policy assets.

70. KPMG BVI/Belmont/Douglas' failure to keep Ford's and other annuitants' assets in accounts separate from BLA and stealing those assets is a crime. Section 812.014, Florida Statutes; British Virgin Islands Criminal Code Part XIV.

71. The liquidation was a simple matter only a handful of separate account annuity clients remained, and a summary judgement clarified that BLA owned its general reserves and that the casualty products were 1 year terms. KPMG BVI/Belmont/Douglas agreed in its earlier audits that BLA owned its reserves. KPMG BVI/Belmont/Douglas, in the insurance product filing with the BVI Financial Services Department, stated the casualty product required no reserving after the term of its risk, which was one year, and premium was earned as received. KPMG BVI/Belmont/Douglas as insurance manager agreed that no reserving was necessary and issued and signed the one year policies in question. That is more mail fraud by KPMG BVI/Belmont/Douglas.

72. McDonald and Beighton billed $717,000 for its liquidation services for 2 months, from December 20, 2007 to February 27, 2008. McDonald and Beighton were only Provisional Liquidators at this time.

73. As evidenced by wire fraud and mail fraud email letters dated July 8, 2016, Drury and Crumpler seek to continue the liquidation even though an order from the BVI prohibited the liquidators from pursuing claims about BLA's assets, and as cash comes in the liquidators take as fees all the liquid money including Ford's annuity policy assets (which the KPMG Defendants admit, BVI law confirms, and the annuity policy documents show) belong to Ford, not BLA, the BLA liquidation estate, or the KPMG Defendants.

74. McDonald, Beighton, Drury and Crumpler failed in their duties to protect BLA, Ford, and other US client policy assets. KPMG BVI, Belmont, Douglas, McDonald, Beighton Drury and Crumpler failed to pursue third parties who owe Ford millions:

| | |
|---|---|
| Puritan | $2,500,000 |
| LCCF | $1,500,000 |

| | |
|---|---|
| Hoilman's/MHA Financial secret commission regarding BLA's MedCap investment | $65,000 |
| MedCap | $1,000,000 |

Because those moneys were not collected, Ford lost fees and clients and his reputation would not have been damaged in the insurance business.

**PURITAN**

75. Policy holders F. Best, J. Shaw, M. Haddock and 10 other US clients including an IRA account, 3 non-US persons and BLA lost their funds due to McDonald, Beighton, Drury and Crumpler's failure to follow-up on the Puritan theft issue. At this time during the BLA liquidation, KPMG BVI, Belmont, Douglas, McDonald, Beighton Drury and Crumpler excluded Ford from all involvement and information regarding BLA. Ford urged McDonald, Beighton Drury and Crumpler to pursue the Puritan principals to recover Puritan investors' funds that the Puritan principals stole. But McDonald, Beighton, Drury and Crumpler refused to pursue the matter as they made no money from the action, and the action would have required McDonald, Beighton, Drury and Crumpler to hire professional firms to investigate and pursue. Those funds would have reduced the general reserves and therefore less money for McDonald, Beighton, Drury and Crumpler to bill BLA. Millions were lost as a result of McDonald, Beighton, Drury and Crumpler's failure to act. McDonald, Beighton, Drury and Crumpler acted similarly regarding Medcap and LCCF investments. As recently as July 8, 2016, Drury and Crumpler refuse to recover BLA assets and instead seek money only from Ford.

**DOLPHIN COVE**

76. Casey McDonald, one of the KPMG liquidators, told Ford that one of the Cayman KPMG office's "clients" was interested in buying one of BLA's real estate assets, Dolphin

Cove in the United States Virgin Islands, but only at pennies on the dollar. Ford, a Florida BLA policyholder, is an owner of Dolphin Cove through his annuity policy. Dolphin Cove was sold. KPMG BVI, Belmont, Douglas, McDonald, Beighton and Crumpler refuse to pay out the Dolphin Cove proceeds to Ford even though those KPMG Defendants' documents show Ford owns the property; Ford's annuity policy assets are not part of the annuity company BLA and not part of the liquidation estate; BVI law states Ford through his annuity owns the property; a Certification from the BVI prohibited McDonald, Beighton, Drury and Crumpler from asserting any claim regarding the BLA assets; and KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler admit in letters that annuity policies such as Ford's own their property, not the annuity company like BLA. As recently as July 8, 2016, the Drury and Crumpler continued the wire fraud and mail fraud when they claimed the Dolphin Cove property and refuse to acknowledge Ford's and his annuity policy's legitimate claim to the property and Carina stock by way of 2 wire fraud and mail fraud emails and letters to Ford and his attorney claiming the Dolphin Cove property, even though Ford and his annuity paid for the Dolphin Cove property.

77. The notes on the draft policies denote that KPMG BVI, Belmont, and Douglas designated the premium "as earned" by Ford. Now, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler have reversed their position.

78. Client funds are due to Ford from Ford's intellectual property with KPMG BVI's, Belmont's, and Douglas' knowledge and assistance.

79. During this period of time, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler a smear and intentional disinformation campaign launched against Ford, ruining Ford's reputation in the insurance industry, and by reason of the KPMG Defendants'

actions, Ford is no longer able to work in the insurance industry.

80. MHA Financial is identified in McDonald and Beighton's "Report of the Joint Liquidators" as taking a secret commission from one of BLA's investments. McDonald, Beighton, Drury and Crumpler as Liquidators have failed to follow up on this asset.

81. KPMG BVI/Belmont/Douglas violated client privilege and their fiduciary duty by discussing the BLA proceedings with Barros: "Prior to Boston life filing a Claim before this Court on March 7, 2006, I spoke with Simon Owen, who at the time was the Insurance Manager of Boston Life at Belmont Insurance Management in Tortola, BVI about Boston Life."

**PREDICATE ACTS**

82. The KPMG Defendants' association-in-fact enterprise has committed predicate acts of mail and wire fraud on a continuing and ongoing basis. The KPMG Defendants' mail and wire fraud involves a scheme or plan to intentionally defraud Ford and Ford's clients using the mail and wires to further their scheme. KPMG LLP's, KPMG BVI's, Belmont's, Douglas', McDonald's, Beighton's, Drury's and Crumpler's fraudulent misrepresentations and other documents were sent via wire and U.S. Mail to Ford and his clients. Ford and his clients in the US were deceived by those fraudulent communications.

83. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury represented to Ford that Ford and his annuity policy, not BLA, own the annuity policy assets including Dolphin Cove. Now, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury claim BLA, the BLA liquidation estate, or a company called Carina owned the St. Thomas property and owns the proceeds from the sale.

84. The KPMG Defendants are committing the same pattern of racketeering activity,

mail fraud, and wire fraud with other annuitants in the US.

**KPMG LLP**

85. The false statement or omission made: Ford must use KPMG BVI to set up BLA but KPMG LLP would assume liability for KPMG BVI's actions; the time and place of the statement or omission: March, 2001, Miami, Florida and Deerfield, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: KPMG LLP's financial services manager; the content of the statement or omission Ford must use KPMG BVI to set up BLA but KPMG LLP would assume liability for KPMG BVI's actions; the manner in which the statement or omission mislead Ford: Ford wanted an accounting and management firm close to his home so Ford could be informed and monitor the activity and that would be liable under US law and subject to jurisdiction of US courts, and now the KPMG Defendants hid information from Ford in the BVI and dispute jurisdiction; invoices for work done by KPMG LLP that KPMG LLP represented was for Ford when in fact the work was also done for Ford's competitor the Barros Group; what this Defendant gained as a consequence of the fraud: excessive accounting and management fees that were supposed to be incurred for Ford, but were incurred by Ford so KPMG BVI could assist Ford's competitor the Barros Group, and KPMG LLP gained a new client the Barros Group; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, lost reputation in the insurance business, $182,416,000.

86. The false statement or omission made: the time and place of the statement or omission July, 2003, Deerfield, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement KPMG LLP's financial services manager in Miami; the content of the statement or omission: invoices for work done by KPMG LLP that

KPMG LLP represented was for Ford when in fact the work was also done for Ford's competitor the Barros Group; the manner in which the statement or omission mislead Ford: Ford relied on the statement by disclosing his insurance product design to KPMG LLP with the understanding that KPMG LLP would not give it to a competitor, which then used it to steal clients and business from Ford costing Ford income and lost reputation in the insurance business; what this Defendant gained as a consequence of the fraud excessive accounting and management fees that were supposed to be incurred for Ford, but were incurred by Ford so KPMG BVI could assist Ford's competitor the Barros Group, and KPMG LLP gained a new client the Barros Group; the damages Ford suffered personally as a result of the fraud lost income, lost clients, lost reputation in the insurance business, $182,416,000.

87. If, as the KPMG Defendants claim, KPMG LLP operates in the United States and KPMG BVI, KPMG Cayman, Belmont, Douglas, McDonald, only operate outside the United States, then all the above managerial, not accounting, actions in the United States in furtherance of the RICO enterprise were a fortiori performed by KPMG LLP.

88. The following mail and wire fraud, which will be addressed in more detail below, occurred in the United States, and according to KPMG LLP's website are necessarily actions by by KPMG LLP.

89. The KPMG Defendants claim an entity named Carina owns the assets in Ford's annuity policy. The mailing address for an entity called Carina is Miami, Florida. According to KPMG's website, those actions were by KPMG LLP.

90. A document signed by Douglas, shows Douglas has signing authority for Carina, an entity located in Miami, Florida. A document signed by Douglas, shows Carina will receive monthly payments "from a trust in Florida. Those actions were by KPMG LLP.

91. A document shows the payments to Carina are from Equitable Bank in Ft. Lauderdale, Florida, and from William Reilly, 15801 Biscayne Blvd., North Miami Beach, Florida. According to KPMG's website, those actions were by KPMG LLP.

92. Leo Ford along with Mary Ford have an annuity policy with BLA. Their grandson Kenneth is a beneficiary on that annuity policy. At all times relevant to this case, Mary Ford and Kenneth have been and are Florida residents in Palm Beach County, Florida. At the time the Fords' annuity policy commenced, Leo Ford lived in Florida. Because KPMG BVI, Belmont and Douglas signed and administered an annuity policy in Florida, KPMG LLP necessarily signed and administered that annuity policy. According to KPMG's website, those actions were by KPMG LLP.

93. An April 23, 2009 letter from McDonald, Beighton, and KPMG BVI to another annuity policyholder in the US, necessarily by KPMG LLP, in which those KPMG Defendants specifically admit the annuity policy assets are separate from the annuity company. According to KPMG's website, those actions were by KPMG LLP.

94. McDonald and Beighton have taken actions in the United States by asserting a claim to the United States Virgin Islands property. The KPMG Defendants take the position that BLA and therefore the British Virgin Islands (BVI) liquidation estate owns Ford's share of the Dolphin Cove property on St. Thomas. According to KPMG's website, those actions in the US were by KPMG LLP.

95. On July 8, 2016, Drury and Crumpler sent out two pieces of mail fraud and wire fraud to Florida contending that Ford owes BLA $750,000 and Mr. Ford is not entitled to the proceeds of the St. Thomas property. According to KPMG's website, those actions were by KPMG LLP.

96. Douglas actually managed and operated BLA before the liquidation. Douglas advertises that she works for "KPMG" -- discovery will determine which KPMG or all of them. KPMG LLP agreed to and took actions to set up the whole association in fact RICO enterprise that is the basis of this lawsuit.

**KPMG BVI**

97. The false statement or omission made: Ford owes the liquidators $1,106,618.91; the time and place of the statement or omission: July 8, 2016, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: Drury, Crumpler and KPMG BVI; the content of the statement or omission: "the total sum due to the Company from Mr. Leo Ford totals $1,106,618.91".; the manner in which the statement or omission mislead Ford: those statements are false and contradicted by previous mail and wires from those Defendants, and Ford relied on KMPG BVI to accurately account for BLA and Ford; what this Defendant gained as a consequence of the fraud: millions in management fees and liquidation fees from Ford's annuity assets; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, and lost reputation, $182,416,000.

98. The false statement or omission made: KPMG BVI would not provide advice, services or administration for a competing company; the time and place of the statement or omission: 2001-2006 BVI, USVI and Boca Raton, Fl; the person or entity responsible for the statement or in the case of omissions not making the statement: Andrea Douglas and Martin Everleigh; the content of the statement or omission: Belmont will not assist, provide advice, services or administration to a company that would compete with Ford; the manner in which the statement or omission mislead Ford: Ford relied on the statement by giving KPMG BVI all Ford's insurance product information and client listsd; KPMG BVI then assisted the Barros

Group to set up, helped license, and manage a competing company with Ford's insurance products and Ford's clients; what this Defendant gained as a consequence of the fraud: estimated fees and a new client the Barros Group $1,500,000; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, lost reputation $157,216,000.

99. KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's wire fraud and mail fraud to Ford dated July 22, 2010, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; wire fraud and mail fraud to Ford in Florida dated April 27, 2006, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's 2 predicate acts of wire fraud and mail fraud to Ford and Ford's lawyer in Florida dated July 8, 2016, falsely asserting that assets that belong to Ford and Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG, when in fact the annuity documents, the law and KPMG's own admissions prove the assets belong to Ford or Ford's annuity policy.

100. A letter dated July 22, 2010 to Ford in Florida, in which KPMG BVI, Belmont, Douglas, McDonald and Beighton acknowledged that Ford's annuity policy, not BLA, invested in the Dolphin Cove property on St. Thomas, United States Virgin Islands. "The documents you have provided indicate there was an investment in Dolphin Cove, USVI in policy BP-010782 dated valued at 31 March 2006 at $500,000." Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. KPMG BVI gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

101. A KPMG BVI, Belmont, Douglas, McDonald, and Beighton accounting

document sent in March, 2008 to Ford in Florida showing that Ford's investment in the Dolphin Cove property on St. Thomas is held in Carina. Ford relied on that representation that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. KPMG BVI gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

102. KPMG BVI's, Belmont's, and Douglas' own bookkeeper Melissa Schreiner, in another admission against interest on April 27, 2006, sent to Ford in Florida wrote that she was collecting money from Putnam (which she and the liquidators had a duty to collect) and AFTER payment of the purported $751,449.23 loan to Ford, his annuity had a cash value of $420,000. That is consistent with Schreiner's handwritten notes, sent to Ford in Florida on behalf of KPMG BVI, Belmont and Douglas, which show after the Putnam collection, Ford's annuity policy value was $1,902,678.26, minus the purported loan of $751,449.03, leaving a policy value of $1,151,229.03 -- all of which KPMG kept in violation of the annuity documents and BVI law. Moreover, the June 30, 2006, printed valuation, sent to Ford in Florida on behalf of KPMG BVI, Belmont and Douglas, shows a policy value of $1,122,680.86, AFTER repayment of the purported loan of $751 ,449.03 -- all of which KPMG kept. Ford relied on that representation that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he does not owe BLA money and he owned Dolphin Cove and now is entitled to the proceeds of the sale. KPMG BVI gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his

other assets and investments in the annuity policy.

103. In an April 23, 2009 letter from McDonald, Beighton and KPMG BVI to another annuity policyholder in the United States in which KPMG specifically admits the annuity policy assets are separate from the annuity company. Ford relied on this document believing his investment in his annuity policy was his and safe and relying on KPMG BVI's management and representations. That is mail fraud. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Because the letter was sent in the United States and because the KPMG Defendants claim actions in the United States were actions of KPMG LLP, then that mail fraud was by KPMG LLP. Ford relied on that representation that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. KPMG BVI gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

104. In a March 31, 2006 Quarterly Statement and in other quarterly statements from 2002 to 2006 from KPMG BVI, Belmont, and Douglas to Leo Ford and Mary Ford -- a Florida resident -- showing the annuity policy's, not Boston Life's, investment in Dolphin Cove. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Ford relied on that representation and made the investment in Dolphin Cove and believed that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. KPMG BVI gained accounting and management fees from the sale of

the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

**JAMES DRURY**

105. The false statement that Ford owes the liquidators $1,106,618.91; the time and place of the statement or omission: July 8, 2016, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: James Drury and Russell Crumpler whose Senior Manager is James Drury; the content of the statement or omission: "the total sum due to the Company from Mr. Leo Ford totals $1,106,618.91".; the manner in which the statement or omission mislead Ford: the manner in which the statement or omission mislead Ford: those statements are false and contradicted by previous mail and wires from those Defendants, and Ford relied on those Defendants to accurately account for BLA and Ford; what this Defendant gained as a consequence of the fraud: millions in liquidation fees from Ford's annuity assets; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, and lost reputation, $182,416,000.

106. A purported $500,000 loan to Ford shown on the documents sent by Drury and Crumpler to Ford in Florida on July 8, 2016, had nothing to do with the St. Thomas property or the annuity. There is no paperwork other than a unilateral decision by KPMMG BVI, Belmont, Douglas, McDonald Beighton, Crumpler and Drury to apply that purported loan to a jointly held annuity, which could not be done legally. Drury and Crumpler gained excessive and liquidation fees. Ford lost income, clients, and his reputation in the insurance business.

107. The false statement or omission made: "KPMG was never the auditor for BLA and never contracted with plantiff Ford to prepare the presentation for a captive to the BVI

insurance regulators" ; the time and place of the statement or omission: February 13, 2017; the person or entity responsible for the statement or in the case of omissions not making the statement: Russell Crumpler whose Senior Manager is James Drury; the content of the statement or omission: "KPMG was never the auditor for BLA and never contracted with plantiff Ford to prepare the presentation for a captive to the BVI insurance regulators"; the manner in which the statement or omission mislead Ford: the manner in which the statement or omission mislead Ford: those statements are false and contradicted by previous emails, audits, mail, and wires from those Defendants, and Ford relied on those Defendants accurately account for BLA and Ford; what this Defendant gained as a consequence of the fraud: millions in liquidation fees from Ford's annuity assets; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, and lost reputation, $182,416,000.

108. Contrary to the admissions in the July 22, 2010, letter set forth below, now on July 8, 2016, KPMG BVI, Crumpler and Drury sent out two pieces of mail fraud and wire contending that Ford owes BLA $750,000, and Ford is not entitled to the proceeds of the St. Thomas property.

**RUSSELL CRUMPLER**

109. The false statement that Ford owes the liquidators $1,106,618.91; the time and place of the statement or omission: July 8, 2016, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: James Drury and Russell Crumpler whose Senior Manager is James Drury; the content of the statement or omission: "the total sum due to the Company from Mr. Leo Ford totals $1,106,618.91".; the manner in which the statement or omission mislead Ford: the manner in which the statement or omission mislead Ford: those statements are false and contradicted by previous mail and wires from

those Defendants, and Ford relied on those Defendants to accurately account for BLA and Ford; what this Defendant gained as a consequence of the fraud: millions in liquidation fees from Ford's annuity assets; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, and lost reputation, $182,416,000.

110. A purported $500,000 loan to Ford shown on the documents sent to Ford in Florida on July 8, 2016, had nothing to do with the St. Thomas property or the annuity. There is no paperwork other than a unilateral decision by KPMMG BVI, Belmont, Douglas, McDonald Beighton, Crumpler and Drury to apply that purported loan to a jointly held annuity, which could not be done legally.

111. The false statement or omission made: "KPMG was never the auditor for BLA and never contracted with plantiff Ford to prepare the presentation for a captive to the BVI insurance regulators" ; the time and place of the statement or omission: February 13, 2017; the person or entity responsible for the statement or in the case of omissions not making the statement: Russell Crumpler whose Senior Manager is James Drury; the content of the statement or omission: "KPMG was never the auditor for BLA and never contracted with plantiff Ford to prepare the presentation for a captive to the BVI insurance regulators"; the manner in which the statement or omission mislead Ford: the manner in which the statement or omission mislead Ford: those statements are false and contradicted by previous emails, audits, mail, and wires from those Defendants, and Ford relied on those Defendants accurately account for BLA and Ford; what this Defendant gained as a consequence of the fraud: millions in liquidation fees from Ford's annuity assets; the damages Ford suffered personally as a result of the fraud: lost income, lost clients, and lost reputation, $182,416,000.

112. Contrary to the above admissions in the July 22, 2010, letter, now on July 8, 2016,

KPMG BVI, Crumpler and Drury sent out two pieces of mail fraud and wire contending that Ford owes BLA $750,000, and Ford is not entitled to the proceeds of the St. Thomas property.

**BELMONT INSURANCE MANAGEMENT**

113. The false statement or omission made: providing Leo and Mary Ford with an annuity quarterly statement showing Ford's assets including the Dolphin Cove Property, location USVI was held by Ford's annuity policy, when the KPMG Defendants now claim the property was transferred to Carina; the time and place of the statement or omission: April, 2006, Boca Raton, Florida and St Thomas, USVI; the person or entity responsible for the statement or in the case of omissions not making the statement: Andrea Douglas on behalf of Belmont; the content of the statement or omission: Listing Dolphin Cove, USVI as an asset of Ford's and his annuity policy; the manner in which the statement or omission mislead Ford: Ford relied on Belmont, KPMG BVI, and Douglas placing the Dolphin Cove Property, USVI in the annuity separate account as required by BVI insurance law and Ford made the investment in Dolphin Cove, but the KPMG Defendants now claim the property was placed in the general accounts of BLA and the KPMG Defendants are entitle to the property and the proceeds from the property; what this Defendant gained as a consequence of the fraud: $500,000; the damages Ford suffered personally as a result of the fraud: $780,000 .

114. A letter dated July 22, 2010, sent to Ford in Florida by KPMG BVI, Belmont, Douglas, McDonald and Beighton in which they acknowledged that Ford's annuity policy, not BLA, invested in the Dolphin Cove property on St. Thomas, United States Virgin Islands. "The documents you have provided indicate there was an investment in Dolphin Cove, USVI in policy BP-010782 dated valued at 31 March 2006 at $500,000." Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin

Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Belmont gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford’s other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

115. KPMG BVI's, Belmont's, and Douglas' own bookkeeper Melissa Schreiner, in another admission against interest on April 27, 2006, to Ford in Florida, wrote that she was collecting money from Putnam (which she and the liquidators had a duty to collect) and AFTER payment of the purported $751,449.23 loan to Ford, his annuity had a cash value of $420,000. That is consistent with Schreiner's handwritten notes, sent on behalf of KPMG BVI, Belmont and Douglas, which show after the Putnam collection, Ford’s annuity policy value was $1,902,678.26, minus the purported loan of $751,449.03, leaving a policy value of $1,151,229.03 -- all of which KPMG kept in violation of the annuity documents and BVI law. Moreover, the June 30, 2006, printed valuation, sent on behalf of KPMG BVI, Belmont and Douglas, shows a policy value of $1,122,680.86, AFTER repayment of the purported loan of $751 ,449.03 -- all of which KPMG kept. Ford relied on this making investments in his BLA annuity and thinking he did not owe BLA money and his investments were safe. Ford relied on that representation that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Belmont gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford’s other assets and investments in the annuity. Belmont gained excessive accounting and management fees. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy, and lost clients and

reputation in the insurance business.

116. In a March 31, 2006 Quarterly Statement and other quarterly statements from 2002 to 2006 from KPMG BVI, Belmont, and Douglas to Leo Ford and Mary Ford -- a Florida resident -- showing the annuity policy's, not Boston Life's, investment in Dolphin Cove. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Ford relied on that representation and invested in Dolphin cove thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Belmont gained accounting and management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy, lost clients, and lost reputation in the insurance industry.

**CASEY MCDONALD**

117. The false statement or omission made: "which clearly shows Carina as the holder of a $2,000,025 interest in Dolphin Cove"; the time and place of the statement or omission: December 13, 2016, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: Casey McDonald; the content of the statement or omission: "which clearly shows Carina as the holder of a $2,000,025 interest in Dolphin Cove"; ; the manner in which the statement or omission mislead Ford: Leo and Mary Ford's annuity policy held a $500,000 in Dolphin Cove, USVI; KPMG fraudulently placed annuity assets into the Carina; what this Defendant gained as a consequence of the fraud: $2,000,025; the damages Ford suffered personally as a result of the fraud: $780,000.

118. The false statement or omission made: "we have had substantial correspondence

with you regarding the various claims you have submitted in the liquidation of BLA." ; the time and place of the statement or omission: December 13, 2016, Florida; the person or entity responsible for the statement or in the case of omissions not making the statement: Casey McDonald; the content of the statement or omission: "we have had substantial correspondence with you regarding the various claims you have submitted in the liquidation of BLA."; the manner in which the statement or omission mislead Ford: Casey McDonald would not return calls or emails made over several years about Ford's annuity policy or Ford's other claims against BLA and Ford relied on McDonald to protect Ford's and his annuity's investment in Dolphin Cove and the other assets in Ford's annuity policy; what this Defendant gained as a consequence of the fraud $11,500,000; the damages Ford suffered personally as a result of the fraud: $179,837,000.

119. A letter dated July 22, 2010, the KPMG BVI, Belmont, Douglas, McDonald and Beighton acknowledged that Ford's annuity policy, not BLA, invested in the Dolphin Cove property on St. Thomas, United States Virgin Islands. "The documents you have provided indicate there was an investment in Dolphin Cove, USVI in policy BP-010782 dated valued at 31 March 2006 at $500,000." Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. McDonald gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

120. In an April 23, 2009 letter from McDonald, Beighton and KPMG BVI to another annuity policyholder in the United States in which KPMG specifically admits the annuity

policy assets are separate from the annuity company. That is mail fraud. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. McDonald gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

121. On December 18, 2007, Beighton and McDonald informed Ford -- at his email in Florida -- that McDonald and Beighton worked together as joint liquidators and therefore had knowledge of and approved each other's actions.

122. A joint liquidators report sent to Ford in Florida in March, 2008, from Defendants McDonald and Beighton admitting Ford's annuity policy invested $500,000 in the United States Virgin Islands property. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. McDonald gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

123. As set forth in an email sent in 2017, McDonald tried to arrange the sale of that property on St. Thomas. That email in which McDonald represented he had authority over the Dolphin Cove property contradicted previous emails admitting Ford and his annuity owned the Dolphin Cove property. Ford relied on that representation and made the Dolphin Cove

investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. McDonald gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

124. KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's wire fraud and mail fraud to Ford dated July 22, 2010, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; wire fraud and mail fraud to Ford dated April 27, 2006, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's 2 predicate acts of wire fraud and mail fraud to Ford and the undersigned dated July 8, 2016, falsely asserting that assets that belong to Ford and Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG, when in fact the annuity documents, the law and KPMG's own admissions prove the assets belong to Ford or Ford's annuity policy. McDonald and Beighton gained liquidation fees from the false statements. Ford lost the Dolphin Cove property and his other assets in the annuity policy.

**KRIS BEIGHTON**

125. The false statement or omission made: "Ford holds an option to purchase 45% of the Company's outstanding shares."; the time and place of the statement or omission: March 20, 2008; Florida and USVI; the person or entity responsible for the statement or in the case of omissions not making the statement: Kris Beighton; the content of the statement or omission: "Ford holds an option to purchase 45% of the Company's outstanding shares."; the manner in which the statement or omission mislead Ford: Beighton placed this statement in the JL

Creditors Report; Ford had executed his option and relied on KPMG BVI, Belmont, Douglas, McDonald, and Beighton to effectuate that optioin, but Beighton refused to acknowledge Ford's earlier option exercise; what this Defendant gained as a consequence of the fraud: $11,500,000; the damages Ford suffered personally as a result of the fraud: $179,837,000.

126. The false statement or omission made: "Proofs of debt received…Ford, Leo $4,500,000"; the time and place of the statement or omission: April 2008, Florida and USVI; the person or entity responsible for the statement or in the case of omissions not making the statement: Kris Beighton; the content of the statement or omission: "Proofs of debt received…Ford, Leo $4,500,000"; ; the manner in which the statement or omission mislead Ford: Ford did not bring legal action as Ford believed the JL's were going to pay the $4,500,000 plus his annuity policy value; what this Defendant gained as a consequence of the fraud: $6,500,000; the damages Ford suffered personally as a result of the fraud: $6,500,000.

127. A letter dated July 22, 2010, the KPMG BVI, Belmont, Douglas, McDonald and Beighton acknowledged that Ford's annuity policy, not BLA, invested in the Dolphin Cove property on St. Thomas, United States Virgin Islands. "The documents you have provided indicate there was an investment in Dolphin Cove, USVI in policy BP-010782 dated valued at 31 March 2006 at $500,000." Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Beighton gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

128. In an April 23, 2009 letter from McDonald, Beighton and KPMG BVI to another

annuity policyholder in the United States in which KPMG specifically admits the annuity policy assets are separate from the annuity company. That is mail fraud. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Beighton gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

129. On December 18, 2007, Beighton and McDonald informed Ford -- at his email in Florida -- that McDonald and Beighton worked together as joint liquidators and therefore had knowledge of and approved each other's actions.

130. A joint liquidators report sent to Ford in Florida in March, 2008, from Defendants McDonald and Beighton admitting Ford's annuity policy invested $500,000 in the United States Virgin Islands property. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Beighton gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

131. As set forth in an email sent in 2017, McDonald tried to arrange the sale of that property on St. Thomas. That email in which McDonald represented he had authority over the Dolphin Cove property contradicted previous emails admitting Ford and his annuity owned the

Dolphin Cove property. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Beighton gained liquidation fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

132. In an email from McDonald and Beighton they admit they have taken actions in the United States by asserting a claim to the United States Virgin Islands property. The KPMG Defendants, which include Belmont and Douglas, take the position that BLA and therefore the BVI liquidation estate owns Ford's share of the Dolphin Cove property on St. Thomas. As set forth in the email, McDonald and Beighton asserted in the United States Virgin Islands that Carina -- with the Florida mailing address -- owns Ford's share of the St. Thomas property.

**ANDREA DOUGLAS**

133. The false statement or omission made: that Douglas would not provide services or administration for a similar company to BLA ; the time and place of the statement or omission: 2001-2006 BVI, USVI and Boca Raton, FL; the person or entity responsible for the statement or in the case of omissions not making the statement: Andrea Douglas; the content of the statement or omission: Douglas will not assist, provide services or administration to a company that would compete with BLA; the manner in which the statement or omission mislead Ford: Ford gave Douglas, KPMG BVI, and Belmont all Ford's insurance products and then let them manage Ford's business and then those Defendants used Ford's products and information to assist the Barros Group in competing against Ford; what this Defendant gained as a consequence of the fraud: estimated $1,500,000; the damages Ford suffered personally as a

result of the fraud: $157,216,000.

134. The false statement or omission made: that Leo and Mary Ford's annuity held an investments in separate accounts and not listing all the assets -Raptor Networks Technology Inc and Merlot Communications; the time and place of the statement or omission: April 2006, St. Thomas USVI and Boca Raton, Fl.; the person or entity responsible for the statement or in the case of omissions not making the statement; Andrea Douglas; the content of the statement or omission: a statement showing multiple assets held in Leo and Mary's Ford annuity policy and not listing all the assets ; the manner in which the statement or omission mislead Ford: ford made the investments in his annuity policy: what this Defendant gained as a consequence of the fraud $2,000,000; the damages Ford suffered personally as a result of the fraud $4,160,000.

135. A letter dated July 22, 2010, the KPMG BVI, Belmont, Douglas, McDonald and Beighton acknowledged that Ford's annuity policy, not BLA, invested in the Dolphin Cove property on St. Thomas, United States Virgin Islands. "The documents you have provided indicate there was an investment in Dolphin Cove, USVI in policy BP-010782 dated valued at 31 March 2006 at $500,000." Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Douglas gained management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

136. KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's wire fraud and mail fraud to Ford dated July 22, 2010, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; wire fraud and mail fraud to Ford dated April 27,

2006, stating assets in Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG; KPMG BVI's, Belmont's, Douglas', MacDonald's, and Beighton's 2 predicate acts of wire fraud and mail fraud to Ford and the undersigned dated July 8, 2016, falsely asserting that assets that belong to Ford and Ford's annuity policy belong to BLA, the BLA liquidation, and KPMG, when in fact the annuity documents, the law and KPMG's own admissions prove the assets belong to Ford or Ford's annuity policy. McDonald and Beighton gained liquidation fees from the false statements. Ford lost the Dolphin Cove property and his other assets in the annuity policy.

137. In a March 31, 2006 Quarterly Statement and other quarterly statements from 2002 – 2006 from KPMG BVI, Belmont, and Douglas to Leo Ford and Mary Ford -- a Florida resident -- showing the annuity policy's, not Boston Life's, investment in Dolphin Cove. Now the KPMG Defendants assert BLA and the liquidation estate, not the Fords' annuity policy, own the assets in the annuity policy. Ford relied on that representation and made the Dolphin Cove investment thinking that his investment in Dolphin Cove was his and safe. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Douglas gained management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

138. A KPMG BVI, Belmont, Douglas accounting document sent in March, 2008, showing that Ford's investment in the Dolphin Cove property on St. Thomas is held in Carina. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Douglas gained management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss

of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

139. KPMG BVI's, Belmont's, and Douglas' own bookkeeper Melissa Schreiner, in another admission against interest on April 27, 2006, wrote that she was collecting money from Putnam (which she and the liquidators had a duty to collect) and AFTER payment of the purported $751,449.23 loan to Ford, his annuity had a cash value of $420,000. That is consistent with Schreiner's handwritten notes, sent on behalf of KPMG BVI, Belmont and Douglas, which show after the Putnam collection, Ford's annuity policy value was $1,902,678.26, minus the purported loan of $751,449.03, leaving a policy value of $1,151,229.03 -- all of which KPMG kept in violation of the annuity documents and BVI law. Moreover, the June 30, 2006, printed valuation, sent on behalf of KPMG BVI, Belmont and Douglas, shows a policy value of $1,122,680.86, AFTER repayment of the purported loan of $751 ,449.03 -- all of which KPMG kept. Ford relied on this document thinking that he owned Dolphin Cove and now is entitled to the proceeds of the sale. Douglas gained management fees from the sale of the Dolphin Cove property and theft of Ford's other assets and investments in the annuity. Ford suffered the loss of the Dolphin Cove proceeds and his other assets and investments in the annuity policy.

140. These predicate acts are ongoing, as recently as July 8, 2016, occur on a daily basis, and will carry on into the future as, KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler continue to advertise their fraudulent services to clients and the public. Defendants' fraudulent misrepresentations outlined above are conveyed through the U.S. Mail, online, and via telephonic communications. KPMB LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler make these fraudulent statements online, via U.S. Mail, and during telephonic communications.

141. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's predicate acts above were intentionally false and fraudulent.

142. The above predicate acts of wire fraud and mail fraud were false.

143. Ford relied on the above predicate acts of wire fraud and mail fraud to his detriment.

144. Defendants gained exorbitant and fraudulent fees and stole Ford's annuity assets and insurance products and used them to set up a competitor to Ford to gain more fees.

145. The predicate acts of false statements in mail fraud and wire fraud, which were made with the intent to defraud Ford of his money and property.

146. The above predicate acts of wire fraud and mail fraud were false. The Defendants' predicate acts of wire fraud and mail fraud were intentionally false.

147. The KPMG Defendants gained accounting, management, and liquidation fees from the fraud.

148. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's mail and wire fraud are in direct violation of 18 U.S.C. 1343, 1341, 1344, 1962, 1831, 1832, and 1957.

**THE PREDICATE ACTS FORM A "PATTERN OF RACKETEERING ACTIVITY"**

149. The predicate acts discussed above, the last of which occurred within 10 years after the commission of a prior act of racketeering activity, are an ongoing, open-ended scheme. These predicate acts have occurred over the course of at least 10 years and continue to the present on a daily basis.

150. Although annuity contracts, the law, and KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's own admissions prove that assets in annuity

policies are segregated from the annuity company, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler continue to this day to take the position in wire fraud and mail fraud that annuity policy assets are property of the annuity company and refuse to protect annuity policy assets while raping the insurance company with fees, as in the case of wire fraud and mail fraud to annuitant Fred Best dated March 30, 2009, refusing to protect Mr. Bests annuity assets, and other US annuitants.

151. The KPMG Defendants are committing the same pattern of racketeering activity, wire fraud and mail fraud with other annuitants in the US.

152. The KPMG Defendants false claims and RICO enterprise and scheme continue to this day.

153. Neil Mitchell sued a KPMG entity in the same "affiliated" "network" as the KPMG Defendants about a similar conspiracy to push a company Torex Retail into liquidation and then not protect the assets.

154. The KPMG Defendants' association-in-fact enterprise has exhibited a "pattern of racketeering activity" by its commission of numerous related acts of mail and wire fraud, all of which have common purposes, results, participants, victims, methods of commission, and are otherwise interrelated by distinguishing characteristics and are not isolated events. Each predicate act, individual, business, and component of their fraudulent and deceptive scheme is necessary to accomplish the overall objective of the enterprise.

155. The foregoing predicate acts and racketeering activity are necessary to accomplish vital components and the overall objective of the association-in-fact enterprise. The KPMG Defendants resort to committing various predicate acts to effectuate their fraudulent scheme, including fraudulent misrepresentations in person, online, and over the telephone wires.

156. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler conspire to commit the predicate acts of mail and wire fraud in furtherance of their fraudulent scheme. Mail fraud plays an integral component in accomplishing Defendants' fraudulent scheme.

157. The KPMG Defendants' actions were not mere accounting, but also management actions for Ford.

**THE PREDICATE ACTS RELATE TO EACH OTHER AS PART OF A COMMON PLAN**

158. The racketeering activity and/or mail and wire fraud arise as the result of KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's deceptive and fraudulent tactics to ruin Ford's reputation and steal Ford's products and clients and gain more commissions and fees. The purpose of the scheme is to enable KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler to ruin Ford's reputation and steal Ford's products and clients. This entire process is illegal, fraudulent and deceptive. As discussed above, each predicate act and component of the fraudulent and deceptive process is necessary to accomplish the overall objective of the enterprise and common plan of the enterprise's members.

159. Each KPMG Defendant had a common purpose and a common understanding to defraud Ford.

160. The predicate acts of mail and wire fraud are necessary and essential to accomplish the overall objective of the KPMG Defendants' association-in-fact enterprise. To consummate the scheme, KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler then repeatedly commit mail and wire fraud.

**CAUSATION**

161. While representing the Ford, KPMG BVI, Belmont, and Douglas used the Ford's ideas, intellectual property, and insurance products and set up a competing insurance product and business.

162. KPMG BVI, Belmont, and Douglas diverted $2.7M of premiums that were supposed to go to Ford and BLA. Ford personally lost fees, clients, and his reputation by reason of the KPMG Defendants' actions.

163. The Eastern Caribbean Supreme Court extended an ex parte freeze order re BLA assets. McDonald and Beighton assisted in freezing the assets of Ford and BLA. (In this complaint, Ford is not suing for assets of BLA). That freeze order was obtained by McDonald and Beighton's fraud and crippled BLA and Ford's ability to do business. At that time McDonald and Beighton were the BLA liquidators, conspired with the Barros Group, would not sue the Barros Group, and just liquidated BLA, Ford, and Ford's annuity policy and charged excessive fees and costs.

164. BLA won the summary judgment in the Eastern Caribbean Court. The freeze order was lifted. The decision was reversed, but the reversal had nothing to with the RICO conspiracy in this case.

165. While all this was going on, after KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler took control of BLA and excluded Ford from knowledge about the business, the Barros Group offered -- not to Ford -- that the Barros Group would take BLA's 52 clients, proving the Barros Group was in the same business. Ford found out about the Barros Group's offer after April 21, 2012. Ford attempted to discover matters about BLA, but KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler refused to provide Ford with information about BLA while KPMG BVI, Belmont, Douglas, McDonald,

Beighton, Drury and Crumpler managed BLA before, during, and after the liquidation.

166. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler stole Ford's ideas and products and ruined his reputation and ability to work in the insurance business.

167. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler conspired to steal Ford's assets, and did in fact steal the assets from Ford's annuity policy, which contractually and legally was not part of BLA or the BLA liquidation, as recently as July 8, 2016 and continuing up to this day attempting to prevent Ford from receiving assets in his annuity policy, such as proceeds from the sale of the Dolphin cove property on St. Thomas, stock in a company associated with that property, and membership in a limited liability company that owned that property, which Ford's annuity policy purchased.

168. On information and belief, to be determined during discovery, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler took money and assets from Ford's annuity, which by contract, law, and KPMG admissions should have been kept in Ford's separate accounts, and the KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler put Ford's annuity assets in BLA general reserves and the KPMG Defendants took the annuity assets as fees.

169. The following damages claims set forth in the FAC, which clearly are personal to Ford.

170. While the Defendants used BLA to damage Ford, the damages set forth above are clearly damages personal to Ford.

171. By reason of the KPMG Defendants' actions, Ford personally suffered the following damages.

**FORD'S PERSONAL DAMAGES**

| Event | Loss to Ford (interest not applied) | People/Organizations Involved |
|---|---|---|
| Diversion $2.7 million GT, ABG insurance premium (11 risks) intended for BLA (plan was$2.7M each year for 5 years and they diverted year 1 years 2-5 not paid for a total of $13.5M lost premium) | $3,375,000 (Ford was to receive 25% of premium per Ford's contract) + $540,000 (2% per year premium fee) = ***$3,915,000 interest of 4% would add $1,566,000 minimum*** | Belmont Insurance Management, Ltd., Andrea Douglas, KPMG (BVI) Ltd. |
| Ford's Loss of Initial Investment in BLA; Capitalization, legal, accounting and other fees (2001) | ***$750,000 interest at 4% adds $450,000*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler, Drury |
| Cash and Equity Loss (General reserves $11.5M; standard valuation of insurance company is 10 times general reserves | ***$115,600,000 interest adds $41,616,000*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler, Drury |
| Ford had a contract with BLA if liquidated or cease business | ***$6,500,000 interest at 4% adds $2,340,000*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler, Drury |
| Ford loss re Dolphin Cove real estate on ST. Thomas | ***$375,000 + $405,000 = $780,000 ($405,000 is interest at 12% contractual)*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler, Drury |
| Annuity | ***$2,000,000 + $2,160,000 = $4,160,000 ($2,160,000 is interest at 12%)*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler, Drury |
| Loss of Earnings including loss of reputation and loss of ability to do business 2006 – 2016 based on Ford previous year's tax returns (2006-2016) | ***$11,000,000 (no interest or reinvestment of earned monies included)*** | Belmont Insurance Management, Ltd., Douglas, KPMG (BVI) Ltd., McDonald, Beighton, Crumpler |
| **HARD LOSSES** | ***$136,205,000*** | |
| **INTEREST** | ***$ 43,632,000*** | |

| Event | Loss to Ford (interest not applied) | People/Organizations Involved |
|---|---|---|
| **TOTAL** | ***$179,837,000*** | |

* Ford also claims treble damages under RICO.

172. KPMG BVI, Belmont and Douglas incorporated the Barros Group and performed for it insurance manager and administration functions. KPMG BVI, Belmont and Douglas had an exclusive contract with Ford at that time not to perform similar duties with competing companies as the product line was developed by Ford and was his intellectual property.

173. McDonald, Beighton, Crumpler, and Drury should never have accepted the position as liquidators due to their prior duties as incorporators, administrators, managers and auditors for BLA and Ford. McDonald, Beighton, Crumpler, and Drury did so in order to cover and conceal their and KPMG BVI's, Belmont's and Douglas' misdeeds, which continue to this day as evidenced by 2 acts of mail fraud and wire fraud on July 8, 2016. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler "fee'd" all the liquid cash out of Ford's annuity policy and refused to distribute insurance policy assets and monies to Ford and his co-policy holder, Mary Ford, a Florida resident. The application for that annuity was taken and executed in Florida.

174. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler further failed to follow up on the counterclaim filed by BLA before its liquidation. Two other individuals received sizeable settlements from 54 BLA clients in Miami. Ford was never served and was informed by KPMG BVI, Belmont, Douglas, McDonald and Beighton that Ford could not submit a counterclaim.

175. As set forth above, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler failed in their fiduciary duty to protect BLA's and Ford's assets.

176. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler refuse

to pay any of Ford's claims although various contracts existed since the inception of BLA and his five-year contract was renewed 5 to 6 months prior to BLA's liquidation. Ford's expenses on the behalf of the BLA were not reimbursed. Although Ford was the major single creditor at liquidation, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury refused to allow him on the Creditors' Committee, recognized the 54 creditors despite the Summary Judgment in favor of BLA. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler did not provide Ford with any knowledge of the liquidation after they positioned themselves to loot all of BLA's and Ford's funds and assets.

177. Ford invested $2,000,000 in Dolphin Cove real estate project on St. Thomas. McDonald, Beighton, Drury and Crumpler contacted Dolphin Cove partners and entered negotiations to buy the Dolphin Cove real estate at pennies on the dollar. By reasons of the KPMG Defendants' actions, Dolphin Cove decided not to pay Ford his contractual monies due as they wanted Ford to be unable to fight them legally and also removed him as a Managing Member and from the Dolphin Cove website where he had been prominently placed as a Founder and Managing Member. As recently as July 8, 2016, Crumpler and Drury continue to fraudulently assert claims over the Dolphin Cove property and fraudulently deprive Ford of his investment in the Dolphin Cove property, even though the BVI Certification prohibited the KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler from asserting any claims regarding BLA's assets.

178. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury refuse to pay claims, loans, and distributions against the Ford's annuity policy that were not collateralized by the policy. Mary Ford and Leo Ford were residents of Florida at the time the annuity policy application was signed (in Florida) and assets transferred to a separate account

at BLA. Mary Ford remains a Florida resident to this day. Mary Ford had to sell the house she lived in since the mid 1980's due to lack of money and move with her young grandson to a far inferior location/house. By BVI law, the terms of the annuity policy, and the KPMG Defendants' own admissions, policy assets are to be held in separate accounts not subject to claims of creditors. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Crumpler, and Drury are fraudulently not recognizing that law. Florida law is very strict protecting the assets of policyholders.

179. By reason of the KPMG Defendants' actions, Ford has been unable to do any insurance business since this conspiracy. Real estate joint ventures fell apart, and people refused to do business with him after reading the negative press in the insurance and all other business endeavors.

**DEFENDANTS/CULPABLE PERSONS**

180. All the KPMG Defendants comprise an association-in-fact enterprise (the "RICO Enterprise"). The KPMG Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

**RICO ENTERPRISE**

181. All the KPMG Defendants are associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct towards Ford.

182. The KPMG Defendants used mail and wire fraud to facilitate the RICO Enterprise.

**THE NAMES OF THE INDIVIDUALS, PARTNERSHIPS, CORPORATIONS, ASSOCIATIONS, OR OTHER LEGAL ENTITIES THAT CONSTITUTE THE RICO ENTERPRISE**

183. All the names of the individuals, partnerships, corporations, and other legal entities that constitute the RICO Enterprise are set forth above.

184. All the above named KPMG Defendants have formed an association-in-fact enterprise comprised of the KPMG Defendants and multiple other individuals and businesses that all play an integral role in orchestrating a fraudulent and deceptive scheme upon Ford, his clients, and the public. All KPMG Defendants have utilized their background and knowledge and Ford's products and work product to structure various businesses and individuals in such a manner so as to serve critical, interrelated, and component roles necessary in facilitating Defendants' scheme and racketeering activity.

185. The above persons and entities when combined as an association-in-fact enterprise provide vital and necessary component services that together facilitate racketeering activity and a fraudulent scheme that any one business or individual could not accomplish standing on its own. Each individual and business of the association-in-fact enterprise is necessary to accomplish the overall objectives of the enterprise.

**THE STRUCTURE, PURPOSE, FUNCTION, AND COURSE OF CONDUCT OF THE TIMESHARE FRAUD RICO ENTERPRISE**

186. The various functions of each KPMG Defendant are outlined above in greater detail.

187. The KKPMG Defendants are an association-in-fact RICO enterprise and conspiracy in Florida and the United States to ruin Mr. Ford's reputation and steal all his assets and money.

188. The KPMG Defendants agreed to the common purpose of the conspiracy and committed predicate acts.

189. The KPMG Defendants, their agents, and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact. The various KPMG Defendants function together as a

continuing unit. From on or about 2002 to today, the KPMG Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962, including multiple acts of mail fraud, wire fraud, online fraud, and/or financial fraud. The KPMG Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. The KPMG Defendants' acts of mail fraud, wire fraud, online fraud, and financial fraud are occurring on an ongoing and daily basis targeting Ford's clients, Ford's assets, Ford's annuity policy, and Ford's intellectual property.

190. The KPMG Defendants' participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing/continuing basis since 2005.

191. The KPMG Defendants utilize wire fraud, mail fraud, online fraud, and/or financial fraud to accomplish or further the enterprise's fraudulent scheme, and the KPMG Defendants' actions are violations of public policy, violations of state statutes, and affect interstate and international commerce. The nature of the KPMG Defendants' more than 2 and multiple predicate acts, including 2 acts of wire fraud and mail fraud on July 8, 2016, business model, and organizational structure involve a distinct threat of long-term racketeering activity. The KPMG Defendants have the same or similar purposes, results, participants, victims, methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy, and meticulous organizational structure. The acts committed by the KPMG Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal, and predatory practices occurring on a daily basis. KPMG BVI, Belmont, Douglas, McDonald,

Beighton,, Drury and Crumpler refuse to protect the assets of other annuitants in segregated accounts, such as Fred Best, all the time raping the insurance company of assets and fees. The KPMG Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise. The KPMG Defendants' scheme is ongoing and daily in nature, and predicate acts are committed daily and routinely. Those predicate acts are continuing and will continue into the future.

192. Ford's claims are plausible. KPMG LLP's website admits the KPMG entities are in a "network" and are "affiliated". It appears KPMG LLP already admits it is in an enterprise -- which Ford alleges is a RICO enterprise. Just as Ford alleges in this case, KPMG recently had to rebate 7,000,000 Euros in excessive liquidation fees in the UK after discussions with the UK Ministry of Finance.

193. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) continue to conspire together to steal Mr. Ford's property and interfere with his contracts and business relationships, up to and including today.

194. The organization functions with the KPMG Defendants orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. The meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

195. The KPMG Defendants' enterprise has an existence that is independent of and/or separate from the pattern of racketeering activity in which it engages. The KPMG Defendants have some raison d'etre beyond mere criminality. The association-in-fact enterprise consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

196. The enterprise is an association-in-fact enterprise comprised of the KPMG Defendants, and other persons and entities listed above.

**THE KPMG DEFENDANTS ARE INDIVIDUALS OR ENTITIES SEPARATE FROM THE TIMESHARE FRAUD RICO ENTERPRISE**

197. All the KPMG Defendants are associated with the alleged association in-fact enterprise and each comprises and integral part of the entire scheme as outlined in greater detail above. The KPMG Defendants have orchestrated and meticulously structured the various KPMG Defendant companies and individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

198. The KPMG Defendants are not the enterprise itself.

199. Each KPMG Defendant's role in the association-in-fact enterprise is outlined above. The KPMG Defendants and other, but unidentified, individuals working for the KPMG Defendants are currently and/or have perpetrated racketeering activity and are members of the association-in-fact enterprise. This perpetration of racketeering activity is ongoing as described above.

200. All KPMG Defendants play an integral role in actively furthering the objective of the enterprise. All KPMG Defendants are members of the association-in-fact enterprise. None of the KPMG Defendants were passive instruments or victims. The KPMG Defendants are instruments for racketeering activity and the companies provide necessary and vital components of the KPMG Defendants' scheme and racketeering activity.

201. The pattern of racketeering activity and the enterprise are separate.

202. The RICO enterprise and the RICO activity have not merged into one entity. The KPMG Defendants utilize the various persons and entities to engage in racketeering activity.

The organization functions with the KPMG Defendants orchestrating and meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. This meticulous structure is necessary to accomplish the enterprise's ultimate objectives.

203. The KPMG Defendants' fraud and deception described above are primarily necessary to accomplish the enterprise scheme and requires conduct beyond the purview of legitimate business practices associated with just selling and marketing a timeshare contract.

**THE RELATIONSHIP BETWEEN THE ACTIVITIES OF THE ENTERPRISE AND THE PATTERN OF RACKETEERING ACTIVITY**

204. The racketeering activity differs from the usual and daily activities of the enterprise.

205. The KPMG Defendants' businesses in this case, when combined as an association-in-fact enterprise, provide vital and necessary component services that together facilitate the racketeering activity and fraudulent scheme that any one business or individual could not accomplish standing on its own. The racketeering activity and/or mail fraud and wire fraud arise as the result of fraud.

**THE BENEFITS THAT THE ENTERPRISE RECEIVES FROM THE PATTERN OF RACKETEERING ACTIVITY**

206. The KPMG Defendants benefitted financially from the above racketeering activity by receiving premiums, attorneys' fees, management fees, accounting fees, and liquidation fees as set forth above.

**THE ENTERPRISE ACTIVITIES AFFECT INTERSTATE AND FOREIGN COMMERCE**

207. The KPMG Defendants' telephone, mail, and online solicitations to Ford and Ford's clients reach throughout the United States, the Caribbean, and Europe. The association-

in-fact enterprise is comprised of individuals and business from different states and countries.

208. The KPMG Defendants' racketeering activity has far reaching effects and impacts interstate and foreign commerce.

**PERSONS AND ENTITIES ARE NOT BOTH THE LIABLE "PERSON" AND THE "ENTERPRISE" UNDER 18 U.S.C. § 1962(A)**

209. The Complaint alleges an association-in-fact enterprise, and the association-in-fact is not per se the KPMG Defendants.

210. The KPMG Defendants are all "persons" as defined by RICO in that they are capable of holding a legal or beneficial interest in property.

211. The association-in-fact enterprise is comprised of the KPMG Defendants and the paralegals and secretaries who work for the above attorneys and other Defendants. Those individuals all serve roles in accomplishing the conduct and racketeering activity described above, all associated for the common purpose of engaging in a course of deceptive, illegal, and fraudulent conduct.

**THE KPMG DEFENDANTS ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY**

212. The racketeering activity includes mail fraud and wire fraud. The mail fraud and wire fraud are an intentional, malicious, and knowledgeable participation in a scheme to defraud Ford of money and property and the use of mail and wires in furtherance of the scheme. Defendants, KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler, in furtherance of the association-in-fact enterprise, have committed, and continue to commit, more than 2 and multiple predicate acts of wire fraud and mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

213. Although the annuity contracts, the law, and KPMG BVI, Belmont, Douglas,

McDonald, Beighton, Drury and Crumpler's own admissions prove that assets in annuity policies are segregated from the annuity company, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler continue to this day to take the position in public that annuity policy assets are property of the annuity company and refuse to protect annuity policy assets while charging excessive fees, as in the case of annuitant Fred Best, and other US annuitants.

**CONTINUED CRIMINAL ACTIVITY AND THE THREAT OF CONTINUED CRIMINAL ACTIVITY**

214. The KPMG Defendants have a pattern of stealing the assets from Mr. Ford's, Mary Ford's, and their grandson's annuity, up to and including today. KPMG LLP's website admits the KPMG entities are in a "network" and are "affiliated". It appears KPMG LLP already admits it is in an enterprise -- which Ford alleges is a RICO enterprise. Neil Mitchell sued KPMG about a similar conspiracy to push a company Torex Retail into liquidation and then not protect the assets.

215. Three BLA policyholders, 10 other U.S. clients including an IRA account, and 3 non-U.S. persons lost their money from the KPMG Defendants' RICO conspiracy. Other annuitants lost their money that was supposed to be in segregated accounts. The KPMG Defendants' charging excessive fees caused losses to other persons such as Fred Best. The KPMG Defendants engaged in mail fraud against other policyholders such as Fred Best.

216. The pattern of criminal activity continues to this day. In furtherance of the RICO conspiracy, the KPMG Defendants continue the mail fraud and wire fraud as recently as July 8, 2016, when Drury and Crumpler sent out fraudulent mail and wires asserting a claim on Ford's property on St. Thomas.

217. The KPMG Defendants' actions stealing Ford's annuity assets and St. Thomas property are crimes. Section 812.014, Florida Statutes.

218. KPMG entities is the same “affiliated” “network” as the KPMG Defendants. KPMG just got caught charging other entities with excessive liquidation fees in the UK. KPMG recently had to rebate 7,000,000 Euros in liquidation fees in the UK after discussions with the UK Ministry of Finance.

**THE KPMG DEFENDANTS’ ACTIONS CAUSE INJURY TO FORD’S REPUTATION, BUSINESS AND PROPERTY**

219. As described above, the KPMG Defendants’ deceptive and illegal tactics are designed to ruin Ford’s reputation and steal Ford’s products, clients, and assets.

220. Fraud and stealing business secrets are a violation of public policy, are illegal, and affect interstate commerce.

221. The KPMG Defendants’ fraudulent activities are the sole and proximate cause of Ford’s damages.

**DIRECT CAUSAL RELATIONSHIP BETWEEN THE INJURY AND THE RICO VIOLATIONS**

222. Ford’s injuries are actually and proximately caused by actions of KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler’s,which violate 18 USC Section 1962.

**THE DAMAGES SUSTAINED FOR WHICH EACH KPMG DEFENDANT IS LIABLE**

223. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler bear joint and several liabilities under conspiracy theories alleged in this Complaint. The actions of KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler and the damages attributable to just that component of the enterprise or fraudulent scheme are set forth above.

**PERSONAL JURISDICTION**

## KPMG LLP, DOUGLAS, BELMONT, MCDONALD, BEIGHTON, DRURY, CRUMPLER, AND KPMG (BVI) ARE SUBJECT TO FLORIDA'S LONG-ARM JURISDICTION

### THERE IS SPECIFIC JURISDICTION

224. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) operate, conduct, engage in , and carry on a business or business venture in Florida; they contracted to insure Florida residents at the time of contracting; they are breaching those contracts in Florida by failing to perform acts required by the contract to be performed in this state; they have caused and are causing injury to persons in Florida at the time they were engaged in solicitation and service activities within Florida; products and materials serviced by those Defendants were used by Florida residents; and they are committing fraud in Florida.

225. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG BVI sent letters to US residents stating assets in BLA annuity policy are assets segregated from BLA; represented that Leo Ford, Mary Ford and their grandson (Florida residents) and their annuity policy own the USVI property that is the subject of this case; sent letters to Ford in Florida fraudulently claiming the assets in Ford's annuity policy belong to BLA; conducted business meetings in Miami about the subject matter of this case; and stole Ford's property and transferred Ford's property into a business in Miami that Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG BVI control. Those actions have caused Leo Ford, Mary Ford and her grandson, Florida residents, to suffer economically.

226. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) assumed control of BLA. Therefore, those Defendants contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy.

227. Ford along with Mary Ford have an annuity policy with BLA. Their minor

grandson Kenneth is a beneficiary on that annuity policy. At all times relevant to this case, Mary Ford and Kenneth have been and are Florida residents in Palm Beach County, Florida. At the time the annuity policy commenced, Ford lived in Florida.

228. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) have substantial business activity in the US in this District directly related to this case.

229. All of the mail and wire fraud detailed in the Predicate Acts section of this complaint occurred in Florida and the USVI.

**KPMG LLP**

230. KPMG LLP is located in Miami, represented Ford in Miami, held business meetings in Miami about setting up the RICO enterprise, and recommended to Ford that he use Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG BVI. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG BVI set up the RICO enterprise.

231. KPMG LLP sent fraudulent documents to Ford in Florida.

232. The non-US KPMG Defendants took actions in Florida, and according to KPMG LLP's website, those are the actions of KMPG LLP.

**DOUGLAS**

233. Douglas' tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

234. Douglas assumed control of BLA. BLA, and therefore Douglas contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

235. Douglas has signing authority for Carina, an entity located in Miami, Florida.

Douglas signed a document that states Carina will receive monthly payments "from a trust in Florida".

236. Payments to Carina are from Equitable Bank in Ft. Lauderdale, Florida, and from William Reilly, 15801 Biscayne Blvd., North Miami Beach, Florida.

237. So, Douglas was the administrator -- and Douglas was an authorized signatory -- of an entity located in Miami, Florida, which received payments "from a trust in Florida".

238. Douglas and the other KPMG Defendants claim they transferred property from Ford's annuity policy to Carina, in violation of the annuity policy, BVI and Florida law, and the KPMG Defendants' own representations to Ford and other US annuitants.

**BELMONT**

239. Belmont's tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

240. Belmont assumed control of BLA. BLA, and therefore Beighton contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

241. Belmont is the administrator of an entity in Miami, Florida, named Carina.

242. Douglas worked with Belmont.

243. Payments to Carina are from Equitable Bank in Ft. Lauderdale, Florida, and from William Reilly, 15801 Biscayne Blvd., North Miami Beach, Florida.

244. So, Belmont was the administrator of an entity located in Miami, Florida, which received payments "from a trust in Florida".

245. Belmont and the other KPMG Defendants claim they transferred property from Ford's annuity policy to Carina, in violation of the annuity policy, BVI and Florida law, and

the KPMG Defendants' own representations to Ford and other US annuitants.

**BEIGHTON**

246. Beighton's tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

247. Beighton assumed control of BLA. BLA, and therefore Beighton, contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

248. Beighton sent fraudulent documents to residents in Florida, thereby doing business in Florida and committing torts in Florida.

249. Beighton attended meetings in Miami about BLA and Ford.

250. Beighton controlled an entity named Carina that he claims owns the USVI property. Carina has a Florida address and is funded by a Florida trust and a Florida bank.

251. Beighton takes actions in the United States by asserting a claim to the United States Virgin Islands property owned by Mr. and Mrs. Ford's annuity policy.

252. Beighton is not acting within his authority as he should not have accepted the liquidator assignment due to a conflict of interest.

253. Beighton engaged in commercial activity that has an effect in the United States.

254. Beighton attempted to sell property in the United States Virgin Islands, that belongs to Ford's annuity policy. Beighton to arrange the sale of that property in the USVI. McDonald has asserted that KPMG (BVI) transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by Beighton. Selling investment property and transferring ownership of investment property from one entity (Ford's annuity) to a corporation (the Carina corporation as Beighton asserts) are the type of actions by which a private party engages in trade and commerce.

255. If Beighton is a foreign official, this action against McDonald involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. McDonald, claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by fraud.

256. Beighton took actions against Ford when the BVI Court had entered an order specifically prohibiting them from claiming assets for BLA.

257. Ford is suing Beighton for stealing assets from Ford's annuity policy. Beighton is acting outside his authority as liquidator.

258. Beighton is not acting within his authority as he should not have accepted the liquidator assignment due to a conflict of interest.

259. Beighton has engaged in commercial activity that has an effect in the United States.

260. Beighton attempted to sell property in the United States Virgin Islands, that belongs to Ford's annuity policy. Ford's property was transferred from Ford's annuity policy to a corporation named Carina controlled by Beighton. Selling investment property and transferring ownership of investment property from one entity (Ford's annuity) to a corporation (the Carina corporation as Beighton asserts) are the type of actions by which a private party engages in trade and commerce.

261. Selling investment property and transferring ownership of investment property from one entity (Ford's annuity) to a corporation (the Carina corporation as Crumpler asserts) are the type of actions by which a private party engages in trade and commerce.

262. Beighton engaged in fraud regarding the investment property in the USVI.

263. This action against Beighton involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. Beighton claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by fraud.

264. This action claims money damages for damage to or loss of property occurring in the United States and if Beighton is a foreign state or an official or employee of that foreign state while acting within the scope of his office or employment, Beighton committed tortious acts.

265. These Defendants took actions against Ford when the BVI Court had entered an order specifically prohibiting them from claiming assets for BLA.

266. Beighton's activities have an effect in the United States. He stole assets from Ford's annuity policy, and Mary Ford and their young grandson Kendrick James Ford Bahrnes are beneficiaries of that annuity policy and are residents of Palm Beach County, Florida, USA.

267. Also, Beighton attempted to steal stock in a corporation with a Florida address funded by a Florida trust and a Florida bank that claims owns land in the USVI, and are attempting to steal land in the USVI.

**MCDONALD**

268. McDonald's tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

269. McDonald sent fraudulent documents to residents in Florida, thereby doing business in Florida and committing torts in Florida.

270. McDonald assumed control of BLA. BLA, and therefore McDonald contracted to

insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

271. This action claims money damages for damage to or loss of property occurring in the United States and if McDonald is a foreign state or an official or employee of that foreign state while acting within the scope of his office or employment, McDonald committed tortious acts.

272. McDonald makes claim to the funds from the sale of the USVI property. KPMG BVI's employee McDonald claimed they controlled and control to this day an entity named Carina that he claims owns the USVI property, and Carina has a Florida address and is funded by a Florida trust and a Florida bank.

273. McDonald tried to arrange the sale of Ford's property in the USVI. McDonald has asserted that he transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by McDonald. Carina has a Florida address and is funded by a Florida trust and a Florida bank.

274. KPMG (BVI)'s employees McDonald took actions in the United States by asserting a claim to the United States Virgin Islands property owned by Mr. and Mrs. Ford's annuity policy.

275. McDonald makes claim to the St. Thomas funds in the United States.

276. Ford is suing McDonald for stealing assets from Ford's annuity policy. McDonald acted outside his authority as liquidator.

277. McDonald engaged in commercial activity that has an effect in the United States.

278. McDonald attempted to sell property in the United States Virgin Islands, that belongs to Ford's annuity policy. McDonald is trying to arrange the sale of that property in the

USVI. McDonald has asserted that KPMG (BVI) transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by McDonald. Selling investment property and transferring ownership of investment property from one entity (Ford's annuity) to a corporation (the Carina corporation as McDonald asserts) are the type of actions by which a private party engages in trade and commerce.

279. McDonald is not acting within his authority as they should not have accepted the liquidator assignment due to a conflict of interest.

280. McDonald engaged in fraud regarding the investment property in the USVI.

281. This action against McDonald involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. McDonald, claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by fraud.

282. McDonald took actions against Ford when the BVI Court had entered an order specifically prohibiting them from claiming assets for BLA.

283. McDonald's activities have an effect in the United States. He stole assets from Leo Ford's annuity policy, and Mary Ford and their young grandson Kendrick James Ford Bahrnes are beneficiaries of that annuity policy and are residents of Palm Beach County, Florida, USA. Also, McDonald attempted to steal stock in a corporation with a Florida address funded by a Florida trust and a Florida bank that they claim owns land in the USVI, and are attempting to steal land in the USVI.

**CRUMPLER**

284. Crumpler's tortious conduct in Florida is set forth in the Predicate Acts section of

this Complaint.

285. Crumpler assumed control of BLA. BLA, and therefore Crumpler contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

286. Crumpler is engaging in fraud regarding the investment property in the USVI.

287. This action against Crumpler involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. Crumpler claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by fraud.

288. Crumpler took actions against Ford when the BVI Court had entered an order specifically prohibiting them from claiming assets for BLA.

289. Crumpler's activities have an effect in the United States. He stole assets from Leo Ford's annuity policy, and Mary Ford and their young grandson Kendrick James Ford Bahrnes are beneficiaries of that annuity policy and are residents of Palm Beach County, Florida, USA. Also, Crumpler is attempting to steal stock in a corporation with a Florida address funded by a Florida trust and a Florida bank that he claims owns land in the USVI, and is attempting to steal land in the USVI.

290. This action claims for damage to or loss of property and money occurring in the United States and if Crumpler is a foreign state or an official or employee of that foreign state while acting within the scope of his office or employment, Crumpler committed tortious acts.

291. Crumpler attempted and is attempting to sell property in the United States Virgin Islands, that belongs to Ford's annuity policy. Crumpler is trying to arrange the sale of that

property in the USVI. Crumpler has asserted that KPMG (BVI) transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by Crumpler and the KPMG Defendants. Selling investment property and transferring ownership of investment property from one entity (Ford's annuity) to a corporation (the Carina corporation as Crumpler asserts) are the type of actions by which a private party engages in trade and commerce.

292. Drury sent two emails from Drury (Senior Manager of KPMG (BVI)) on behalf of Crumpler on KPMG (BVI) letterhead to Ford in Florida dated July 10, 2016, in which include Crumpler and Drury continue the RICO conspiracy by engaging in two new predicate acts of mail fraud and wire fraud by sending fraudulent communications and refusing to agree to, interfering with, and making an affirmative claim to Ford's right to the proceeds of the sale of the United States Virgin Islands property.

293. Crumpler makes claim to the St. Thomas funds in the United States.

294. Ford is suing Crumpler for stealing assets from Ford's annuity policy. Crumpler is acting outside his authority as liquidator.

295. Crumpler is not acting within his authority as he should not have accepted the liquidator assignment due to a conflict of interest.

296. Crumpler has engaged in commercial activity that has an effect in the United States.

**DRURY**

297. Drury's tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

298. Drury assumed control of BLA. BLA, and therefore Drury contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had

meetings in Florida about BLA.

299. Drury sent fraudulent documents to residents in Florida, thereby doing business in Florida and committing torts in Florida.

300. This action claims money damages for damage to or loss of property and money occurring in the United States and if Drury is a foreign state or an official or employee of that foreign state while acting within the scope of his office or employment, Drury committed tortious acts.

301. Drury makes claim to the funds from the sale of the USVI property. Drury claims he controlled and controls to this day an entity named Carina that he claims owns the USVI property, and Carina has a Florida address and is funded by a Florida trust and a Florida bank.

302. Drury tried to arrange the sale of Ford's property in the USVI. Drury has asserted that he transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by Drury. Carina has a Florida address and is funded by a Florida trust and a Florida bank.

303. Drury took actions in the United States by asserting a claim to the United States Virgin Islands property owned by Mr. and Mrs. Ford's annuity policy.

304. Drury makes claim to the St. Thomas funds in the United States.

305. Ford is suing Drury for stealing assets from Ford's annuity policy. Drury acted outside his authority as liquidator.

306. Drury engaged in commercial activity that has an effect in the United States.

307. Drury is not acting within his authority as they should not have accepted the liquidator assignment due to a conflict of interest.

308. Drury engaged in fraud regarding the investment property in the USVI.

309. This action against Drury involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. Drury claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by fraud.

310. Drury took actions against Ford when the BVI Court had entered an order specifically prohibiting them from claiming assets for BLA.

311. Drury's activities have an effect in the United States. He stole assets from Leo Ford's annuity policy, and Mary Ford and their young grandson Kendrick James Ford Bahrnes are beneficiaries of that annuity policy and are residents of Palm Beach County, Florida, USA. Also, Drury attempted to steal stock in a corporation with a Florida address funded by a Florida trust and a Florida bank that they claim owns land in the USVI, and are attempting to steal land in the USVI.

312. Drury is engaging in fraud regarding the investment property in the USVI.

313. This action claims money damages for damage to or loss of property occurring in the United States and caused by the tortious act of that foreign state or of an official or employee of that foreign state while acting within the scope of his office or employment, and the claim is conversion.

**KPMG (BVI)**

314. KPMG BVI's tortious conduct in Florida is set forth in the Predicate Acts section of this Complaint.

315. KPMG BVI assumed control of BLA. BLA, and therefore McDonald, contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy. McDonald had meetings in Florida about BLA.

316. KPMG BVI sent fraudulent documents to residents in Florida, thereby doing

business in Florida and committing torts in Florida.

317. This action claims money damages for damage to or loss of property and money occurring in the United States and if KPMG BVI is a foreign state or an official or employee of that foreign state while acting within the scope of his office or employment, KPMG BVI committed tortious acts.

318. KPMG BVI makes claim to the funds from the sale of the USVI property. KPMG BVI claims he controlled and controls to this day an entity named Carina that he claims owns the USVI property, and Carina has a Florida address and is funded by a Florida trust and a Florida bank.

319. KPMG BVI tried to arrange the sale of Ford's property in the USVI. KPMG BVI has asserted that he transferred ownership of that property from Ford's annuity policy to a corporation named Carina controlled by KPMG BVI. Carina has a Florida address and is funded by a Florida trust and a Florida bank.

320. KPMG BVI took actions in the United States by asserting a claim to the United States Virgin Islands property owned by Mr. and Mrs. Ford's annuity policy.

321. KPMG BVI makes claim to the St. Thomas funds in the United States.

322. Ford is suing KPMG BVI for stealing assets from Ford's annuity policy. KPMG BVI engaged in commercial activity that has an effect in the United States.

323. KPMG BVI engaged in fraud regarding the investment property in the USVI.

324. This action against KPMG BVI involves rights in property taken in violation of international law. That property is present in the United States Virgin Islands. KPMG BVI claims the liquidators, the liquidation estate, or the corporation named Carina owned by BLA and the liquidation estate owns the USVI property. Ford claims that property was taken by

fraud.

325. KPMG BVI's activities have an effect in the United States. It stole assets from Leo Ford's annuity policy, and Mary Ford and their young grandson Kendrick James Ford Bahrnes are beneficiaries of that annuity policy and are residents of Palm Beach County, Florida, USA. Also, KPMG BVI attempted to steal stock in a corporation with a Florida address funded by a Florida trust and a Florida bank that they claim owns land in the USVI, and are attempting to steal land in the USVI.

326. KPMG BVI is engaging in fraud regarding the investment property in the USVI.

327. If KPMG BVI is a foreign official, this action claims money damages for damage to or loss of property occurring in the United States and caused by the tortious act of that foreign state or of an official or employee of that foreign state while acting within the scope of his office or employment.

328. KPMG (BVI) employees sent many letters and emails to Florida about this case stating the matter was being handled pursuant to "KPMG's policy" and "the job is staffed by KPMG employees".

329. KPMG (BVI)'s own lawyer admits KPMG (BVI) has no legal claim to the proceeds of the sale of the USVI property, but KPMG (BVI) sent letter after letter (as will be shown below) including the July 10, 2016 letter to Mr. and Mrs. Ford in Florida and other US annuitants claiming money from the sale of the USVI property.

330. Beighton advertises on the internet that he works for KPMG BVI (British Virgin Islands). So Beighton must have sent all those fraudulent documents to Florida residents, attended those meetings in Miami, and filed all those lawsuits and other documents in the US on behalf of KPMG BVI.

## KPMG LLP, DOUGLAS, BELMONT, MCDONALD, BEIGHTON, DRURY, CRUMPLER, AND KPMG (BVI) HAVE SUFFICIENT INDIVIDUAL CONTACTS WITH FLORIDA WHICH ARE ARE SUBSTANTIAL, SYSTEMATIC, AND CONTINUOUS TO ESTABLISH GENERAL JURISDICTION

331. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) are engaged in substantial and not isolated activity in Florida**.**

### KPMG LLP

332. KPMG LLP is located in Miami, represented Ford in Miami, held business meetings in Miami about setting up the RICO enterprise, and recommended to Ford that he use Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI), all of whom set up the RICO enterprise.

### DOUGLAS

333. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) assumed control of BLA. Therefore, those Defendants contracted to insure Mary Ford and her grandson in Florida by virtue of the annuity policy.

334. Ford along with Mary Ford have an annuity policy with BLA. Their minor grandson Kenneth is a beneficiary on that annuity policy. At all times relevant to this case, Mary Ford and Kenneth have been and are Florida residents in Palm Beach County, Florida. At the time the annuity policy commenced, Ford lived in Florida.

335. Douglas is the administrator of an entity in Miami, Florida, named Carina.

336. Douglas has signing authority for Carina, an entity located in Miami, Florida. Douglas signed a document that states Carina will receive monthly payments "from a trust in Florida".

337. Payments to Carina are from Equitable Bank in Ft. Lauderdale, Florida, and from William Reilly, 15801 Biscayne Blvd., North Miami Beach, Florida.

338. So, Douglas is the administrator -- and Douglas was an authorized signatory -- of an entity located in Miami, Florida, which received payments "from a trust in Florida".

**BELMONT**

339. Belmont is the administrator of an entity in Miami, Florida, named Carina.

340. Douglas worked with KPMG BVI and then Belmont.

341. Payments to Carina are from Equitable Bank in Ft. Lauderdale, Florida, and from William Reilly, 15801 Biscayne Blvd., North Miami Beach, Florida.

342. So, Belmont was the administrator -- and Douglas was an authorized signatory -- of an entity located in Miami, Florida, which received payments "from a trust in Florida".

**BEIGHTON**

343. Beighton admitted in an affidavit he has attended business meetings in Florida not related to this case.

344. Beighton ships goods through the Port of Miami.

345. Beighton has represented to the United States District Court for the Eastern District of Virginia that he is "a partner of the international professional services and auditing firm KPMG".

346. Beighton advertises he has been doing liquidations in the United States for 15 years.

347. Beighton has filed a lawsuit in the United States District Court for the Eastern District of Virginia.

348. Beighton has filed a lawsuit in the United States District Court for the District of New Jersey.

349. Beighton has filed a lawsuit in the United States District Court for the Northern District of Texas.

350. Beighton has managed a business in Houston, Texas.

351. Beighton has done business with the Bank of New York.

352. Beighton has signed and filed documents with the United States Securities and Exchange Commission.

353. Beighton has engaged in commercial activity that has an effect in the United States.

**MCDONALD**

354. McDonald sent letters to US residents stating assets in BLA annuity policy are assets segregated from BLA.

355. McDonald is a liquidator in US Courts.

356. McDonald advertises that for 15 years he has been appointed as a fiduciary in North America.

357. McDonald is a member of the American Bankruptcy Institute.

**CRUMPLER**

358. Crumpler admits he has had business meetings in Florida.

359. Crumpler speaks at conferences in the US.

**DRURY**

360. Drury has filed lawsuits in the US Courts.

361. Drury advertises he is an expert in US law.

**KPMG (BVI)**

362. KPMG (BVI) sent letter after letter (as will be shown below) including the July 10, 2016 letter to Mr. and Mrs. Ford in Florida and other US annuitants claiming money from the sale of the USVI property.

**DUE PROCESS IS SATISFIED**

363. Douglas, Belmont, KPMG BVI, McDonald, Beighton, Drury, and Crumpler are certainly willing to come to Florida to give seminars and solicit Florida clients, conduct and control the Florida business Carina funded by a Florida trust and Florida bank, and send fraudulent mail to Florida. They advertise they do liquidations in the US. KPMG BVI advertises it is an international accounting firm. They are used to working in other jurisdictions, especially in Florida.

364. Florida has an interest in adjudicating the suit

365. This case is not limited to actions in the BVI liquidation case. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) stole Ford's insurance products, stole his assets, ruined his reputation, and damaged him personally.

366. Florida and the Florida courts have an interest in protecting Florida residents like Mary Ford and her grandson from having their benefits in an annuity policy stolen. The public interest for this Court is to prevent an entity and persons, like Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI), who insured Florida residents, who committed torts in the US, who attempted to steal property in the US, who admitted annuity policy assets are segregated from BLA, who violated the terms of the annuity policy, from stealing from Florida residents and beneficiaries in the United States.

367. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) admit they control a company called Carina that has a Florida address and is funded by a Florida trust and a Florida bank.

368. Ford has an interest in obtaining effective relief.

369. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) have admitted the assets in the BLA annuity should be segregated from the company. The

terms of the annuity policy state the assets in the BLA annuity are segregated from the company. Yet, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) still seek to usurp control and steal the assets in Leo Ford's, Mary Ford's and their grandson Kenneth's annuity policy.

370. The interstate judicial system has an interest in using resources efficiently

371. All the evidence is not in the BVI. There are witnesses and records in Florida -- KPMG, Greenberg, Mary Ford, and her grandson. Ford lives in Panama, and his evidence is in Florida and Panama. The witnesses and evidence about the St. Thomas property are in Florida and St. Thomas. Former Defendant but still witness Barros is in Delaware. Certainly, all the parties and witnesses are not in the BVI, only the few KPMG Defendants.

372. The states have an interest in furthering shared substantive policies

373. The KPMG Defendants have engaged in a continuous and widespread RICO enterprise, not only as to the Fords, but also as to other annuitants in other states.

374. KPMG (BVI) sent letters to US residents asserting annuity assets are segregated from BLA and then committed intentional mail fraud in Florida by lying about the assets in Ford's annuity policy. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) claim their actions are protected because they are liquidators and therefore control BLA. Thus, they insured Palm Beach County, Florida residents Mary Ford and her grandson, and then stole their assets. And there is no recourse for those Florida annuitants.

375. The KPMG Defendants conduct seminars in Florida, manage a company in Miami funded by a Florida trust and bank, advertise they have done liquidations in the United States for 15 years, and send mail fraud to Florida residents.

**THE ESSENTIAL ELEMENTS OF A RICO CLAIM**
**CONDUCT AND INJURIES THAT ARE NOT DOMESTIC**

376. The KPMG Defendants stole annuity assets that insure Florida residents, committed the same fraud as to other US annuitants, and are attempting to steal Ford's property in the United States Virgin Islands.

377. KPMG LLP's website admits the KPMG entities are in a "network" and are "affiliated". It appears KPMG already admits it is in an enterprise -- which Ford alleges is a RICO enterprise.

378. The website also states: "Services are only provided by member firms in their respective geographic areas". So, the actions in the United States of KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury, and Crumpler were necessarily actions by KPMG LLP.

**VENUE**

379. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the alleged events giving rise to the original claim occurred and continue to occur in this District. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) conduct business in this District and/or reside in this District. The KPMG Defendants' fraudulent activities occurred within this District.

380. The real estate at issue is on St. Thomas, not the British Virgin Islands (BVI). All the witnesses and evidence about the St. Thomas property are in Florida and on St. Thomas.

381. BLA contracted to ensure and hold assets in a separate and segregated account with fiduciary responsibility for Ford, Mary Ford and their minor grandson in Florida by virtue of the annuity policy.

382. Ford resides in Panama, and his evidence is in Florida.

383. There is no adequate potential remedy for Ford in the BVI and the substantive matters in the BVI case are not the same as the substantive matters in this case. There are no

U.S. Federal RICO claims at issue in the BLA BVI liquidation to address the RICO enterprise set up by KPMB LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI), and the other RICO conspirators to ruin Ford's reputation, steal his insurance products, set up a competitor, and steal Ford's assets.

384. Ford is not claiming assets of or a more favorable distribution of assets of BLA. Ford is claiming assets of his annuity policy and his own assets, insurance products, and reputation stolen by the Defendants.

385. McDonald's, Beighton's, Drury's, Crumpler's and KPMG (BVI)'s own letters and emails prove they took many actions regarding the RICO conspiracy, not just in the USVI, but also in Florida.

386. Defendants come to Miami for business meetings.

387. Two of the joint liquidators, Beighton and McDonald, live in the Cayman Islands, not the BVI.

388. Defendants have not asserted the file about this case is in the BVI.

389. The beneficiaries of Ford's annuity policy reside in Palm Beach County, Florida. Leo Ford, Mary Ford, and their grandson Kenneth are individuals. KPMG is a giant corporation. The individuals should not have to litigate out of their country and out of their judicial district just for the convenience of a giant corporation.

390. The real estate at issue is on St. Thomas, not in the BVI. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) took actions in Florida and St. Thomas.

391. The only witnesses in the BVI are some KPMG employees. All other parties, witnesses, and evidence are in Florida (KPMG in Miami, Mary Ford and her grandson,

Greenberg Traurig), St. Thomas (the St. Thomas co-owners, corporation, property, and documents), Delaware (Barros), Panama (Leo Ford), and the Cayman Islands (Beighton and Mcdonald). Witnesses and evidence about the St. Thomas property are on St. Thomas.

392. BVI is not more convenient for Mary Ford and her grandson, Leo Ford who lives in Panama, the St. Thomas witnesses, and the other US defendants. In fact, other than the few KPMG Defendants who reside in the BVI, all the other defendants and witnesses are going to have to travel through this judicial district, Miami, to travel to the BVI.

393. In a case with many parties, the only parties in the BVI are some, but not all, of the KPMG Defendants.

394. The only evidence and witnesses in the BVI are some, but not all, the KPMG agents.

395. BVI courts cannot make any of the non-BVI witnesses appear. This Court has compulsory process over every witness in this case except those few KPMG employees in the BVI and the Caymans.

396. The annuity policy itself states annuity policy assets must be held in a segregated account, separate from the general assets of BLA. Beighton and KPMG BVI have admitted in letters sent to the US that such an annuity policy is separate from BLA and therefore not part of a liquidation estate.

397. KPMG LLP, Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) ignoring the local interests of Florida resident annuity policy beneficiaries is exactly what this case is about. The public interest for this Court is to prevent people and entities who commit torts in the US (mail fraud in Florida, who attempt to steal real property in the US, who wrote letters to the US admitting annuity policy assets are segregated from BLA,

who violate the terms of the annuity policy and who steal annuity assets from Florida residents and beneficiaries (Mary Ford and her grandson Kenneth).

398. Douglas, Belmont, McDonald, Beighton, Drury, Crumpler, and KPMG (BVI) committed torts, mail fraud, in Florida and are stealing assets from Florida residents.

## CAUSES OF ACTION

## COUNT I

## CIVIL RICO – 28 U.S.C. § 1962

399. Plaintiff adopts, reiterates, incorporates by reference and re-alleges paragraphs 1-398 as if each were set forth separately herein.

400. The KPMG Defendants, their agents and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact enterprise. The various KPMG Defendants/companies function together as a continuing unit.

401. From on or about 2005 to present, the KPMG Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including multiple acts of mail fraud, wire fraud, and/or financial fraud.

402. The KPMG Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. Defendants' acts of mail fraud, wire fraud, and other fraud are occurring on an ongoing and daily basis targeting Ford's clients and reputation.

403. The KPMG Defendants participate in this association-in-fact enterprise for purposes of generating substantial financial gain on an ongoing and continuing basis. Defendants have been profiting from their activities since at least 2005.

404. The KPMG Defendants utilize wire fraud, mail fraud, and/or other fraud to accomplish, facilitate or further the enterprise's fraudulent scheme, and the KPMG Defendants' actions are violations of public policy, violations of state statutes, and affect interstate commerce. The nature of the KPMG Defendants' predicate acts, business model, and organizational structure involves a distinct threat of long-term racketeering activity.

405. The KPMG Defendants have the same or similar purposes, results, participants, victims, and methods of commission, and are interrelated by distinguishing characteristics, specific hierarchy and meticulous organization. The acts committed by the KPMG Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal and predatory practices occurring on a daily basis. The KPMG Defendants are associated in such a manner as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise.

406. The organization's hierarchy is detailed above in this Complaint. The purpose of the scheme and the KPMG Defendants' intent is to fraudulently ruin Ford's reputation and steal Ford's products, assets, and clients, through mail and wire fraud.

407. The enterprise functions by meticulously structuring various companies and multiple individuals, all within the enterprise and all necessary to accomplish each step or aspect of the fraudulent scheme. The meticulous structure is further necessary to accomplish the enterprise's ultimate objectives.

408. The KPMG Defendants' enterprise has an existence that is independent to and/or

separate from the pattern of racketeering activity in which it engages. The KPMG Defendants have some raison d'etre beyond mere criminality. The association-in-fact enterprise in this case consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose.

409. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler submit fraudulent documents to by U.S. Mail, FedEx, or UPS, and Ford has relied to his detriment upon KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's representations contained in the documents.

410. By reason of the KPMG Defendants' actions, Ford has been damaged.

411. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's mail and wire fraud are in direct violation of 18 U.S.C. 1343, 1341, 1344, 1962, 1831, 1832, and 1957.

412. The KPMG Defendants' actions are intentional.

413. Ford is entitled to collect treble damages, attorney's fees and any other relief applicable under 18 U.S.C. § 1962.

**COUNT II**

**CIVIL RICO**

**28 U.S.C. § 1962(d)**

414. Plaintiff adopts, reiterates, incorporates by reference and re-alleges paragraphs 1 – 413 as if each were set forth separately herein.

415. Ford has been injured by reason of KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's conspiracy to violate 18 U.S.C. § 1962, and KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumplers

conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of other parts of 18 U.S.C. § 1962. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's act in concert and conspire to profit financially by defrauding Ford of his assets, products, clients, and reputation. The KPMG Defendants act in concert to utilize fraudulent, deceptive, and illegal tactics. KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler earn substantial profits off the scheme. A civil conspiracy between the KPMG Defendants is a vital and integral aspect in accomplishing the KPMPG Defendants' unlawful purposes. The complexity of the KPMG Defendants' organizational structure and methodology clearly shows that each KPMG Defendant acts with a common purpose supported by a concerted action to defraud. Each KPMG Defendant intends to defraud, that intent is common to each KPMG Defendant, and each KPMG Defendant understands that the others intend to defraud.

416. Plaintiff has been injured by the KPMG Defendants' conspiracy to violate 18 U.S.C. § 1962, and the KPMG Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of the KPMG Defendants' violation of subsection (c).

417. A civil conspiracy between the KPMG Defendants is a vital and integral aspect to accomplishing the KPMG Defendants' unlawful purposes.

418. The complexity of the organizational structure and the method of transaction clearly reflect that each KPMG Defendant has a common purpose supported by a concerted action to defraud. Each KPMG Defendant had the intent to defraud, that intent was common to each KPMG Defendant, and each KPMG Defendant had the understanding that the others had the intent to defraud.

419. Plaintiff is entitled to treble damages, attorney's fees and any other relief

applicable under 18 U.S.C. § 1962(d).

## AS TO ALL COUNTS: STATUTE OF LIMITATIONS AND EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

### STATUTE OF LIMITATIONS

420. Ford first learned of his injury and the source of his injury after April 21, 2012, when Ford received and read an email and a Memorandum in Civil Action No. 10, subsequently investigated the claims.

421. The KPMG Defendants had an intent to defraud and that a prudent person would have been deceived. Ford engaged in due diligence to try to find out about the KPMG Defendants' management of BLA, but the KPMG Defendants prevented him from doing so.

422. When Ford started to investigate the conspiracy, and learned Barros had diverted $2,700,000 from Ford, and Barros, Greenberg and the KPMG Defendants had stolen Ford's work product and formed and actively promoted a competitor to their client Ford. Ford first learned of his injury and the source of his injury after April 21, 2012, during his subsequent investigation.

423. The KPMG Defendants prevented Ford from learning what was happening with BLA).

424. During the time that KPMG BVI, Belmont, and Douglas managed BLA, and during the liquidation by Beighton, McDonald, Drury, and Crumpler, Ford was excluded from information and decisions about BLA and Ford's assets. Despite Ford's due diligence to learn what was going on with BLA and what Beighton, McDonald, Drury, and Crumpler were doing about BLA and Ford's assets and products, Ford did not learn about the conspiracy or his injury in fact until he read a Memorandum in Civil Action No. 10 on April 21, 2012, and subsequently investigated the claims.

425. While the KPMG Defendants managed and ran BLA, they failed and refused to keep Mr. Ford informed as to the operations of BLA and the liquidation. The KPMG Defendants prevented Ford from learning what was going on with BLA. The KPMG Defendants informed Ford that he could not make a claim. Ford attempted to discover matters about BLA, but the KPMG Defendants refused to provide Ford with information about BLA while the KPMG Defendants managed BLA before, during, and after the liquidation.

426. Ford did not know and should not have known about his injury before four years prior to the date the complaint was filed, and Ford tried to find out information but the KPMG Defendants prevented him from learning the status of BLA and told Ford he could not file a claim.

427. Any applicable statutes of limitation have either been delayed in their triggering event(s) or have been suspended in their operation by virtue of the equitable tolling principles, the "discovery rule," and/or related rules and doctrines.

428. As previously alleged, Defendants fraudulently and deliberately concealed their fraudulent and scandalous wire and mail fraud by purportedly working for and representing Ford while at the same time and without disclosing to Ford and hiding from Ford that Defendants were stealing Ford's products and annuity assets, setting up competing businesses, and stealing Ford's clients, and by concealing from Ford the actions of the liquidators. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler purposely excluded Ford from knowing information about BLA and the BLA liquidation. KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler' actions were calculated to deceive Ford and prevent discovery of wrongdoing, and which did in fact deceive Ford and prevent discovery of wrongdoing.

429. Ford attempted to ascertain KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's actions regarding BLA and the liquidation. Ford could not reasonably have discovered the fraudulent nature of KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's transactions until Ford learned of the Bancroft court case described above on April 21, 2012, and then begin investigating the claims and evidence in that case.

430. Many of acts and omissions complained of herein are ongoing and continuing in nature and persist through July 8, 2016, and continue today.

431. As a consequence of the foregoing, the Court should determine that no portion of any cause of action herein is barred by any applicable statute of limitations or by the equitable doctrine of laches.

**PRAYER FOR RELIEF**

WHEREFORE, Ford respectfully requests as follows:

a. Actual and compensatory damages against KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler, jointly and severally, in an amount to be determined at trial.

b. Civil penalties to the fullest extent allowed by law.

c. Costs, losses and fees related to the substantial resources needed to investigate and prosecute KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's willful and malicious actions.

d. Disgorgement of KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler's unjust enrichment.

e. Punitive and exemplary damages against KPMG LLP, KPMG BVI, Belmont, Douglas, McDonald, Beighton, Drury and Crumpler, jointly and severally, in an amount to be

determined at trial.

f. An award of treble damages.

g. Reasonable attorneys' fees, costs and expenses.

h. An award of pre- and post- judgment interest on any award of damages to the fullest extent allowed by law.

**JURY DEMAND**

*(The remainder of this page is intentionally left blank.)*

Ford hereby demands a trial by jury as to all issues raised herein.


/s/ Paul Platte
PAUL PLATTE, ESQUIRE
FLORIDA BAR NO. 298298
PAUL PLATTE PA
611 S. Ft. Harrison Ave., Suite 252
Clearwater, FL 33756
Telephone: 727.474.1011
Email: paul@paulplatte.com


I have read the Second Amended Complaint, and the allegations in the Second Amended Complaint are true and correct to the best of my personal knowledge.

____________________
Leo Ford

NOTARY PUBLIC
COUNTRY OF PANAMA

The foregoing instrument was acknowledged before me this 13 day of April, 2018, by Leo Ford who has produced a passport as identification.

Lic. Jorge E. Gantes S.
Notario Público Quinto
Notary Public
Print Name:
My commission expires: 01-Jul-2018

(Seal)

REPUBLICA DE PANAMA
NOTARIA QUINTA DEL CIRCUITO

NOTARIA QUINTA
Lcdo. Jorge E. Gantes S.
VERIFICADO POR:
FECHA: 13-4-18